# 23-476

## In the
## United States Court of Appeals
### For the Second Circuit



CANDICE D'CUNHA,

*Plaintiff-Appellant,*

v.

NORTHWELL HEALTH SYSTEMS,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX

LLOYD LEMMON, PLLC
*Attorneys for Plaintiff-Appellant*
15 Chester Street
Front Royal, Virginia 22630
(540) 631-4081

LITTLER MENDELSON, P.C.
*Attorneys for Defendant-Appellee*
290 Broadhollow Road, Suite 305
Melville, New York 11747
(631) 247-4713

APPELLATE INNOVATIONS
(914) 948-2240

19519

i

# Table of Contents

**Page**

Docket Entries ............................................................................ JA-1

Amended Complaint, Dated February 24, 2022 .......................... JA-7

    Exhibit A to Amended Complaint -
    Request for Religious Exemption by Candice D'Cunha,
    Dated September 3, 2021 .........................................................JA-17

    Exhibit B to Amended Complaint -
    Request for Medical Exemption by Candice D'Cunha,
    Dated September 9, 2021 .........................................................JA-21

    Exhibit C to Amended Complaint -
    Denial Letter for Medical Exemption Request from
    Northwell Health Human Resources to Candice D'Cunha,
    Dated September 20, 2021 .......................................................JA-30

    Exhibit D to Amended Complaint -
    Denial Letter for the Appeal of Medical Exemption
    Request from Northwell Health Human Resources to
    Candice D'Cunha, Dated September 29, 2021 ........................JA-32

    Exhibit E to Amended Complaint -
    Screenshot of Kate Rafla Chat ................................................JA-34

    Exhibit F to Amended Complaint -
    Denial Letter for Religious Exemption Request from
    Northwell Health Human Resources to Candice D'Cunha,
    Dated October 1, 2021 ............................................................JA-35

    Exhibit G to Amended Complaint -
    Termination Letter from Brahim Ardolic, MD to
    Candice D'Cunha, Dated September 28, 2021 ........................JA-37

    Exhibit H to Amended Complaint -
    Termination Letter from Amy Durante to Candice D'Cunha,
    Dated October 5, 2021, with Attachments ...............................JA-39

    Exhibit I to Amended Complaint -
    Second Termination Letter from Northwell Health Human
    Resources to Candice D'Cunha, Dated October 7, 2021 .........JA-48

    Exhibit J to Amended Complaint -
    Transcript of Proceedings, Dated November 22, 2021 .............JA-49

ii

**Page**

Exhibit K to Amended Complaint -
Report of the Adverse Action Review Committee,
Dated December 23, 2021 ........................................................JA-143

Exhibit L to Amended Complaint -
Notice of Right to Sue from EEOC to Candice D'Cunha,
Dated November 5, 2021 .........................................................JA-154

Declaration of Daniel Gomez-Sanchez, for Defendant, in
Support of Motion, Dated June 7, 2022 ...................................JA-159

Exhibit 1 to Gomez-Sanchez Declaration -
Candice D'Cunha's Two Charges of Discrimination,
Dated October 26, 2021 ..........................................................JA-161

Memorandum Opinion and Order of Honorable
Mary Kay Vyskocil Granting Motion to Dismiss,
Dated February 28, 2023 ..........................................................JA-163

Judgment of The United States District Court Southern District
of New York, Dated March 1, 2023, with Attachments ...........JA-174

Notice of Appeal, Dated March 30, 2023 ....................................JA-185

JA-1

**Query    Reports    Utilities    Help    Log Out**

CLOSED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:22-cv-00988-MKV

| | |
|---|---|
| D'Cunha v. Northwell Health Systems | Date Filed: 02/03/2022 |
| Assigned to: Judge Mary Kay Vyskocil | Date Terminated: 03/01/2023 |
| Cause: 42:2000e-2sx Job Discrimination (Sex) | Jury Demand: Plaintiff |
| | Nature of Suit: 442 Civil Rights: Jobs |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Candice D'Cunha**                represented by    **Edward Scott Lloyd**
Lloyd Law Group, PLLC
20 E. 8th Street
Suite 3
Front Royal, VA 22630
540-631-4081
Email: scott@lloydlemmon.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Northwell Health Systems**        represented by    **Daniel Sergio Gomez-Sanchez**
Littler Mendelson, P.C.
290 Broadhollow Road Suite 305
Melville, NY 11747
(631) 247-4700
Fax: 631-824-9249
Email: dsgomez@littler.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kimberly Wilkens**
Littler Mendelson
290 Broadhollow Road
Melville, NY 11747
631-247-4700
Email: kwilkens@littler.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/03/2022 | 1 | COMPLAINT against Northwell Health Systems. (Filing Fee $ 402.00, Receipt Number ANYSDC-25684571)Document filed by Candice D'Cunha.(Lloyd, Edward) (Entered: |

JA-2

| | | 02/03/2022) |
|---|---|---|
| 02/03/2022 | 2 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Edward Scott Lloyd to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25684626. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Candice D'Cunha..(Lloyd, Edward) Modified on 2/4/2022 (bcu). (Entered: 02/03/2022) |
| 02/04/2022 | | **\*\*\*NOTICE TO ATTORNEY TO ELECTRONICALLY FILE CIVIL COVER SHEET. Notice to Attorney Edward Scott Lloyd. Attorney must electronically file the Civil Cover Sheet. Use the event type Civil Cover Sheet found under the event list Other Documents.** (vf) (Entered: 02/04/2022) |
| 02/04/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Edward Scott Lloyd. The party information for the following party/parties has been modified: Northwell Health System; Candice D'Cunha. The information for the party/parties has been modified for the following reason/reasons: party name contained a typographical error; party role was entered incorrectly.** (vf) (Entered: 02/04/2022) |
| 02/04/2022 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 2 MOTION for Edward Scott Lloyd to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25684626. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Proposed Order; Missing Attorney Affidavit as Per Local Rule 1.3;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (bcu)** (Entered: 02/04/2022) |
| 02/04/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Mary Kay Vyskocil. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(vf) (Entered: 02/04/2022) |
| 02/04/2022 | | Magistrate Judge Debra C. Freeman is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (vf) (Entered: 02/04/2022) |
| 02/04/2022 | | Case Designated ECF. (vf) (Entered: 02/04/2022) |
| 02/04/2022 | 3 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** AMENDED MOTION for Edward Scott Lloyd to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Candice D'Cunha..(Lloyd, Edward) Modified on 2/7/2022 (bcu). (Entered: 02/04/2022) |
| 02/04/2022 | 4 | PROPOSED ORDER. Document filed by Candice D'Cunha. Related Document Number: 3 ..(Lloyd, Edward) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 02/04/2022) |
| 02/04/2022 | 5 | CIVIL COVER SHEET filed..(Lloyd, Edward) (Entered: 02/04/2022) |
| 02/07/2022 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 3 AMENDED MOTION for Edward Scott Lloyd** |

| | | |
|---|---|---|
| | | to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): Missing Proposed Order. Proposed Order Should Not Be Filed Separately For PHV;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (bcu) (Entered: 02/07/2022) |
| 02/07/2022 | 6 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Edward Scott Lloyd to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Candice D'Cunha..(Lloyd, Edward) Modified on 2/8/2022 (bcu). (Entered: 02/07/2022) |
| 02/08/2022 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 6 MOTION for Edward Scott Lloyd to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): Attorney Affidavit not notarized Per Local Rule 1.3;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (bcu)** (Entered: 02/08/2022) |
| 02/08/2022 | 7 | MOTION for Edward Scott Lloyd to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Candice D'Cunha.. (Lloyd, Edward) (Entered: 02/08/2022) |
| 02/09/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 7 MOTION for Edward Scott Lloyd to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 02/09/2022) |
| 02/09/2022 | 8 | ORDER granting 7 Motion for Edward Scott Lloyd to Appear Pro Hac Vice (HEREBY ORDERED by Judge Mary Kay Vyskocil)(Text Only Order) (rz) (Entered: 02/09/2022) |
| 02/24/2022 | 9 | **FILING ERROR - DEFICIENT PLEADING - ERROR -** AMENDED COMPLAINT amending 1 Complaint against Northwell Health Systems with JURY DEMAND.Document filed by Candice D'Cunha. Related document: 1 Complaint..(Lloyd, Edward) Modified on 2/25/2022 (vf). (Entered: 02/24/2022) |
| 02/24/2022 | 10 | AMENDED COMPLAINT amending 1 Complaint against Northwell Health Systems with JURY DEMAND.Document filed by Candice D'Cunha. Related document: 1 Complaint.. (Lloyd, Edward) (Entered: 02/24/2022) |
| 03/28/2022 | 11 | NOTICE OF APPEARANCE by Daniel Sergio Gomez-Sanchez on behalf of Northwell Health Systems..(Gomez-Sanchez, Daniel) (Entered: 03/28/2022) |
| 03/28/2022 | 12 | NOTICE OF APPEARANCE by Kimberly Wilkens on behalf of Northwell Health Systems..(Wilkens, Kimberly) (Entered: 03/28/2022) |
| 03/30/2022 | 13 | WAIVER OF SERVICE RETURNED EXECUTED. Northwell Health Systems waiver sent on 3/3/2021, answer due 5/2/2021. Document filed by Northwell Health Systems.. (Gomez-Sanchez, Daniel) (Entered: 03/30/2022) |
| 04/29/2022 | 14 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Northwell Health Systems..(Gomez-Sanchez, Daniel) (Entered: 04/29/2022) |
| 04/29/2022 | | NOTICE OF REDESIGNATION TO ANOTHER MAGISTRATE JUDGE. The above entitled action has been redesignated to Magistrate Judge Valerie Figueredo. Please note that this is a reassignment of the designation only. (nb) (Entered: 04/29/2022) |

JA-4

| 05/02/2022 | 15 | LETTER MOTION for Conference re: 10 Amended Complaint *to discuss anticipated bases to dismiss the Amended Complaint pursuant to Rules 12(b)(1) and (6)* addressed to Judge Mary Kay Vyskocil from Littler Mendelson, P.C. dated May 2, 2022. Document filed by Northwell Health Systems..(Gomez-Sanchez, Daniel) (Entered: 05/02/2022) |
|---|---|---|
| 05/05/2022 | 16 | LETTER RESPONSE to Motion addressed to Judge Mary Kay Vyskocil from E. Scott Lloyd dated May 5, 2022 re: 15 LETTER MOTION for Conference re: 10 Amended Complaint *to discuss anticipated bases to dismiss the Amended Complaint pursuant to Rules 12(b)(1) and (6)* addressed to Judge Mary Kay Vyskocil from Littler Mendelson, P.C. dated May 2, 2022. . Document filed by Candice D'Cunha..(Lloyd, Edward) (Entered: 05/05/2022) |
| 05/10/2022 | 17 | SCHEDULING ORDER denying 15 Letter Motion for Conference re: 15 LETTER MOTION for Conference re: 10 Amended Complaint *to discuss anticipated bases to dismiss the Amended Complaint pursuant to Rules 12(b)(1) and (6)* addressed to Judge Mary Kay Vyskocil from Littler Mendelson, P.C. dated May 2, 2022. After reviewing the arguments set out in the parties' submissions, IT IS HEREBY ORDERED that the motion for a pre-motion conference is DENIED, and defendant is GRANTED leave to file a motion to dismiss on the schedule set forth below. IT IS FURTHER ORDERED that on or before May 17, 2022, Plaintiff must inform the Court via letter whether she intends to amend her complaint. This will be Plaintiff's last opportunity to amend the complaint in response to arguments raised in the parties' letters. IT IS FURTHER ORDERED that if the Plaintiff does not amend her complaint, Defendant must file its motion to dismiss on or before May 31, 2022. Further briefing shall be submitted on the schedule set forth in Local Rule 6.1(b). IT IS FURTHER ORDERED that if the Plaintiff elects to amend her complaint, the amended complaint is due on or before May 31, 2022. Defendant's must respond to any amended complaint within 14 days of its filing. In the event Defendant files a new motion to dismiss, the briefing for that motion will be on the schedule set forth in Local Rule 6.1(b). Any request for an extension or adjournment shall be made by letter filed on ECF and must be received at least 48 hours before the deadline. SO ORDERED. (Signed by Judge Mary Kay Vyskocil on 5/10/2022) (tg) (Entered: 05/10/2022) |
| 05/10/2022 | | Set/Reset Deadlines: Amended Pleadings due by 5/31/2022. Motions due by 5/31/2022. (tg) (Entered: 05/10/2022) |
| 05/17/2022 | 18 | LETTER addressed to Judge Mary Kay Vyskocil from Scott Lloyd dated May 17, 2022 re: Amendment of Complaint. Document filed by Candice D'Cunha..(Lloyd, Edward) (Entered: 05/17/2022) |
| 05/26/2022 | 19 | FIRST LETTER MOTION for Extension of Time to File *Motion to Dismiss* addressed to Judge Mary Kay Vyskocil from Daniel Gomez-Sanchez dated May 26, 2022. Document filed by Northwell Health Systems..(Gomez-Sanchez, Daniel) (Entered: 05/26/2022) |
| 05/26/2022 | 20 | ORDER granting 19 Letter Motion for Extension of Time to File. Granted. SO ORDERED. (Signed by Judge Mary Kay Vyskocil on 5/26/2022) (tg) (Entered: 05/26/2022) |
| 05/26/2022 | | Set/Reset Deadlines: Motions due by 6/7/2022. Responses due by 6/28/2022 Replies due by 7/12/2022. (tg) (Entered: 05/26/2022) |
| 06/07/2022 | 21 | MOTION to Dismiss *Amended Complaint*. Document filed by Northwell Health Systems.. (Wilkens, Kimberly) (Entered: 06/07/2022) |
| 06/07/2022 | 22 | DECLARATION of Daniel Gomez-Sanchez in Support re: 21 MOTION to Dismiss *Amended Complaint*.. Document filed by Northwell Health Systems. (Attachments: # 1 Exhibit 1).(Wilkens, Kimberly) (Entered: 06/07/2022) |

JA-5

| 06/07/2022 | 23 | MEMORANDUM OF LAW in Support re: 21 MOTION to Dismiss *Amended Complaint*. . Document filed by Northwell Health Systems..(Wilkens, Kimberly) (Entered: 06/07/2022) |
| 06/28/2022 | 24 | RESPONSE in Opposition to Motion re: 21 MOTION to Dismiss *Amended Complaint*. . Document filed by Candice D'Cunha..(Lloyd, Edward) (Entered: 06/28/2022) |
| 06/29/2022 | 25 | RESPONSE in Opposition to Motion re: 21 MOTION to Dismiss *Amended Complaint*. . Document filed by Candice D'Cunha..(Lloyd, Edward) (Entered: 06/29/2022) |
| 07/12/2022 | 26 | REPLY MEMORANDUM OF LAW in Support re: 21 MOTION to Dismiss *Amended Complaint*. . Document filed by Northwell Health Systems..(Wilkens, Kimberly) (Entered: 07/12/2022) |
| 10/26/2022 | 27 | NOTICE of Supplemental Authorities In Support of Motion to Dismiss re: 21 MOTION to Dismiss *Amended Complaint*.. Document filed by Northwell Health Systems. (Attachments: # 1 Exhibit Doe Decision, # 2 Exhibit Marte Decision).(Gomez-Sanchez, Daniel) (Entered: 10/26/2022) |
| 11/03/2022 | 28 | NOTICE of Response to Supplemental Authorities re: 27 Notice (Other),. Document filed by Candice D'Cunha. (Attachments: # 1 Exhibit Exhibit A).(Lloyd, Edward) (Entered: 11/04/2022) |
| 12/16/2022 | 29 | NOTICE of Reply Notice of Supplemental Authorities in Further Support of Motion to Dismiss re: 27 Notice (Other),. Document filed by Northwell Health Systems..(Wilkens, Kimberly) (Entered: 12/16/2022) |
| 01/16/2023 | 30 | NOTICE of Supplemental Authority re: 24 Response in Opposition to Motion. Document filed by Candice D'Cunha..(Lloyd, Edward) (Entered: 01/16/2023) |
| 02/01/2023 | 31 | NOTICE of Reply in Opposition to Plaintiff's Notice of Supplemental Authority re: 30 Notice (Other). Document filed by Northwell Health Systems. (Attachments: # 1 Exhibit Bassett Decision, # 2 Exhibit McGlynn Decision).(Gomez-Sanchez, Daniel) (Entered: 02/01/2023) |
| 02/28/2023 | 32 | MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISMISS re: 21 MOTION to Dismiss *Amended Complaint*. filed by Northwell Health Systems. For the foregoing reasons, Defendant's motion to dismiss is GRANTED. The Clerk of the Court is respectfully requested to terminate docket entry 21 and to close this case. SO ORDERED. (Signed by Judge Mary Kay Vyskocil on 2/28/2023) (tg) Transmission to Orders and Judgments Clerk for processing. (Entered: 02/28/2023) |
| 03/01/2023 | 33 | CLERK'S JUDGMENT re: 32 Memorandum & Opinion in favor of Northwell Health Systems against Candice D'Cunha. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Memorandum Opinion and Order dated February 28, 2023, Defendant's motion to dismiss is GRANTED; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 3/1/2023) (Attachments: # 1 Right to Appeal) (km) (Entered: 03/01/2023) |
| 03/30/2023 | 34 | NOTICE OF APPEAL from 32 Memorandum & Opinion,. Document filed by Candice D'Cunha. Filing fee $ 505.00, receipt number ANYSDC-27543751. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Lloyd, Edward) (Entered: 03/30/2023) |
| 04/03/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 34 Notice of Appeal..(nd) (Entered: 04/03/2023) |
| 04/03/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 34 Notice of Appeal filed by Candice D'Cunha were transmitted to the |

JA-6

SDNY CM/ECF NextGen Version 1.6

U.S. Court of Appeals..(nd) (Entered: 04/03/2023)

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 05/30/2023 16:54:55 | | | |
| PACER Login: | appealteam | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:22-cv-00988-MKV |
| Billable Pages: | 5 | Cost: | 0.50 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CANDICE D`CUNHA ) ) ) ) ) ) ) **Plaintiff,** ) ) ) ) v. ) ) ) ) NORTHWELL HEALTH SYSTEMS ) ) ) **Defendant** ) | AMENDED COMPLAINT FOR DECLARATOR AND INJUNCTIVE RELIEF Civil Action No. 1:22-cv-988 |

**AMENDED COMPLAINT**

**INTRODUCTION**

1.  Candice D`Cunha was a resident at Northwell Health Systems Staten Island University Hospital. There she worked since the summer of 2020, receiving stellar performance reviews throughout her time at Northwell. She worked through much of the COVID-19 pandemic, even catching COVID herself with an infant at home.

2.  Despite this hard work, dedication, and sacrifice on behalf of Northwell Health Systems and its patients, Northwell Health Systems fired Dr. D`Cunha in October of last year while she was four months pregnant.

3.  This was not because of poor performance as an employee or as a doctor; it was not

Case 23-476, Document 34, 06/07/2023, 3526224, Page11 of 190

because Northwell found that she was sick or presented an actual threat to her patients or co-workers in any way. It was because Northwell insisted that Dr. D'Cunha take a vaccine that she could not accept as a matter of concern for her unborn child and her conscience, medical training, common sense, and religious beliefs.

4.   In seeking to exert economic pressure on the question of whether she would accept medical treatment, Northwell Health Systems abandoned its commitment to the fundamentals medical ethics—the principal of informed consent in particular.

5.   In refusing to accommodate Dr. D'Cunha's pregnancy, religious beliefs, and medical condition, Northwell also violated state and federal law.

## JURISDICTION AND VENUE

6.   Plaintiff seeks relief pursuant to the civil enforcement provisions of the Pregnancy Discrimination Act and the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Americans with Disabilities Act, 42 U.S.C. § 12101.

7.   This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4) because this action arises under the laws of the United States.

8.   Venue for this action properly lies in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events, actions, or omissions giving rise to the claim occurred in this judicial district, where Northwell Health Systems Staten Island Staten Island University Hospital is principally located.

9.   This Court may also issue declaratory relief pursuant to 28 U.S.C. § 2201. Additionally, "[f]urther necessary or proper relief based on a declaratory judgment may [also] be granted ...," including via injunction. See Powell v. McCormack, 395 U.S. 486, 499 (1969) ("A

2

declaratory judgment can then be used as a predicate to further relief, including an injunction. 28

U.S.C. § 2202 ....").

10. This Court also has concurrent jurisdiction over the state claims pursuant to 28 U.S.C.

§ 1367.

## PARTIES

11. Plaintiff Candice D`Cunha is a 2020 graduate of Kent State University College of

Podiatric Medicine. She Matched in January 2020 with Staten Island University Hospital

Northwell for her residency and began work there in June of 2020.

12. Northwell Health Systems is a New York domestic not-for-profit corporation

headquartered in Westbury, Nassau County, New York. Northwell is the parent company of

Staten Island University Hospital, located in Staten Island, where Dr. D`Cunha worked.

Northwell Health Systems is the largest health provider in New York.[1]

## FACTUAL BACKGROUND

13. Dr. D`Cunha lived in New York City upon arriving in the United States in August of

2008. She received an education there and worked her way into medical school at Kent State

---

[1] *See, e.g.*, Brian Rosenthal, *The largest hospital system in New York sued 2,500 patients for unpaid medical bills after the pandemic hit.*, NEW YORK TIMES, (January 6, 2021), available at
https://www.nytimes.com/2021/01/06/world/the-largest-hospital-system-in-new-york-sued-2500-patients-for-unpaid-medical-bills-after-the-pandemic-hit.html?auth=login-email&login=email (last accessed February 3, 2022)("When the coronavirus began spreading through New York, Gov. Andrew M. Cuomo ordered state-run hospitals to stop suing patients over unpaid medical bills, and almost all of the major private hospitals in the state voluntarily followed suit by suspending their claims. But Northwell Health, which is the state's largest health system and is run by one of Mr. Cuomo's closest allies, sued more than 2,500 patients last year, records show.")
.

3

Case 23-476, Document 34, 06/07/2023, 3526224, Page13 of 190

University College of Podiatric Medicine.

14. During medical school at Kent State, then, an externship in the City was a natural choice. She accepted an offer of an externship at Staten Island University Hospital ("SIUH" or "SIUH Northwell") and worked there in August of 2019.

15. Dr. D'Cunha then interviewed for her residency at SIUH in January of 2020, and applied in February 2020.

16. SIUH Northwell informed Dr. D'Cunha that she matched for a residency in March, 2020.

17. Dr. D'Cunha graduated in May of 2020 and began her residency at SIUH Northwell on June 22, 2020.

18. Dr. D'Cunha progressed nicely throughout her residency and received good reviews.

19. Dr. D'Cunha was pregnant when she began her residency and gave birth to her daughter in October of 2020.

20. In February of 2021, Dr. D'Cunha started experiencing symptoms consistent with COVID-19, which a positive test confirmed.

21. As a result, Dr. D'Cunha missed roughly ten days of work while she recovered in the February-March 2021 timeframe. She had vertigo symptoms that continued for an additional six weeks.

22. On August 2, 2021, SIUH Northwell announced a mandate that its employees must receive a COVID-19 vaccine or receive a religious or medical exemption by September 27, 2021, or face termination.

23. Northwell never published any criteria by which it would grant religious exemptions

4

to its mandate.

24. Upon information and belief, Northwell never published any criteria by which it would grant medical exemptions.

25. Upon information and belief, Northwell never *established* any criteria by which it would grant medical exemptions.

26. On September 3, 2021, Dr. D`Cunha submitted a request for a religious exemption. (See Exhibit A.)

27. On September 4, 2021, Northwell verbally informed Dr. D`Cunha that they were no longer accepting any religious exemption requests.

28. On September 9, 2021, Dr. D`Cunha submitted a request for a medical exemption. (See Exhibit B.)

29. On September 20, 2021, Northwell informed Dr. D`Cunha that they had denied her request for medical exemption. (See Exhibit C.)

30. On September 23, 2021, Dr. D`Cunha appealed Northwell`s decision on her medical exemption request.

31. On September 29, 2021, Northwell informed Dr. D`Cunha that it rejected the appeal of her medical exemption request. (See Exhibit D.)

32. On September 30, 2021, Kate Rafla, Northwell Director of Operations at SIUH, contacted Dr. D`Cunha to inform her that Northwell could not locate her request for religious exemption. (See Exhibit E.)

33. Dr. D`Cunha re-submitted her request for religious exemption the same day.

34. On October 1, 2021, Northwell informed Dr. D`Cunha that it had rejected her request for religious exemption in which it referenced a stay on New York state`s mandate and stated in

relevant part:

> in an effort to provide clarity to you while we await the court's final
> determination and in an effort to address its operational concerns…In accord with
> the principles that would apply should such religious exemptions be permitted, we
> nevertheless have determined that your religious exemption request must be
> denied as it would create an undue hardship. (See Exhibit F.)

35. On October 1, 2021, while she was seeing patients, Northwell summoned Dr. D'Cunha and hand-delivered her a letter of termination back-dated to September 28. (See Exhibit G.)

36. Later that day, Amy Durante, Northwell Director of Medical Education, informed Dr. D'Cunha that, as a resident, she was entitled to a delayed termination date and an appeals process. She followed up with a letter to this effect dated October 5, 2021. (See Exhibit H.)

37. On October 8, Northwell provided Dr. D'Cunha with a second termination letter stating that October 7 had been her last day of work. (See Exhibit I.)

38. Dr. D'Cunha requested an appeal, and on November 22, 2021, participated in an internal hearing of Northwell's Adverse Action Review Committee that Northwell conducted to review its termination. (See Exhibit J.)

39. On Christmas Eve, December 24, 2021, Northwell delivered to Dr. D'Cunha the decision of the Adverse Action Review Committee that it stood by its decision to terminate her. (See Exhibit K.)

40. Northwell did not reach an independent determination that Dr. D'Cunha posed an increased health threat to any of her patients or co-workers that necessitated the steps it took.

41. Northwell never made an independent determination that Dr. D'Cunha posed an increased health threat to any of her patients or co-workers as a result of not having taken the COVID-19 vaccine.

6

42. Dr. D'Cunha filed a complaint with the Equal Employment Opportunity Commission (EEOC), charge number 520-2022-00721.

43. The EEOC issued a *Notice of Right to Sue* on November 5, 2021. (See Exhibit L.)

44. Upon information and belief, Northwell granted exemptions to several of its employees in order to accommodate their religious beliefs.

45. Upon information and belief, Northwell granted exemptions to several of its employees to accommodate their pregnancies.

46. Upon information and belief, Northwell granted exemptions to several of its employees to accommodate their medical conditions.

47. Northwell made no attempt to accommodate Dr. D'Cunha's pregnancy, medical condition, or religious beliefs.

48. Northwell made no showing that any such accommodation would present an undue hardship.

49. Dr. D'Cunha remains unemployed.

## COUNT ONE

**Discrimination on the basis of sex.**

50. Paragraphs 13-51 are incorporated herein.

51. The Civil Rights Act of 1964, 42 U.S.C 2000e-2(a)(1) prohibits discrimination on the basis of sex.

52. In 1978, Congress Amended the Civil Rights Act, defining "sex" to include "pregnancy, childbirth, or related medical conditions."

53. In refusing to accommodate Dr. D'Cunha's request for exemption because of her

7

pregnancy and firing her, Northwell discriminated against her on the basis of sex.

<div align="center">

**COUNT TWO**
**Discrimination on the basis of religion.**

</div>

54. Paragraphs 13-51 are incorporated herein.

55. The Civil Rights Act of 1964, 42 U.S.C 2000e-2(a)(1) prohibits discrimination on the basis of religion.

56. In refusing to accommodate Dr. D'Cunha's request for exemption because of her religious beliefs and firing her, Northwell discriminated against her on the basis of religion.

<div align="center">

**COUNT 3**
**Discrimination on the basis of perceived disability.**

</div>

57. Paragraphs 13-51 are incorporated herein.

58. The Americans with Disabilities Act, 42 U.S.C. 12101 prohibits discrimination on the basis of disability.

59. These protections include situations when the employee is "regarded as having such an impairment." 42 U.S.C. §12102(1)(c).

60. In refusing to accommodate Dr. D'Cunha's request for a medical exemption and firing her, Northwell discriminated against her on the basis of perceived disability—that, despite providing a laboratory-confirmed antibody count, she was impaired in her immunity to the disease, and is a carrier or potential carrier of an infectious disease.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, Plaintiff respectfully prays for relief as follows:

A.  Hold unlawful and set aside Northwell's vaccine mandate.

B.  Issue permanent injunctive relief enjoining Defendant Northwell and its agents from

JA-15

failing to accommodate Dr. D'Cunha and terminating her and reinstate her to full employment status.

    C.  Award compensatory and punitive damages to Dr. D'Cunha for loss of employment and costs incurred as a result of her loss of her residency, including losses related to the delay in the progress of her career.

    D.  Award Plaintiff costs and reasonable attorneys' fees.

    E.  Award such other and further relief as the Court deems equitable and just under the circumstances.


Dated: February 24, 2022

                         Respectfully Submitted,


                         _____
                         Counsel
                         E. Scott Lloyd
                         Law Office of E. Scott Lloyd, PLLC
                         Virginia Bar # 76989
                         20 E. 8th Street, Suite 3
                         Front Royal, VA 22630
                         (540)631-4081
                         scott@law-esl.com
                         Counsel for the Plaintiff
                         *Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I will cause a copy of the foregoing Complaint to be served upon Defendant on February 25, 2022.

_____
E.  SCOTT LLOYD

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Candice D'Cunha, declare under penalty of perjury that the foregoing is true and correct. Executed on February 24, 2022.

_____
CANDICE D'CUNHA

**JA-17**



**:::: Northwell**
**:::: Health·**

**COVID-19 Vaccination – Religious Accommodation Request Form**

**Please complete this form to submit a request for a religious exemption from the New York State (NYS) COVID-19 Vaccination Requirement and submit it to your Site Human Resources Department no later than** <u>September 3, 2021.</u>

Name: <u>Candice D'Cunha</u>          Phone: ███████████

Email: <u>███████</u> @ <u>northwell.edu</u>   Person ID Number: _____

Work Location/Facility: <u>SIUH Health & South</u>   Job title: <u>Resident Physician - PGY2</u>

Department Name: <u>Podiatry</u>          Manager's name: <u>Brigitte McLaughlin</u>

**Team Member Acknowledgment:**

By completing this form, I am requesting an accommodation in the form of an exemption from the NYS COVID-19 vaccination requirement because I have a genuine and sincere religious belief contrary to the practice of immunization. My objections to vaccinations are not based solely on grounds of personal philosophy or inconvenience. *"When the producers of the vaccines used for that immunization use tissue, cells, DNA or other organic materials derived from aborted human fetuses in the research, development and/or production of that vaccine."* CD 09/3/21

I understand that NYS requires all healthcare workers to receive their first COVID-19 vaccine by September 27, 2021 and complete the vaccination series as outlined by the manufacturer and that my request for an accommodation may be denied if it would create an undue hardship for Northwell Health, which includes but is not limited to an impairment to workplace safety or a burden to business operations.  I understand that if my accommodation request is denied, I will be required to become fully vaccinated to continue my employment at Northwell Health.

Please describe the reason for your religious accommodation request, including a statement of how your particular sincerely-held religious belief, practice, or observance relates to your requested accommodation and why your requested accommodation is necessary.  Please provide as much detail as possible, including any supporting documentation, that may be relevant to your request.

*I understand all of the foregoing to reference and to be in accord with current state and federal law regarding discrimination on the basis of religion, and reasonable accommodation of religious practice in the workplace. I do not, by signing this document, consent to any other standard other than the protections afforded to me under state and federal law, and I do not, by signing this document, agree to waive any protection against discrimination on the basis of religious belief, moral conviction, or any other protected status, nor do I waive any guarantee of equal protection, reasonable accommodation, or any other protection afforded to me under the law.* CD 09/3/21

I understand that Northwell Health may request additional supporting documentation or information regarding my sincerely-held religious belief, practice, or observance.

v.1 – 8.18.2021



*All information provided as part of the accommodation request process will be kept as confidential as possible.*

**Please submit this completed form to your Site Human Resources Department.** Because of New York State's September 27 vaccine requirement for health care workers, team members will not be permitted to work beyond that date unless they are either vaccinated or have an approved exemption.

For that reason, we are strongly encouraging all team members to submit their forms no later than September 3. Any forms submitted after September 3 will still be reviewed, but in order to comply with the State's regulatory requirement, team members submitting forms after September 3 may be placed on unpaid administrative leave as of September 27th if they are unvaccinated and their request is still being reviewed on that date.

You will be contacted by a member of the Human Resources team to review your request and to advise if further information is required.  You will be notified if your request has been approved or not approved.

For questions about this process, please reach out to your Site Human Resources department.

**Team Member signature:** ████████

**Date:** 09/3/2021

I, Candice D'Cunha, request an exemption from the COVID-19 Northwell Health vaccine requirement. I am a lifelong practicing Roman Catholic, and my genuine and sincere religious beliefs are contrary to the practices which are herein required of me.

As a practicing Roman Catholic, I believe and my religion instructs me that abortion violates the very basic commands found in Exodus 20:13 and Deuteronomy 5:17 ("You shall not kill") which instructs us to not murder. All three vaccines currently available for the treatment of COVID-19 involve the use of cell lines derived from aborted fetuses.[1]

I also object to, and seek to avoid, all other vaccines which involve the practice of abortion either directly or indirectly. Supporting vaccinations and vaccination development involving aborted fetal cells is an endorsement of the sacrifice of those and the continuing sacrifice of other human souls. Genesis 4:1, 17 and Jeremiah 1:5 demonstrate that the deceased children used in the aforementioned vaccinations were recognized by God as human souls from the point of conception in the same way that we, as parents, recognized our child as a human from the moment we were aware of his/her presence in his/her mother's wombs.  Genesis 1:27 - 28, 4:1, 2 Kings 17:17-18, Psalm 22:10-11, 106: 35, 37-38, 113:7-9, 127:3, 139:13-16, Amos 1:13, Matthew 18:1-4, and Matthew 19:13-15 are just a few verses that illustrate the aforementioned children as blessings from God that are valued and loved by him, their Creator, in whose image they were created and that their killing is condemned and causes God's destructive anger to burn against their murderers and those complicit in those murders.  Exodus 20:13, Leviticus 18:21 & 20:2-5, Deuteronomy 5:13, 12:30-32, 18:10, 2 Kings 16:3, and Psalm 106:38 illustrate that all child sacrifice is condemned with no exception clauses allowing for the greater good or public exception clauses found anywhere in the sacred scriptures, Catholic Tradition, or the teaching authority of the Catholic Church. As the Catechism of the Catholic Church section 1782 states, "Man has the right to act in conscience and in freedom so as personally to make moral decisions. 'He must not be forced to act contrary to his

---

[1] *See, e.g.,* Fred Guterl, *COVID-19 Vaccines and Fetal Tissue: The Science and Controversy Explained*, NEWSWEEK, March 21, 2021, at https://www.newsweek.com/covid-19-vaccines-fetal-tissue-science-controversy-explained-1575863. ("Fetal-cell lines played a vital role in the development of all three vaccines. Moderna and Pfizer used Van der Eb's original cell line, called HEK 293, in the testing of their coronavirus vaccines—that is, scientists first developed the vaccines using their mRNA technologies and subsequently tested them on lab-cultured HEK 293 cells, ancestors of the original cells that Van der Eb took from an embryo almost 50 years ago. Johnson & Johnson used a different fetal-cell line, called PER.C6, that was cultured in Van der Eb's lab in 1995. While Moderna and Pfizer used fetal cells for testing their vaccine after it was already produced, J&J used fetal cells as tiny "factories" that produced the active ingredient in its vaccine.")

**JA-20**

conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters.'"


Inasmuch as my sincerely held beliefs would be violated by taking a COVID vaccine for the aforementioned reasons, there is legal precedent that upholds and defends my right to Religious Exemption in this context. Therefore, I request that you uphold my genuine and sincerely held religious beliefs.

Sincerely,
Candice D'Cunha, DPM, PGY-2

**Northwell Health·**

### COVID-19 Vaccination – Medical Accommodation Request Form

**Please complete this form and provide the supporting medical documentation described on page 2 of this form to submit a request for a medical exemption from the New York State (NYS) COVID-19 Vaccination Requirement. Submit all forms and supporting documents to** ehscompliance@northwell.edu **no later than** _September 3, 2021_.

Name: _Candice D'Cunha_   Phone: ▮▮▮▮▮

Email: ▮▮▮▮▮ _@northwell.edu_   Person ID Number: _____

Work Location/Facility: _____   Job Title: _Resident Physician – PGY2_

Department Name: _Podiatry_   Manager's name: _Dr. Sottile_

**Required Supporting Documentation:**

When returning this form, please include the required supporting medical documentation/information shown on page two (2). These documents must be provided and certified by a physician, physician assistant or nurse practitioner who is licensed to practice in the United States, and who is not related to you. For licensed practitioners, the certification may not be signed by yourself or a licensed practitioner from your practice. If this documentation is not provided upon initial submission, it will be requested prior to completing the review. Northwell Health may be unable to complete the review of an accommodation request if the required supporting medical documentation is not provided.

This request will be approved or denied after review by a Northwell Health clinical committee.

**Team Member Acknowledgment:**

By completing this form, I am requesting an accommodation in the form of a medical exemption from NYS COVID-19 Vaccination Requirement.

I understand that NYS requires all healthcare workers to receive their first dose of a COVID-19 vaccine by **September 27, 2021** and complete the vaccination series as outlined by the manufacturer and that my request for an accommodation may be denied if providing me a medical exemption would pose a direct threat to myself or others in the workplace or would create an undue hardship for Northwell Health. I understand that if the request is denied I will be required to become fully vaccinated to continue my employment at Northwell Health. _I understand all of the foregoing to acquiesce and to be in accord with current state and federal law regarding discrimination on the basis_ You will be notified if the exemption request has been approved or not approved. If approved, the _of pregnancy_ exemption will remain in effect for so long as your medical provider indicates that your health condition _and/or_ prevents you from receiving the COVID-19 vaccine and so long as the exemption continues to meet _disability,_ Northwell Health's criteria and standards for approval. You must also agree to adhere to all safety _and reasonable_ requirements set forth by Northwell Health for unvaccinated team members. _accommodation of both in the_

For questions about this process, please reach out to your Site Human Resources department. _workplace._

_I do not, by_
Team Member signature: ▮▮▮▮▮   _signing this_
_document, consent_
Date: _9/9/2021_   _to any other standard_
_other than the protections afforded to me_
_under state and federal law, and I do not_
_by signing this document, agree to waive any_
_protection against discrimination on pregnancy,_
_disability, or any other protected status, nor do I waive any_
_guarantee of equal protection, reasonable accommodation, or any_
_other protection afforded to me under the law. CD_

v.1 – 8.18.2021

**JA-22**

Case 1:22-cv-00669-MKV   Document 10   Filed 02/24/22   Page 18 of 164

# Obstetrics and Gynecology at Staten Island

### 1145 Targee Street, Suite 2
### Staten Island, NY 10304
### (718) 979-5887

**Patient:** DCUNHA, CANDICE

**Age/Sex/DOB:**
**EMRN:**
**OMRN:**
**Home:**
**Work:**

## Results

| | | | |
|---|---|---|---|
| **Lab Accession #** | 5250409205 | **Collected:** | 08/03/2021  3:20:00PM |
| **Ordering Provider:** | LAPORTA, CHRISTOPHER | **Resulted:** | 08/04/2021  2:39:00AM |
| | | **Verified By:** | LAPORTA, CHRISTOPHER |
| **Performing Location:** | NSLIJ Core Lab (Med Director: Dwayne A. Breining M.D) | **Auto Verify:** | N |
| | 450 Lakeville Road | | |
| | Lake Success, NY 11042 | | |

**COVID-19 Spike Domain Antibody**

**Stage:** **Final**

| Test | Result | Units | Flag | Reference Range |
|---|---|---|---|---|
| COVID-19 Spike Domain Antibody | >250.00 | U/mL | H | <=0.79 |

   Roche ECLIA Total AB (GAM)
   NOTE: This result index represents a total antibody measurement, which includes IgG, IgA and IgM.
   Measures Receptor Binding Domain of the Spike Protein
   Negative <= 0.79 U/mL
   Positive  >= 0.80 U/mL

| Test | Result | | Flag | Reference Range |
|---|---|---|---|---|
| COVID-19 Spike Domain Antibody Interpretation | Positive | | A | Negative |

   This test has been authorized for emergency use by the FDA. Northwell Health Laboratories has validated this test to be accurate.
   Results from antibody testing should not be used to inform infection status.
   A positive result is consistent with vaccination, prior infection, or rarely be due to past or present infection with non-SARS-CoV-2
   coronavirus strains, such as  coronavirus HKU1,  NL63, OC43, A3 or 229E.
   A negative result does not rule out SARS-CoV-2 infection, particularly in those who have been in recent contact with the virus.



# Staten Island University Hospital
## Northwell Health

Christopher LaPorta, MD
1145 Targee Street
Staten Island, NY 10304

To whom it may concern,

Candice Dcunha, DOB ████ is currently under my care for current pregnancy EDC 3/6/22. She currently resides at 236 Graves Ave. S.I. 10314; Covid antibodies on 8/3/21 > 250. Request delaying vaccine administration to after delivery. I attest that I am not related to this patient. Thank you for your consideration in this matter.

Sincerely,

Dr. Christopher Laporta  license # 199593

Christopher LaPorta, MD
1145 Targee Street
Staten Island, NY 10304

9/2/21

**Caruso, Millisa**

| | |
|---|---|
| **From:** | Dcunha, Candice |
| **Sent:** | Thursday, September 23, 2021 6:49 AM |
| **To:** | EHS Compliance |
| **Subject:** | medical exemption appeal |
| **Attachments:** | DCunha Doctor Letter (1).pdf; Antibody Test Range.pdf; Breastfeeding and vaccine.pdf |

Hello EHS,

I recently was in receipt of your rejection of my medical exemption request. I provided a letter from my Obstetrician regarding my current pregnancy. I also provided my antibody results test from having a prior covid infection earlier this year. As stated in my lab results, my antibody levels are at the maximum level they should be. Your decision to reject my medical exemption is extremely disappointing. I worked as a resident this past year while pregnant with my first child, and I contracted covid-19 three months postpartum, all while there was no effort made by the hospital for covid testing to ensure our safety. But now that a vaccine is available, we must test every week when the number of covid patients in-house are at its lowest. Please do explain.

At this time, after having received training in medicine, I am at a loss for how a level of antibodies that is at its maximum would benefit from a vaccine. How can something that is at its maximum range get any higher? Please do provide an explanation.

Research has shown that getting a vaccine is redundant for those who have already been infected with Covid-19 and have high antibody levels. I have some articles listed below for your reference:

https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2[ "Individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination." "COVID-19 did not occur in anyone over the five months of the study among 2579 individuals previously infected with COVID-19"]

https://medicine.wustl.edu/news/good-news-mild-covid-19-induces-lasting-antibody-protection/ [ "The findings, published May 24 in the journal Nature, suggest that mild cases of COVID-19 leave those infected with lasting antibody protection and that repeated bouts of illness are likely to be uncommon"]

https://www.nydailynews.com/coronavirus/ny-covid-delta-variant-pfizer-protection-past-case-20210827-kbvgdipsvyc5rfzo64xtdfejga-story.html[ "The largest real-world analysis comparing natural immunity and the protection provided by coronavirus vaccines revealed those who have received both jabs of Pfizer's two-stick shot were almost six-fold more likely to contract a delta infection and seven-fold more likely to show symptoms and become hospitalized than those who have already recovered from COVID"]

I have listed an article, and attached an article to this email with regards to lack in data specifically in pregnant women, lactating women, and their newborns: https://www.nih.gov/news-events/news-releases/nih-begins-study-covid-19-vaccination-during-pregnancy-postpartum ["Participants and their infants will be followed through the first year after delivery. To assess the development and durability of vaccine-induced antibodies overall and by vaccine type and vaccine platform, researchers will analyze blood samples collected from pregnant and postpartum participants..."]

The final article I am attaching is regarding a preliminary study on pregnant women who have received the covid vaccine. https://www.nejm.org/doi/full/10.1056/nejmoa2104983 ["Among 827 participants who had a completed pregnancy, the pregnancy resulted in a live birth in 712 (86.1%), in a spontaneous abortion in 104 (12.6%), in stillbirth in 1 (0.1%), and in other outcomes (induced abortion and ectopic pregnancy) in 10 (1.2%)"]

Based on the above-mentioned studies, pregnancy seems like a strong contraindication to getting the vaccine.

Once again, I reiterate, by accepting a vaccine that I do not need due to natural immunity, I would be putting my unborn child at risk of death, I am not at risk of losing my child currently but getting the vaccine would put me at risk.

I am assuming there is a physician(s) reviewing my medical exemption request. You mentioned in your letter to me that my "stated reason for a medical exemption is not a contraindication to COVID-19 vaccination." This is a statement with inherent medical implications, made by unknown persons. Please do provide the name and license number of the physician assuming liability for myself and my unborn, developing child who is assuming there are no risks to either my unborn child or myself if I were to get the covid-19 vaccine.

I hope you will reconsider my appeal because at present you are forcing a pregnant mother to choose between the safety of her unborn child and her income and training. I took care of your patients. Will you take care of your pregnant employee?

I look forward to your response,
Candice D'Cunha, DPM, PGY2

**JA-26**



FollowMyHealth®

| Name: | CANDICE P DCUNHA DCUNHA |
|---|---|
| Date of Birth: | ▮▮▮▮ |
| Gender Identity: | Female |

## Results

**Order:** COVID-19 Spike Domain Antibody

| **Name** | **Date** | **Value** | **Units** | **Range** | **Source** |
|---|---|---|---|---|---|
| COVIDSAB | 8/4/2021 | >250.00 | U/mL | <=0.79 | Northwell Health Clinic Labs |

**Notes:**

Roche ECLIA Total AB (GAM)
NOTE: This result index represents a total antibody
measurement, which includes IgG, IgA and IgM.
Measures Receptor Binding Domain of the Spike Protein
Negative <= 0.79 U/mL
Positive >= 0.80 U/mL

DISCLAIMER: This information is supplied from the patient's medical record via a patient portal. The medical provider is listed as the source. Items with a source of 'Patient-Entered' were added by the patient. This record may not be complete or up to date, and should not be used for providing medical advice. For an official copy of the

individual's medical record, the patient (or custodian) must contact their medical
provider.

Generated on 08/27/2021 11:58:20 AM by FollowMyHealth®
(http://www.followmyhealth.com).



ACADEMY OF
**Breastfeeding
Medicine**

Member Login 🔒     Search our site...     🔍

HOME     ABOUT     JOIN     DONATE     MEMBERS     MYABM     EVENTS     RESOURCES     ANNUAL MEETING

# ABM STATEMENT

## Considerations for COVID-19 Vaccination in Lactation

December 14, 2020 - Several countries have recently issued an emergency use authorization (EUA) for the Pfizer/BioNtech mRNA COVID-19 vaccine. A second mRNA COVID vaccine, manufactured by Moderna, will be reviewed in the coming weeks. Since these two vaccines are similar, the information in this document can be applied to both vaccines.

Although there is currently no clinical data on use of COVID-19 mRNA vaccines in lactation, the United States Food and Drug administration EUA left open the possibility of administering the vaccine to both pregnant and lactating individuals.

Many lactating individuals fall into categories prioritized for vaccination, such as front-line health care workers. The Academy of Breastfeeding Medicine does not recommend cessation of breastfeeding for individuals who are vaccinated against COVID-19. Individuals who are lactating should discuss the risks and benefits of vaccination with their health care provider, within the context of their risk of contracting COVID-19 and of developing severe disease. Health care providers should use shared decision making in discussing the benefits of the vaccine for preventing COVID-19 and its complications, the risks to mother and child of cessation of breastfeeding, and the biological plausibility of vaccine risks and benefits to the breastfed child.

These conversations are challenging, because the Pfizer/BioNtech vaccine trial excluded lactating individuals. As a result, there are no clinical data regarding the safety of this vaccine in nursing mothers. However, there is little biological plausibility that the vaccine will cause harm, and antibodies to SARS-CoV-2 in milk may protect the breastfeeding child.

The vaccine is made of lipid nanoparticles that contain mRNA for the SARS-CoV-2 spike protein; the mRNA sequence only encodes this protein. These particles are injected into muscle, where the nanoparticles are taken up by muscle cells. These muscle cells then transcribe the mRNA to produce spike protein. The spike protein made by the cell stimulates an immune response, protecting the individual from COVID-19 illness.

During lactation, it is unlikely that the vaccine lipid would enter the blood stream and reach breast tissue. If it does, it is even less likely that either the intact nanoparticle or mRNA transfer into milk. In the unlikely event that mRNA is present in milk, it would be expected to be digested by the child and would be unlikely to have any biological effects.

While there is little plausible risk for the child, there is a biologically plausible benefit. Antibodies and T-cells stimulated by the vaccine may passively transfer into milk. Following vaccination against other viruses, IgA antibodies are detectable in milk within 5 to 7 days. Antibodies transferred into milk may therefore protect the infant from infection with SARS-CoV-2.

Although the biology is reassuring, for definitive information, we will have to wait for data on outcomes once the vaccine is used in lactating individuals and their children.

According to the CDC Advisory Committee on Immunization Practices, with the exception of small pox and yellow fever, vaccines during lactation do not affect the safety of breastfeeding for the mother or her child.

The ABM urges vaccine manufacturers to include data for lactating individuals and their children in periodic safety reports. Furthermore, we strongly recommend that future research studies routinely include pregnant and lactating participants. We must protect pregnant and breastfeeding people through research, not from research.

Japanese Translation

JA-29

## CONTACT US

© Copyright 2019 Academy of Breastfeeding Medicine. All rights reserved.
8735 W. Higgins Road, Suite 300 • Chicago, IL 60631
(800) 990.4ABM (USA toll free) • (847) 375 4726 (phone) • (847) 375 4713 Attn: ABM (fax)
Email: abm@bfmed.org
Privacy Policy

Back to top

powered by MemberClicks

JA-30



### Personal and Confidential

September 20, 2021

Sent Via: Electronic Mail

Candice Dcunha
Email Address: ███████@northwell.edu

### Re: Accommodation Status

Dear Candice Dcunha:

We are in receipt of your request for a medical exemption from New York State's mandate that requires all personnel employed or affiliated with a health care facility to receive their first dose of the COVID-19 vaccine by September 27, 2021. In August 2021, the New York State Department of Health ("DOH") issued this vaccine mandate under Section 16 of the Public Health Law. After reviewing your request and supporting materials, we are unable to grant you a medical exemption from the NYS vaccine mandate. Exemption decisions are based on known COVID-19 vaccine safety risks. Your stated reason for a medical exemption is not a contraindication to COVID-19 vaccination. This means that in accordance with the NYS vaccination mandate, you must receive your first dose of the COVID-19 vaccine by September 27, 2021. If you feel as though your exemption decision was made without consideration of all available and/or relevant information, please submit such supplemental documentation to EHSCompliance@northwell.edu.

Although mask wearing and other existing protocols will continue to be required to help prevent the spread of the virus, these life-saving vaccines remain our best shot at crushing COVID-19. As healthcare professionals and members of the largest healthcare provider in New York State, we have a unique responsibility to get vaccinated to end the pandemic and protect our patients, colleagues, families and communities. If you have additional questions, please explore educational materials on the employee intranet, including FAQs, information sheets, recorded discussions and videos, some of which are available in multiple languages. Those without intranet access can also visit our digital vaccine hub for the community. Please reach out if we can provide you with any other information. Northwell is committed to providing you with the information you need to make this decision and can connect you with an expert. We urge you to get your first dose of the COVID-19 vaccine by September 27, 2021 to ensure you can help us continue to improve the health and quality of life of the communities we serve.

If you choose to not receive your first shot before September 27, 2021, you will be non-compliant with the NYS mandate and your continued employment will be at risk. In the meantime, we appreciate your cooperation with health and safety precautions to protect the health of you, your

176669 v.1

colleagues, our patients and visitors. These precautions include the requirement to undergo weekly nasal PCR testing in accordance with Northwell's mandatory PCR testing program. Additionally, between now and September 27, 2021, you may be unable to participate in certain meetings, gatherings, and/or Northwell-sponsored events and programs due solely to your unvaccinated or partially vaccinated status.

Please know that Northwell has a COVID-19 vaccine reserved for all team members. If you are interested in receiving a COVID-19 vaccine, you can book an appointment through the Employee Health Portal. If you opt to get vaccinated at a non-Northwell source, you can upload proof to the portal or email it to ██████████@northwell.edu to record your vaccination status.

Thank you,

Northwell Health Human Resources

CC: Site HRBP

176669 v.1



**Personal and Confidential**

September 29, 2021

Sent Via: Electronic Mail

**Re: Accommodation Status – Medical Exemption Request**

Dear Candice Dcunha:

You were previously informed that your request for a medical exemption from New York State's mandate that requires all personnel employed or affiliated with a health care facility to receive their first dose of the COVID-19 vaccine by September 27, 2021 was denied. Please be advised that after reviewing your resubmission of your request and supporting materials, if any, the initial determination on your request is unchanged and we are unable to grant you a medical exemption from the NYS vaccine mandate. Exemption decisions are based on known COVID-19 vaccine safety risks. Your stated reason for a medical exemption is not a contraindication to COVID-19 vaccination. This means that in accordance with the NYS vaccination mandate, you were required to receive your first dose of the COVID-19 vaccine by September 27, 2021.

Although mask wearing and other existing protocols will continue to be required to help prevent the spread of the virus, these life-saving vaccines remain our best shot at crushing COVID-19. As healthcare professionals and members of the largest healthcare provider in New York State, we have a unique responsibility to get vaccinated to end the pandemic and protect our patients, colleagues, families and communities. If you have additional questions, please explore educational materials on the employee intranet, including FAQs, information sheets, recorded discussions and videos, some of which are available in multiple languages. Those without intranet access can also visit our digital vaccine hub for the community. Please reach out if we can provide you with any other information. Northwell is committed to providing you with the information you need to make this decision and can connect you with an expert. We urge you to get your first dose of the COVID-19 vaccine to ensure you can help us continue to improve the health and quality of life of the communities we serve.

At this time you are noncompliant with the NYS mandate and your continued employment is now at risk. We encourage you to get the vaccine immediately or you are risking your continued employment with Northwell. In the meantime, we appreciate your cooperation with health and safety precautions to protect the health of you, your colleagues, our patients and visitors. These precautions include the requirement to undergo weekly nasal PCR testing in accordance with Northwell's mandatory PCR testing program. Additionally, you may be unable to participate in certain meetings, gatherings, and/or Northwell-sponsored events and programs due solely to your unvaccinated or partially vaccinated status.

JA-33

Please know that Northwell has a COVID-19 vaccine reserved for all team members. If you are interested in receiving a COVID-19 vaccine, you can book an appointment through the Employee Health Portal. If you opt to get vaccinated at a non-Northwell source, you can upload proof to the portal or email it to ███████████@northwell.edu to record your vaccination status.

Thank you,

Northwell Health Human Resources

CC: Site HRBP



**kate Rafla**

Thu, Sep 30, 12:05 PM

Hi Candace it's kate. Can you email me a copy of your exemption paperwork ASAP? And can you
Confirm which HR OFFICE You dealt with back in
August

Sure. I submitted it to the HR office on the 2nd floor by the cafeteria at SIUH north

What email address should I submit it to?

Krafla@northwell.edu

Thank you

Just emailed to you

Delivered

Thank you

iMessage



**<u>Personal and Confidential</u>**

October 1, 2021

Sent Via: Electronic Mail

**Re: Accommodation Status**

Dear Dr. Candice Dcunha,

We are in receipt of your request for a religious exemption from the New York State vaccine mandate requiring health care workers to receive their first dose of a COVID-19 vaccine by September 27.  To the extent that you received an earlier communication from Northwell regarding your religious exemption request, including any prior denials, please disregard that earlier communication.

As you may be aware, the State revised its mandate on August 26 to limit exemptions to those that are medical in nature, thereby excluding any/all religious exemptions.  This meant that the State no longer permitted healthcare employers (including Northwell) from considering religious exemptions.  On September 14, a court granted a temporary order that placed a hold on the New York State Department of Health's ability to enforce its prohibition on religious exemptions.  At this time, it is unknown whether the court's temporary order will become permanent. While we understand your request for a religious exemption, and the rationale behind your request, we must also be mindful of the State's mandate as well as our operational concerns, including the safety of Northwell's patients, visitors and team members.

Therefore, in an effort to provide clarity to you while we await the court's final determination and in an effort to address operational concerns, Northwell has reviewed your religious exemption request in advance of the Court's ruling in the event that Northwell is ultimately permitted to consider such religious exemption.  In accord with the principles that would apply should such religious exemptions be permitted, we nevertheless have determined that your religious exemption request must be denied as it would create an undue hardship.  Specifically, we have determined that permitting you, as an unvaccinated team member, to report to your worksite that provides direct patient care and/or has direct contact with the general public poses an unacceptable health and safety threat to patients, co-workers, and visitors.  Moreover, there is no alternative arrangement that can be made that would allow you to perform the essential functions of your position while unvaccinated without creating an undue hardship.

As such, consistent with our requirements of all other Northwell employees, you are immediately required to receive a first dose of the COVID-19 vaccine as a condition of continued employment. Unless you take immediate steps to get your first dose, you will be considered non-compliant with the COVID-19 vaccine mandate.

177381 v.4

JA-36

Please know that Northwell has a COVID-19 vaccine reserved for all team members. If you are interested in receiving a COVID-19 vaccine, you can book an appointment through the Employee Health Portal. If you opt to get vaccinated at a non-Northwell source, you can upload proof to the portal or email it to ██████████ @northwell.edu to record your new vaccination status.

Thank you,

Northwell Health
Human Resources

177381 v.4

**Staten Island University Hospital**
Northwell Health·

September 28, 2021

Dcunha, Candice

Dear Candice,

Northwell Health has continued to underscore its obligation to lead by example in raising health for our patients and communities by ensuring that all of our team members become vaccinated.

As communicated to you numerous times over the past several weeks all Northwell team members were required to take steps to become compliant with the COVID-19 vaccine mandate for healthcare workers, or risk termination of employment for non-compliance. Because our records indicate that you have not taken any steps to receive your first dose of the vaccine as of today, September 28, 2021, today will be your last day of employment at Northwell Health.

Please note that if you make arrangements to receive your first dose of the vaccine in the near future we hope that you will seek to return to Northwell. In the event that you do receive the vaccine, please contact Mary Beth Springstead at ███████████ to understand what steps to take to pursue your reemployment with Northwell.

We wish you the best in your future endeavors.

Sincerely,

Brahim Ardolic, MD
Executive Director

Avenue | Staten Island, NY 10305 | Tel (718) 226-9000
Avenue | Staten Island, NY 10309
ter Plaza | Staten Island, NY 10305



# Staten Island University Hospital
## Northwell Health®

September 28, 2021

Dcunha, Candice

Dear Candice,

Northwell Health has continued to underscore its obligation to lead by example in raising health for our patients and communities by ensuring that all of our team members become vaccinated.

As communicated to you numerous times over the past several weeks all Northwell team members were required to take steps to become compliant with the COVID-19 vaccine mandate for healthcare workers, or risk termination of employment for non-compliance. Because our records indicate that you have not taken any steps to receive your first dose of the vaccine as of today, September 28, 2021, today will be your last day of employment at Northwell Health.

Please note that if you make arrangements to receive your first dose of the vaccine in the near future we hope that you will seek to return to Northwell. In the event that you do receive the vaccine, please contact Mary Beth Springstead at ████████ to understand what steps to take to pursue your reemployment with Northwell.

We wish you the best in your future endeavors.

Sincerely,

Brahim Ardolic, MD
Executive Director

*10/1/2021*
*LAST WORK DAY*
*WAS 10/1/2021.*

475 Seaview Avenue | Staten Island, NY 10305 | Tel (718) 226-9000
375 Seguine Avenue | Staten Island, NY 10309
One Edgewater Plaza | Staten Island, NY 10305



**Northwell**
Health

October 5, 2021

<u>VIA EMAIL DELIVERY</u>

Candice D'Cunha, DPM

████████████

Dear Dr. D'Cunha,

Northwell Health has continued to underscore its obligation to lead by example in raising health for our patients and communities by ensuring that all of our team members become vaccinated against COVID-19. This obligation is all the more critical for Northwell physicians, such as yourself, who help model the standard for our entire organization.

As was communicated to you numerous times over the past several weeks, including as recently as earlier this week, all Northwell team members were required to receive the first dose of the COVID-19 vaccine by September 27. Because our records indicate that you have not taken steps to receive your first dose of the vaccine and your failure to do so jeopardizes the welfare of patients, other staff and the Northwell Health Training Program (the "Program"), this letter serves as notice of the termination of your employment and your contract for appointment as a member of the House Staff in the Program, effective October 7, 2021.

Upon receipt of this letter, you are encouraged to immediately schedule an appointment to receive the first dose of the vaccine and to provide satisfactory proof of vaccination to Employee Health Services prior to the termination date of October 7, 2021. Please upload your proof of vaccination to the <u>Employee Health Portal</u> or email it to ████████████@northwell.edu. If you decline to be vaccinated and do not have a valid exemption, you may choose to resign your employment and contract by submitting a letter of resignation to your Program Director.

If you remain non-compliant with the vaccine mandate, your employment will be terminated as of October 7, 2021. In that event, you will receive a separate written notice regarding the termination of your employment and benefits, as well as your right to request a review of the termination as per the Office of Academic Affairs' Policies 7 and 7A on Due Process for Adverse Actions Taken Against Residents/Fellows.

Sincerely,

Amy Durante, MHA
Director, Medical Education

cc:    Human Resources Credentialing File: Candice D'Cunha
       John Sottile, DPM Podiatry Program Director

178425 v.1



# OFFICE OF ACADEMIC AFFAIRS

**POLICY # 7:   DUE PROCESS FOR ADVERSE ACTIONS TAKEN AGAINST RESIDENTS/FELLOWS**

**DATE REVISION APPROVED BY GMEC:  March 11, 2020**

---

## I. Purpose

    a.    The purpose of this policy is to establish institutional due process for the resolution of adverse actions taken against Trainees by their training programs or by the Institution.  Adverse actions are those actions that could result in a Trainee's intended career development.

    b.    The term Trainee in this policy includes all residents and clinical fellows in postgraduate medical education programs sponsored by Northwell Health (Northwell or Institution).

    c.    Remedial Action (remediation) for Trainees is not covered under this policy as it is not an adverse action.  Therefore, it cannot be challenged.

## II. Adverse Actions – Overview

    a.    If the Program Director determines, in consultation with the Department Chair and Office of Academic Affairs (OAA), that a Trainee's performance fails to meet required standards and/or the competencies and standards of the ACGME, AOA, CODA, and/or CPME, the Program Director may take one or more of the following actions ("Adverse Action"):

        1)    Impose a term of probation

        2)    Suspend or partially suspend the Trainee's participation in the program

        3)    Deny the Trainee credit for all or a portion of the academic year (as part of an Adverse Action.)

        4)    Deny renewal of the Trainee's contract

        5)    Dismiss the Trainee from the Program

        6)    Such other action as may be appropriate under the circumstances

    b.    An Adverse Action may be taken by the Program Director or the Department Chair, with regard to any Trainee who fails to comply with the provisions set forth in the

House Staff Manual, the Trainee's agreement with Northwell, Departmental policies or procedures, or any applicable laws, rules, and regulations.

c.   In determining which Adverse Action to take, the Program Director may consider factors such as the nature and severity of the circumstances giving rise to the need for an Adverse Action, the protentional impact on patient health or safety, the impact of the Trainee's conduct on the training program or the Institution, the likelihood that the situation can be successfully remediated, the degree of notice to the Trainee of Trainee's deficiencies and the opportunity to remedy same, and such other factors as the Program Director deems appropriate.

## III.   <u>ADVERSE ACTIONS</u>

### 1.   Probation

a.   If the Program Director, in consultation with the Program's Clinical Competency Committee and Department Chair, determines that a Trainee's performance is unsatisfactory, the Program Director may place the Trainee on probation.

b.   Probation connotes a process of intensified evaluation, education and monitoring.

c.   The Program Director must give the Trainee written notice of probationary status prepared on the Probation Form, which must include the duration of probation, the specific actions or deficiencies that led to the imposition of probation, a plan to remedy the identified deficiencies, and methods and frequency of performance evaluation during the probationary period.  A copy of the Probation Form must be forwarded to the OAA.

d.   At the end of the probationary period, the Program Director must notify the Trainee in writing whether the Trainee:

1)   was successful in meeting the terms of the probation and will remain in the program

2)   was not fully successful in meeting the terms of the probation and will remain on probation;

3)   was unsuccessful in meeting the terms of the probation and will be dismissed from the program;

4)   requires additional or different action.

e.   Probation may be required to be reported to future employers or licensing and administrative agencies.

### 2.   Suspension or Partial Suspension:

a.   If at any time the actions of Trainees present a threat to themselves or a threat to the welfare or safety of patients, staff or others or to the integrity of the program or Institution, the Program Director, in consultation with the Department Chair, may immediately prohibit a Trainee from participation in all aspects of the training

program ("Suspension").  Academic credit will not be given to a Trainee during the suspension period.

b.   Depending on the severity of the circumstances, a Program Director may also decide to restrict the Trainee's participation to certain clinical and/or academic activities ("Partial Suspension").  The amount of academic credit to be awarded to a Trainee during a period of Partial Suspension is at the discretion of the Program Director.

c.   The Trainee must be given notice of such Suspension, or Partial Suspension, and the reasons therefor verbally with written notice to be provided to the Trainee as soon as practicable under the circumstances.

d.   At the end of the Suspension or Partial Suspension, the Program Director must notify the Trainee in writing as to what further action is to be taken.

e.   A Suspension, or Partial Suspension, may be required to be reported to future employers or licensing and administrative agencies.

***If a Trainee is suspected of conduct that poses an immediate threat to the safety or welfare of patients, staff or others or to the integrity of the program or Institution, a Trainee may be suspended while such allegations are investigated ("Investigatory Suspension").  If after investigation the allegation(s) are found to be unsubstantiated, a letter will be placed in the Trainee's file by the Program Director documenting the investigatory findings.  An Investigatory Suspension is not considered an Adverse Action for the purpose of this Policy and may not be challenged.***

f.   Extended time away from residency activities during any of the Adverse Actions listed above may need to be made up at the discretion of the Program Director.

3.  **Denial of Academic Credit**

a.   If a Trainee does not satisfactorily complete a probationary period, fails to make up work missed during a suspension, or has otherwise failed to make sufficient academic progress to be advanced to the next training level, the Program Director, in consultation with the Clinical Competency Committee, and Department Chair may require the Trainee to repeat all or part of the academic year's work.

b.   If a Trainees is dismissed before the completion of the Trainee's academic year, the Program Director will determine the number of months of credit to be given the Trainee for that academic year.

c.   Denial of credit may be required to be reported to future training programs, employers, or licensing and administrative agencies.

4.  **Non-Renewal/Dismissal**

a.   A Trainee may be dismissed from the program or be denied a renewal contract for the next academic year, if the Trainee has failed to meet accepted academic, clinical and/or professional standards, or the Trainee has engaged.  In conduct that threatens

the welfare or safety of patients, staff or others or the integrity of the training program or the Institution.

**b.**     The decision to dismiss a Trainee or not to provide a Trainee with a renewal contract will be made by the Program Director, in consultation with the Department Chair and the Clinical Competency Committee.   No later than four months prior to any dismissal or non-renewal of the Trainee's contract, the Program Director must provide the Trainee with written notice of the decision to dismiss or not to renew, stating the reasons therefor.   However, if the primary reason for dismissal or non-renewal occurs within the four months prior to the end of the Trainee's contract, then the Program Director must provide the Trainee with written notice of the decision as soon as the circumstances will reasonably allow.

**c.**     The dismissal or non-renewal may be reported to future training programs, employers, or licensing and administrative agencies.

**5.   Notice and Appeal Procedure**

**a.**     Whenever a Program Director in consultation with the Department Chair and Clinical Competency Committee contemplates taking any of the Adverse Actions listed above, he/she will notify the Office of Academic Affairs (OAA) of the potential action and the facts upon which it is based.

**b.**     When a Trainee is subject to any of the Adverse Actions described above, as soon as practicable the Trainee must be given written notification of the Adverse Action from the Program Director with a copy to the OAA.   This notice must include the circumstances which gave rise to the Adverse Action, the duration of the action, and any conditions imposed for resuming participation in the training program ("Adverse Action Notice") and will be accompanied by a copy of the Policy.   The Trainee may challenge the Adverse Action by requesting that an ad hoc committee be convened to review the action taken.   Such request must be made in writing to the OAA within seven (7) business days of the Trainee's receipt of the Adverse Action Notice.

**c.**     Upon receipt of a Trainee's timely request for a review, the OAA must appoint an Adverse Action Review Committee ("Committee") to review the Adverse Action (The "Review").   The Committee will consist of a Resident or Fellow selected by the Resident Forum or the House Staff Association, as applicable, and two attending physicians, one of whom will serve as the Chair of the Committee ("Committee Chair").    None of the Committee members, including the Resident/Fellow representative, may be a member of the affected Trainee's department.   The OAA must notify the Program Director and the affected Trainee in writing of the time, date, and place of Review ("Notice of Review") and both parties are expected to appear before the Committee to discuss their position on the Adverse Action taken. The Review will take place within thirty (30) business days from the date that the Trainee receives the Notice of Review.

**d.**  If the Adverse Action is a suspension, termination or non-renewal, the Review may be accelerated upon the request of the affected Trainee, to take place on a date that is more than fifteen (15) days, but less than thirty (30) days from the date the OAA receives the request.

**e.**  The Review must be held in accordance with the procedures set forth herein and in "Policy #7A Adverse Action Review and Appeal Rules and Regulations" ("Rules and Regulations")

**f.**  Following the conclusion of all fact finding the Committee may accept, reject or modify the Adverse Action taken, or take any other action that the Committee deems appropriate under the circumstances.  The action the Committee takes and the supporting reasons must be in writing ("Report")

**g.**  No later than 15 days following the conclusion of the Review, a copy of the Report must be sent to the affected Trainee and the Program Director.  If, after receipt of the Report, either the Trainee or Program Director wishes to challenge the Committee's decision, either party must submit its request for an appeal, and the reasons therefor, in writing to the OAA within seven (7) days of receipt of the Report.  If neither party submits a timely request for appeal, the decision of the Committee will be final and binding upon all parties.

As soon as practicable following receipt of a request for an appeal, the Chief Academic Officer ("CAO") will receive the Trainee's record, the basis for the Adverse Action and the Report.  The CAO may request and consider any additional information the CAO deems necessary and must conduct the appeal pursuant to the procedures set forth in the Rules and Regulations.  Within 15 days of the CAO's receipt of the record the CAO will notify the Trainee, the Program Director, and the OAA of the CAO's decision in writing.  The decision of the CAO will be final and binding upon all parties.  It will be the responsibility of the OAA to advise the Graduate Medical Education Committee upon ultimate disposition of each Adverse Action.

Case 23-476, Document 34, 06/07/2023, 3526224, Page48 of 190



**POLICY #7A:  ADVERSE ACTION REVIEW AND APPEAL RULES AND REGULATIONS**

**DATE REVISION APPROVED BY GMEC:**     **March 11, 2020**

---

### I.    <u>Purpose</u>

The purpose of this policy is to establish rules and regulations governing the review and appeal of Adverse Actions, as that term is defined in  Policy  #7: Due Process For Adverse Actions Taken Against Resident/Fellows ("Due Process Policy")1.

### II.    Procedures

Except as provided in the Due Process Policy, the procedures set forth below  will apply whenever a Trainee  requests  a Review  to challenge  an Adverse Action  or when  the Program or Trainee  requests  an appeal of the Committee's  decision.

#### A. Review

1. In connection with the Review,  the  Committee  must  offer  the opportunity for the Trainee to appear; any trainee who refuses to cooperate and/or appear at the scheduled review will be deemed  to have  waived  his  or her right  under  this policy.

2. The Committee will meet with the Trainee and Program Director to hear evidence and\or witness  testimony  in support  of the Trainee  and Program Director's  positions.  The Review  is  not considered  a formal  hearing  and therefore is not subject to any formal rules of evidence  or procedure.  The introduction  of any relevant  information, including  witnesses, will  be determined  by the  Committee  Chair.

3. The  Trainee  may be represented  by counsel  at the Review.  If the  Trainee intends to have  such  legal  representation,  the Trainee must  notify  the  OAA in writing no later than five (5) business days after  submitting  his/her request for a Review. If the Trainee is to be represented by counsel,  then the Program  and the  Committee  may  also be represented  by counsel,  provided that  counsel  representing  the Program cannot be the  same  counsel  representing  the Committee.  If the  Trainee  elects  not to have  an attorney present at the Review, neither the Program nor the Committee will have legal representation.  The primary  role of all  attorneys  present  during  the Review will be limited  to providing advice  to their clients. Counsel  may make  evidentiary and/or procedural objections,  which will be ruled upon by the Committee  Chair  based on common  sense  and fairness,  but counsel  will  not be permitted  to make opening or closing statements or examine or cross- examine  witnesses.

---

*1 All capitalized terms herein will have the meaning ascribed to such terms in the Due Process Policy.70236 v3*

4. The Trainee and the Program will be given the opportunity to make an opening statement. After opening statements have concluded, the Program will be permitted to present its case-in-chief by describing the Adverse Action taken and the bases therefor, which it may do through the use of documentary and/or testimonial evidence.

5. After the Program has presented its case-in-chief, the Trainee will present his/her case-in-chief. To reverse the Adverse Action the Trainee has the burden to persuade the Committee that the Trainee failed to receive notice of his/her deficiencies in the ACGME Core Competencies and a

6. reasonable opportunity to remedy same; or that the Adverse Action lacks any factual basis or is not in compliance with ACGME, CODA, CPME or Northwell policies, including those contained in the house staff manual. The Trainee may meet this burden via documentary and/or testimonial evidence.

7. All participants at the Review will be afforded a reasonable opportunity to present their case through the presentation of documents and witnesses. At the discretion of the Committee Chair after each party has presented his/her case in chief, the parties may be provided the opportunity to rebut any testimony or document presented.

8. A record of the Review will be made by a court reporter who will be present during the entirety of the Review proceeding. Each party is responsible for possessing sufficient copies of all documents to be presented during the Review for all Committee members, the opposing party and his/her counsel, and the court reporter.

9. The Review will not be open to the public and no individuals other than the Committee members, the parties and their counsel, and any relevant witnesses will be permitted to attend. All documents and testimony presented at the Review must be maintained in strict confidence.

**B.  Appeal**

1. Upon the CAO's review of the record below, which will include the Trainee's file, the basis for the Adverse Action, a l documents presented during the Review, the transcript of the Review, and the Committee's Report of its decision ("Record"), the CAO will determine the need for any additional documents or testimony from the parties.

2. If the CAO decides to permit oral argument by the parties, such argument will be limited only to those issues presented during the Review. The CAO will not consider any new arguments or witness testimony. In lieu of oral argument, the CAO may request a writing from the parties to clarify any issues raised during the Review. If the CAO makes such a request, both parties will be provided with the opportunity to provide such writing simultaneously. No reply statements will be permitted by either party. To the extent any party wishes to provide additional written evidence, absent a request from the CAO, the CAO retains sole discretion to accept such writing, provided that the party seeking to provide such evidence can show that such writing is directly related to the issues presented at the Review, and such information was not available at the time of the Review or could not have been presented due to circumstances that could not have been anticipated in the exercise of reasonable diligence.

JA-47

3.  In rendering a decision on appeal, the CAO retains sole discretion to base such decision solely on review of the Record, without oral argument or writings from the parties.

4.  To reverse the Committee's decision, the party requesting the appeal has the burden of persuading the CAO that the Committee's decision lacked a factual basis or could not have reasonably been made given the burden of the prevailing party.

5.  The CAO may affirm, modify, or reverse the Committee's decision or remand the matter to the Committee for reconsideration.

JA-48



**Northwell**
Health·

October 7, 2021

<u>VIA HAND DELIVERY</u>
Candice D'Cunha, DPM

████████████████████

Re: <u>Notice of Adverse Action</u>

Dear Dr. D'Cunha,

This letter provides you formal notice of the decision of the Program Director in consultation with executive leadership of Staten Island University Hospital/Northwell Health to dismiss you from the Northwell Health Training Program – SIUH – Podiatric Medicine and Surgery, Reconstructive Rearfoot & Ankle (the "Program"), effective immediately ("Adverse Action"). This notice is provided in accordance with the Graduate Medical Education Office of Academic Affairs' Policy #7: *Due Process Policy for Adverse Actions Taken Against Residents/Fellows*. Your employment agreement with Northwell Health is also terminated as of this date.

As you know, you were advised by letter dated October 5, 2021 that your employment and contract for participation in the Program would be terminated in the event that you continued to be non-compliant with Northwell Health's mandate that all team members receive the first dose of the COVID-19 vaccine by September 27. Our records indicate you have not taken steps to receive your first dose of the vaccine in violation of this mandate and applicable New York State laws, rules, and regulations. By the foregoing conduct, the Program has determined that your continued participation in the Program would jeopardize the welfare of patients, other staff, and/or the Program.

Pursuant to the *Due Process Policy for Adverse Actions Taken Against Residents/Fellows* (a copy of which is enclosed, along with a copy of Policy #7A: *Adverse Action Review and Appeal Rules and Regulations*), you may request that an *ad hoc* committee be convened to review this Adverse Action by submitting a written request to the Office of Academic Affairs ("OAA") within 7 business days of your receipt of this notice.

Sincerely,

*[signature]* . DPM

Program Director

cc:     Office of Academic Affairs and Human Resources

178923 v.2

PROCEEDINGS - November 22, 2021

Page 1

```
1     _____

2     In the Matter of

3     THE ADVERSE ACTION REVIEW MEETING BETWEEN

4     CANDICE D'CUNHA, DPM

5          - and -

6

7     NORTHWELL HEALTH, INC.

8     _____

9                         November 22, 2021
                          9:05 a.m.
10
                          Held remotely via Zoom
11

12

13    BEFORE:       STEPHEN BARONE, M.D.
                    REBECCA ZWEIFLER, M.D.
14                  SUZANNE EL-SAYEGH, M.D.

15
      ALSO PRESENT: JOHN SOTTILE, M.D.
16                  WILLIAM LOWE, M.D.
                    TAMIRA BRUNSON, Northwell Health
17                  GUS PHILLIPS, Gregory Edwards

18

19

20    REPORTED BY:  MICHELLE CONERO, Court Reporter

21

22
```

PROCEEDINGS - November 22, 2021

Page 2

```
 1              E X H I B I T S

 2

 3      PROGRAM
        EXHIBIT NO.      DESCRIPTION            PAGE
 4
        1        10 NYCRR 2.61, Prevention    Premarked
 5               of COVID-19 Transmission
                 by Covered Entities
 6
        2        Human Resources Policy and   Premarked
 7               Procedure Manual

 8      3        COVID-19 vaccination -       Premarked
                 medical accommodation
 9               request form

10      4        9/20/21 e-mail to Candice    Premarked
                 D'Cunha and 9/29/21 e-mail
11               to Candice D'Cunha

12      5        COVID-19 vaccine update from Premarked
                 Northwell Health dated
13               between 8/2/21 and 10/4/21

14      6        COVID-19 vaccination -       Premarked
                 religious accommodation
15               request form

16      7        10/1/21 e-mail to Candice    Premarked
                 D'Cunha
17
        8        1/21 letter to Candice       Premarked
18               D'Cunha

19      9        2020/2021 Resident/Fellow    Premarked
                 Manual
20
        10       Northwell Health             Premarked
21               documentation

22
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page54 of 190

PROCEEDINGS - November 22, 2021

Page 3

```
 1      EXHIBITS (CONT.):

 2

 3      PROGRAM
        EXHIBIT NO.      DESCRIPTION              PAGE
 4
         11       10/5/21 e-mail to Candice    Premarked
 5                D'Cunha

 6       12       10/7/21 e-mail to Candice    Premarked
                  D'Cunha
 7
         13       10/8/21 termination          Premarked
 8                acknowledgement

 9       14       10/11/21 e-mail to Amy       Premarked
                  Durante from Candice D'Cunha
10
         15       11/4/21 e-mail to Candice    Premarked
11                D'Cunha

12

13

14

15

16

17

18

19

20

21

22
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page55 of 190

PROCEEDINGS - November 22, 2021

Page 4

```
1              DR. BARONE:  William, good morning.
2     Can you introduce yourself?  Are you going
3     to be a witness?
4              MR. LOWE:  Yes.  My name is William
5     Lowe, I'm the medical director for the
6     Employee Health Service.  I am a witness for
7     today.
8              DR. BARONE:  Okay.  So I'm going to
9     ask, I guess, Gus, can you put him in a
10    holding room for the beginning of the
11    presentation until it's time for him to be a
12    witness?
13             MR. PHILLIPS:  Yes.
14             And is it Dr. William Lowe?
15             MR. LOWE:  Yes.
16             DR. BARONE:  Tamira, can you please
17    tell me your role?
18             MS. BRUNSON:  I'm the paralegal.  I'm
19    presenting the exhibits on the screen for
20    the hospital.  I've also been controlling
21    the screen to share the confidentiality
22    statement.
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page56 of 190

JA-53

PROCEEDINGS - November 22, 2021

Page 5

```
 1              DR. BARONE:  Okay.  So your major role

 2      here is to just help present any of the data

 3      that we have to show?

 4              MS. BRUNSON:  Correct.

 5              DR. BARONE:  Okay, good.  And

 6      Michelle, can you introduce yourself?  Ms.

 7      Conero.

 8              MS. CONERO:  Sure.  Good morning,

 9      everybody.  I'm the court reporter.  I will

10      be taking down everything that is said

11      today.

12              DR. BARONE:  Okay.  I'm going to start

13      and read an opening statement.

14              MR. PHILLIPS:  Counsel -- Mr. Barone,

15      Candice, I just wanted to make sure I had

16      your name.  Is it Dr. Candice --

17              DR. D'CUNHA:  Yes.

18              MR. PHILLIPS:  What would your last

19      name be?  I just wanted to change it on the

20      screen.

21              DR. D'CUNHA:  It's D-'-C-U-N-H-A.

22              MR. PHILLIPS:  Thank you.
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page57 of 190

JA-54

PROCEEDINGS - November 22, 2021

Page 6

```
1              MS. EL-SAYEGH:  Dr. Barone, who is the
2         final person in the room?  Dr. Sottile?
3              DR. BARONE:  He's the program
4         director.
5              DR. SOTTILE:  I'm the program director
6         for the podiatric residency program.
7              DR. BARONE:  This is an opening
8         statement regarding the Adverse Action of
9         the Review Committee meeting with Candice
10        D'Cunha.
11             Am I pronouncing it right, Candice?
12             DR. D'CUNHA:  Correct.
13             DR. BARONE:  I would like to call the
14        meeting to order.  My name is Dr. Stephen
15        Barone and I am the program director of
16        Pediatrics at Cohen's Children's Medical
17        Center at Northwell.  We're here to review
18        the adverse action imposed with respect to
19        Dr. Candice D'Cunha, specifically the
20        decision to terminate her from the Podiatric
21        Medical and Surgical Reconstructive Rear
22        Foot and Ankle program at Staten Island
```

PROCEEDINGS - November 22, 2021

1           University Hospital, which I will refer to

2           as the program.

3                   I'm serving as the chair of the

4           Adverse Action Committee.  I would like to

5           take a moment to review the procedures for

6           this morning's meeting.  This review is

7           being held in accordance with procedures set

8           forth in policies number 7 and 7-A of the

9           Office of Academic Affairs.  Each party will

10          be provided the opportunity to make an

11          opening statement.  John Sottile, the

12          director of Podiatric Medicine and Surgery

13          at the hospital, is also the program

14          director.  Dr. Sottile will open the meeting

15          with a statement on behalf of the program.

16                  Dr. D'Cunha, you'll make your

17          opening statement once Dr. Sottile has

18          completed his.

19                  After opening statements have

20          concluded, the program will present its case

21          by describing the adverse action imposed

22          against Dr. D'Cunha and the reasons

Case 23-476, Document 34, 06/07/2023, 3526224, Page59 of 190

PROCEEDINGS — November 22, 2021

Page 8

1        supporting such action, which can be made

2        through the use of documentary evidence or

3        witness testimony.  In order to reverse the

4        adverse action Dr. D'Cunha has the burden to

5        persuade the committee that she failed to

6        receive notice of any deficiency in ACGME

7        core competencies and a reasonable

8        opportunity to remedy same, or that the

9        adverse action lacks any factual basis or is

10       not compliant with ACGME, CODA, CPME or

11       Northwell policies, including those

12       contained in the house staff manual.  Dr.

13       D'Cunha may meet this burden by way of

14       documentary or testimonial evidence.  This

15       meeting is not subject to any formal rules

16       of evidence or procedure, and the committee

17       will permit presentation of evidence and

18       witnesses subject to any restrictions we may

19       impose.  On behalf of the committee I will

20       make all the rulings with respect to whether

21       the proposed evidence and witnesses are

22       relevant to this review.

Case 23-476, Document 34, 06/07/2023, 3526224, Page60 of 190

PROCEEDINGS — November 22, 2021

Page 9

```
 1              I am going to ask the other two
 2      members of the committee to give their name,
 3      department and position.  So you guys want
 4      to go ahead.
 5              DR. EL-SAYEGH:  Dr. Suzanne El-Sayegh.
 6      I'm the program director of Internal
 7      Medicine at Staten Island University
 8      Hospital Northwell, and I'm an associate
 9      chairman of Medicine.
10              DR. ZWEIFLER:  I'm Dr. Rebecca
11      Zweifler, I'm a third-year internal medicine
12      resident at Lenox Hill Hospital.
13              DR. BARONE:  The record should reflect
14      that no one on this committee is a member of
15      the Department of Podiatric Medical Surgery
16      at the hospital.
17              Dr. D'Cunha has elected to proceed
18      without an attorney.  As a result, pursuant
19      to policy 7-A, neither the program nor the
20      committee will have an attorney present.
21              There is a court reporter here today,
22      we introduced her, and a transcript of this
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page61 of 190

PROCEEDINGS - November 22, 2021

Page 10

1          meeting will be made.   All parties and

2          witnesses should be sure to speak clearly

3          and give only verbal responses so the court

4          reporter may accurately transcribe the

5          testimony provided during the meeting.

6               This review is not open to the public.

7          All the documents and testimony present here

8          shall be maintained in strict confidence.

9               As chairperson I'll preside over the

10         meeting and maintain decorum and order.

11         I'll ensure that all participants are

12         offered a reasonable opportunity to present

13         their case.

14               I will act on objections and requests

15         for rulings based on common sense and

16         fairness.

17               Of course this is a confidential

18         proceeding.   Nothing occurring during this

19         meeting should be discussed outside the

20         room.   All documents presented to each party

21         will be confidential.

22               The committee may accept, reject or

Case 23-476, Document 34, 06/07/2023, 3526224, Page62 of 190

PROCEEDINGS - November 22, 2021

```
 1           modify the adverse action taken or take any

 2           other action the committee deems appropriate

 3           under the circumstances.   The action taken

 4           by the committee and the supporting reasons

 5           will be set forth within in a written report

 6           within 15 days of inclusion and review.

 7           Because the transcript of this meeting will

 8           be of great assistance to the committee in

 9           its deliberations, we ask the program and

10           Dr. D'Cunha to agree that the review is

11           deemed concluded -- is not deem concluded

12           until after the committee receives the

13           transcript.

14                Is that okay with you, Dr. Sottile?

15                DR. SOTTILE:  Yes.

16                DR. BARONE:  Is that okay with you,

17           Dr. D'Cunha?

18                DR. D'CUNHA:  Yes.

19                DR. BARONE:  Thank you.

20                Unless there are any other matters

21           anyone would like to raise at the time, I

22           would ask the program to proceed.
```

PROCEEDINGS - November 22, 2021

Page 12

1              Before I let Dr. Sottile make an

2        opening statement, any other questions or

3        concerns?

4              (No response.)

5              DR. BARONE:  Please speak clearly and

6        at least at a reasonable pace so Michelle

7        can get everything down.

8              Okay.  Go, Dr. Sottile.

9              DR. SOTTILE:  Good morning.  My name

10       is Dr. John Sottile and I am the program

11       director at Staten Island University

12       Hospital for the Podiatric Medical and

13       Surgical Residency Program.  I will refer to

14       that program as program if needed as I

15       continue my opening statement.

16             I was the program director to Dr.

17       Candice D'Cunha whose termination we are

18       here to review.  Dr. D'Cunha became a

19       resident in the program beginning in June

20       2020.  In the summer of 2021 New York State

21       issued a mandate requiring that all

22       healthcare workers receive the COVID-19

Case 23-476, Document 34, 06/07/2023, 3526224, Page64 of 190

PROCEEDINGS - November 22, 2021

Page 13

1          vaccine by September 27, 2021.  Northwell

2          also mandated that its team members receive

3          the COVID-19 vaccine by that same date.

4                You will hear about the mandate from

5          Dr. William Lowe who is a medical director

6          for Northwell's Employee Health Service,

7          also known as EHS.

8                As a resident in the program, an

9          employee of Northwell, Dr. D'Cunha was

10         required to follow and comply with all

11         applicable laws, rules, regulations and all

12         Northwell policies.  Dr. D'Cunha chose not

13         to be vaccinated.  As the other residents in

14         the program were being vaccinated in order

15         to comply with the mandate, I learned that

16         Dr. D'Cunha had not yet been vaccinated.  I

17         asked her and she said no.  I recommended

18         that she discuss it with her husband and her

19         OB/GYN.  The next time we discussed it she

20         said that she had discussed it with her

21         family and her OB but she still did not want

22         to be vaccinated.  She indicated that she

Case 23-476, Document 34, 06/07/2023, 3526224, Page65 of 190

PROCEEDINGS - November 22, 2021

Page 14

```
 1          would seek a medical and religious
 2          exemption.  We did not discuss the details
 3          of what those requests might be.  You will
 4          hear from Dr. Lowe about her medical
 5          exemption request and from Vicki Kahaner,
 6          who is vice president of Employee Relations,
 7          about her religious exemption request.
 8          Those requests were denied.  Without an
 9          approved exemption, Dr. D'Cunha needed to
10          get vacc'd.
11              On October 5, 2021 she was given a
12          letter stating that she was out of
13          compliance with the requirement that she be
14          vaccinated by September 27th.  The letter
15          offered her a way to schedule the vaccine so
16          she could comply, and further stated if she
17          did not get vaccinated she would be
18          terminated on October 7, 2021.  She did not
19          get vaccinated.  By the letter dated
20          October 7, 2021 she was given notice of this
21          adverse action, namely that she was being
22          terminated for her failure to comply with
```

PROCEEDINGS - November 22, 2021

Page 15

1           the vaccine mandate.

2                   We discussed it again at that time but

3           there was nothing much more to say.   Her

4           request for this review will follow.

5                   Candice will be given an opportunity

6           to make her statement and then, as I

7           mentioned, Dr. Lowe and Ms. Kahaner will

8           address the nature of her request for

9           exemptions from the vaccine mandate.   If

10          needed, we will discuss a timeline which we

11          have prepared and documents included in that

12          timeline.

13                  Thank you.

14          DR. BARONE:   Thank you.   Dr. D'Cunha,

15          would you like to make an opening statement?

16          DR. D'CUNHA:   Just to verify here.   I

17          have the reasons for why I did want to ask

18          for an appeal.   I also have a longer

19          testimonial of what I really do want to say.

20          Does that come at a later time and then I

21          just make this opening appeal request first?

22          DR. BARONE:   You can make an opening

Case 23-476, Document 34, 06/07/2023, 3526224, Page67 of 190

PROCEEDINGS - November 22, 2021

Page 16

```
 1          statement now.  I mean later we may ask if
 2          you want to present any documents or
 3          evidence.  If you want to make an opening
 4          statement, you can do it now.
 5               DR. D'CUNHA:  This is going to be a
 6          few minutes.  So the reason for the appeal
 7          today from my standpoint is that there is no
 8          rational basis for me to be vaccinated while
 9          I'm pregnant.  The safety of the vaccine for
10          pregnant woman has not been established.
11          There are studies indicating that there
12          could be some cause for concern for pregnant
13          women.  My history of having COVID and the
14          antibody test I provided both indicate that
15          I have obtained natural immunity.
16               The failure of Northwell to
17          accommodate me based on my pregnancy
18          violates the Pregnancy Discrimination Act.
19          The failure of Northwell to accommodate me
20          based on my religious objection violates the
21          Civil Rights Act of 1964.  And then the
22          termination by Northwell solely based on my
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page68 of 190

PROCEEDINGS - November 22, 2021

```
 1              COVID vaccination status over and above all
 2         considerations of performance, ability and
 3         exclusive of any attempt to provide
 4         reasonable accommodations consistent with
 5         Northwell's practices up until a few months
 6         ago, including the use of PPE, social
 7         distancing and other measures, is
 8         inconsistent with the concept of due process
 9         which acknowledges the rights and the unique
10         circumstances of individuals.
11              In 1927 a Supreme Court case, Buck
12         versus Bell, Superintendent of State Colony
13         Epileptics and Feeble Minded, concluded that
14         it was acceptable for the Commonwealth of
15         Virginia to sterilize Carrie Buck, who was
16         deemed to be feeble minded, without her
17         consent.  Such an operation did not violate
18         the Fourteenth Amendment guarantees of equal
19         protection and due process of law according
20         to the court.  In the process of ruling that
21         it did not, Supreme Court Justice Oliver
22         Wendell Holmes stated it is better for all
```

PROCEEDINGS - November 22, 2021

Page 18

1           the world if instead of waiting to execute
2           degenerate offspring for crime, or to let
3           them starve from their imbecility, society
4           can prevent those who are manifestly unfit
5           from continuing their kind.  The principle
6           that sustains compulsory vaccination is
7           broad enough to cover cutting the fallopian
8           tube.  Three generations of imbeciles are
9           enough.  Justice Holmes was not speaking for
10          a lunatic fringe.  He was writing for eight
11          of nine Supreme Court justices. He was also
12          speaking for a scientific establishment that
13          had, to a large degree, accepted the
14          principle of eugenics in the service of
15          racial purity.  That same principle was also
16          taking hold in Germany and gave way to the
17          scourge of Naziism.
18               Just to clarify here in case anyone
19          was lacking this information, Carrie Buck
20          was a woman who was raped by her foster
21          parents' nephew.  She was not someone who
22          was feeble of mind.  They were simply trying

to hide her from society because she got pregnant as a result of the rape. She was not informed that she ever was to be sterilized. She only found that out years later. Five years later, in 1932, the United States Public Health Service commenced a study about the ravages of untreated syphilis in black men in Tuskegee, Alabama. Over a period of 40 years the U.S. Government doctors withheld treatment, including penicillin, to roughly 200 black men in an episode that has become one of the most infamous in U.S. history.

When the story of the testing experiments broke in 1972, Dr. J.D. Millar, head of the Venereal Disease branch of the CDC, stated the study began when attitudes were much different on treatment and experimentation. At this point in time, with the knowledge of treatment and the disease and the revolutionary change in approach to human experimentation, I don't

PROCEEDINGS - November 22, 2021

1          believe the program would be undertaken is

2          what he said.

3               When the story broke in 1972, an ad

4          hoc advisory panel was put together to

5          review the study.   The men were never

6          offered or told that the research was

7          voluntary.   They were never told that they

8          could back out of the program.   They were

9          never told when treatment was made

10         available.   The revolution that he was

11         speaking of, which was borne of these

12         shameful events, its found embodiment in the

13         Belmont Report.

14               The Belmont Report was written by the

15         National Commission for the Protection of

16         Human Subjects of Biomedical and Behavioral

17         Research.   The commission, created as a

18         result of the National Research Act of 1974,

19         was charged with identifying the basic

20         ethical principles that should underlie the

21         conduct of biomedical and behavioral

22         research involving human subjects and

Case 23-476, Document 34, 06/07/2023, 3526224, Page72 of 190

PROCEEDINGS - November 22, 2021

Page 21

1          developing guidelines to assure that such

2          research is conducted in accordance with

3          those principles.   Informed by monthly

4          discussions that spanned nearly four years

5          and an intensive four days of deliberation

6          in 1976, the commission published the

7          Belmont Report which identifies basic

8          ethical principles and guidelines that

9          address ethical issues arising from the

10         conduct of research with human subjects.

11              One very specific thing is care should

12         be taken to ensure information about risks

13         should never be withheld for the purpose of

14         eliciting cooperation of subjects.

15              The Belmont Report is critical for

16         defining the concept of informed consent,

17         but especially in this context because it

18         speaks directly to the definition of

19         coercion and undue influence.

20              Coercion occurs when an overt threat

21         of harm is intentionally presented by one

22         person to another in order to obtain

PROCEEDINGS – November 22, 2021

Page 22

1          compliance.  Unjustifiable pressures usually

2          occur when persons of authority or

3          commanding influence, especially where

4          possible sanctions are involved, urge a

5          course of action for a subject.  Undue

6          influence, by contrast, occurs through an

7          offer of excessive, unwarranted,

8          inappropriate or improper reward or other

9          overture in order to obtain compliance.

10         Also, inducements that would ordinarily be

11         acceptable may become undue influences if

12         the subject is especially vulnerable.

13              Unjustifiable pressure usually when

14         persons in position of authority or

15         commanding influence, especially where

16         possible sanctions are involved, urge a

17         course of action for a subject.  A continuum

18         of such influencing factors exist, however,

19         and it is impossible to state precisely

20         where justifiable persuasion ends and undue

21         influence begins.  Undue influence would

22         include actions such as manipulating a

Case 23-476, Document 34, 06/07/2023, 3526224, Page74 of 190

PROCEEDINGS - November 22, 2021

Page 23

```
 1          person's choice through the controlling

 2          influence of a close relative and

 3          threatening to withdraw health services to

 4          to which an individual would otherwise be

 5          entitled.

 6              The American Medical Association Code

 7          of Medical Ethics Opinion 2.1.1 states

 8          informed consent of medical treatment is

 9          fundamental in both ethics and law.

10          Patients have the right to receive

11          information and ask questions about

12          recommended treatments so they can make well

13          considered decisions about care.  Successful

14          communication of the patient-physician

15          relationship fosters trust and supports

16          shared decision making.

17              At every stage of my training I have

18          had the principle of informed consent

19          reinforced.  You require that I confer it on

20          our patients, and if I did not I would

21          rightly be justified for disciplinary

22          action.  Instead we have convened this
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page75 of 190

JA-72

PROCEEDINGS - November 22, 2021

Page 24

```
 1          hearing because, as a patient, you want to
 2          deny me informed consent.  You want to exert
 3          the coercive pressure of the loss of my
 4          training and my livelihood on the question
 5          of whether I will take medicine that I don't
 6          want while I am pregnant.  I would never, as
 7          a matter of medical ethics and morality, put
 8          my patients in such a situation, and, if I
 9          did, you would be justified in firing me.  I
10          do not see how you could think that this
11          could possibly be acceptable.
12              I worked during the pandemic at this
13          hospital while pregnant with my first child
14          and became sick with COVID at just three
15          months postpartum while serving Northwell's
16          patients.  I put myself and my family at
17          considerable risk to answer the call to
18          provide medical service in your facilities.
19          I have performed well in all of my tasks.
20          In the process of denying my legitimate
21          medical and religious objections to
22          vaccination, you are looking past all of the
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page76 of 190

PROCEEDINGS - November 22, 2021

Page 25

```
1              things that make me a person, a human being,

2              and you're reducing me to a single

3              characteristic.  This is dehumanizing and I

4              deserve better.

5                      I have achieved natural immunity by

6              becoming sick with COVID in Northwell's

7              facilities.  There is no evidence anywhere

8              of a person with natural immunity conferring

9              the disease on another person.  There's no

10             evidence of any health reason for me to take

11             the vaccine or be fired for not taking it,

12             not a shred, and HHS admitted this only days

13             ago.

14                     I have legitimate religious reasons

15             for declining the vaccine.  The law clearly

16             states that sincere religious beliefs are

17             easy to establish and that employers must

18             accommodate them.

19                     For all of these reasons I

20             respectfully ask that you reverse your

21             termination decision and reinstate me.

22                     Thank you.
```

JA-74

PROCEEDINGS - November 22, 2021

Page 26

```
 1              DR. BARONE:  Thank you for your

 2       statement.

 3              Dr. Sottile, now we move on to you, if

 4       you have any documents you want to present

 5       or witnesses you want to present.

 6              DR. ZWEIFLER:  Just briefly.  There

 7       was a sentence I missed.  She said something

 8       admitted a few days ago.  What was that

 9       sentence?  Admitted --

10              DR. D'CUNHA:  That a letter that --

11              DR. ZWEIFLER:  Can you just reread

12       that sentence?

13              DR. D'CUNHA:  Sure.  There is no

14       evidence of any health reason for me to take

15       the vaccine or be fired for not taking it,

16       not a shred, and HHS admitted this only days

17       ago.

18              DR. ZWEIFLER:  Thank you.

19              DR. SOTTILE:  Dr. Barone, the

20       testimonial outline that I have is just an

21       exhibit of contracts, statements, a fellow

22       -- a resident and fellow manual for which
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page78 of 190

PROCEEDINGS – November 22, 2021

1          all of the information is stating that our

2          residents are supposed to follow Northwell

3          policies.  If you want me to go through it,

4          I'll be happy to go through it.  I have all

5          the exhibits labeled.  It actually pertains

6          to the fact that at Northwell we informed

7          our residents in various exhibits that they

8          are to be compliant with Northwell Health

9          policies.

10              The short end of it is that when

11         Northwell mandated the vaccine and Candice

12         did not get vacc'd, then she was in breach

13         of her contract.  But if you want me to go

14         through that, I'll be happy to go through

15         it.

16              DR. BARONE:  I'll ask Dr. D'Cunha.  Do

17         you agree with the dates and timelines of

18         the letters that Dr. Sottile stated in his

19         opening statement, that you received letters

20         given the timeframe?  I think October 5th

21         and October 7th specifically were the dates.

22              DR. D'CUNHA:  There was a letter that

Case 23-476, Document 34, 06/07/2023, 3526224, Page79 of 190

**JA-76**

PROCEEDINGS - November 22, 2021

Page 28

```
 1              I initially received on October 1st that was
 2         informing me of termination but it was
 3         backdated to 9/28.  On that day -- I was
 4         first told that I was terminated as of that
 5         day, and later on that day I was informed by
 6         Amy Durante that to hold on to my ID, not to
 7         turn it in yet, because as a resident I
 8         might possibly qualify for a later
 9         termination date, but I had no idea what
10         that date was at the time.
11              I was also informed that I would
12         probably have access to an appeal.
13              DR. BARONE:  Thanks.  Do you have
14         those -- maybe put those letters --
15              DR. SOTTILE:  I can clarify that. On
16         October 5, 2021 Candice was provided a
17         letter reminding her that she needed to be
18         vaccinated or she would be terminated on
19         October 7th.  This letter gave her a final
20         chance to get vaccinated or she would be
21         terminated.  That's Exhibit 11.  If you'd
22         like to pull that up, that's the October 5th
```

JA-77

PROCEEDINGS — November 22, 2021

Page 29

1      letter.

2              MS. BRUNSON:  I'm going to share my

3      screen right now.

4              DR. BARONE:  Thank you.

5              MS. BRUNSON:  Can everyone see?

6              Dr. Sottile, is this the letter you're

7      referring to?

8              DR. SOTTILE:  This is the letter -- I

9      can't see the whole thing.  But yes, it was

10     delivered October 5, 2021.  That's it.

11     Correct.

12             MS. BRUNSON:  Just tell me to scroll

13     when you need me to scroll.

14             DR. SOTTILE:  You can scroll.

15             So as you're seeing, in paragraph 2 it

16     explains exactly what we stated.

17             If I can proceed.  She did not get

18     vaccinated as required, and then I gave

19     Candice a letter dated October 7th advising

20     her that because she was still not

21     vaccinated, she was being terminated and

22     being advised of the adverse action being

PROCEEDINGS - November 22, 2021

Page 30

```
 1        taken.  That's Exhibit 12 dated October 7th.
 2             MS. BRUNSON:  Is this the letter that
 3        you're referring to?
 4             DR. SOTTILE:  That's correct.  Can you
 5        scroll, please?  If you continue to scroll,
 6        my signature should be on the bottom.  There
 7        we go.
 8             I spoke with Candice on October 8th
 9        when she acknowledged receipt and had an
10        opportunity to ask questions.  That's
11        Exhibit 13, October 8th acknowledgement.
12        That's correct.
13             I gave Candice an opportunity to ask
14        any questions at that particular time.  She
15        did not have any.  There really was not much
16        to discuss.  We had been through it, and I
17        believe Candice knew that termination was
18        going to happen.  There wasn't much more to
19        say at that particular date.
20             Following that, she requested the
21        review by e-mail on October 8, 2021, Exhibit
22        14, which is an e-mail to Amy Durante and
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page82 of 190

PROCEEDINGS - November 22, 2021

Page 31

1          for which I was copied, and she stated her

2          reasons for her review.

3                    That's correct.  You can scroll.

4                    These were the reasons that were

5          given by Candice for the review.

6                    Dr. D'Cunha was provided a notice of

7          the review on November 4th, scheduled for

8          November 22, 2021 at 9 a.m., and I was also

9          copied.  That's Exhibit 15, notice of

10         review.

11                   That's correct.  That's correct.

12                   DR. BARONE:  Thank you.  Are there

13         any additional documents you want to share

14         before we call the witnesses?

15                   DR. SOTTILE:  No.

16                   DR. BARONE:  Any members of the

17         committee, anything you particularly want to

18         see that Dr. Sottile hasn't put up?

19                   (No response.)

20                   DR. BARONE:  Okay.  Do you want, is

21         it Dr. Lowe, to come in first?

22                   DR. SOTTILE:  I believe so.  Dr.

PROCEEDINGS — November 22, 2021

Page 32

1    Lowe for the medical exemption and then Ms.

2    Kahaner will address the religious

3    exemption.

4            DR. BARONE:  Gus, can we let Dr.

5    Lowe into the group?

6            MR. PHILLIPS:  Yes, sir.  We also

7    have Ms. Kahaner in the waiting room.

8            DR. BARONE:  Thank you.

9            Dr. Lowe, welcome.

10            MR. LOWE:  Good morning, everyone.

11            DR. BARONE:  So the Program and the

12    Resident gave their opening statement.  The

13    Program presented a series of documents

14    outlining to Dr. D'Cunha the timeline of

15    adverse actions, and Dr. D'Cunha's document

16    for her appeal was shown.  I think your role

17    for this committee is to talk about your and

18    the Program and the system's thought to Dr.

19    D'Cunha's objection to getting a vaccine

20    based on a medical exemption.

21            MR. LOWE:  Okay.  Dr. Barone, who

22    else is on the line now?  Will I be

**JA-81**

PROCEEDINGS – November 22, 2021

Page 33

```
 1          introduced?  Are they on already?
 2               DR. BARONE:  Everyone is on.  We
 3          have myself, the two other members of the
 4          committee, Dr. Sottile and Dr. D'Cunha, and
 5          then the medical transcriptionist and a
 6          couple of people helping with the technology
 7          and the documents.
 8               MR. LOWE:  Very good.  Thank you.
 9               DR. BARONE:  Do you want to give us
10          your official title?
11               MR. LOWE:  Good morning, everybody.
12          My name is Dr. William Lowe, I am the
13          medical director for Employee Health
14          Services with Northwell.  I have been in
15          this role for a little over ten years now.
16               A little bit about my background.  I
17          am board certified in residency training in
18          occupational medicine with a master's degree
19          in public health as part of that.  Again,
20          I've been in this role for ten years now.
21          This is sometimes referred to as Corporate
22          Employee Health Services.  I have not direct
```

PROCEEDINGS - November 22, 2021

Page 34

1          oversight but I have advice and guidance to

2          all the Employee Health Service across the

3          entire system, which number is seventeen.

4               In regards to the medical exemption

5          process that was established by Northwell,

6          that was centered in my office.  All medical

7          exemptions from any employee anywhere in our

8          health system were sent here to my office,

9          Corporate Employee Health Service at 410

10         Bayville Road.  This is where we processed

11         and took the information in regarding their

12         medical exemption.

13              Under the guidance of our Clinical

14         Advisory Group, which is a very high senior

15         level clinical leadership group for

16         Northwell that has been in place since

17         January, February of `20 when COVID first

18         started to become a reality for all of us,

19         the Clinical Advisory Group was established

20         under the leadership of our senior vice

21         president for quality for Northwell, and

22         that group has been responsible, and I will

Case 23-476, Document 34, 06/07/2023, 3526224, Page86 of 190

PROCEEDINGS - November 22, 2021

Page 35

```
 1        say for all things COVID, whether they are
 2        all clinical and administrative issues
 3        around COVID.  Whether it was a patient care
 4        algorithm, treatment, management of
 5        employees, PPE, all the decision making,
 6        visitors, all the decision making that had
 7        to go around COVID and how that was going to
 8        be managed from an infection prevention and
 9        otherwise was managed by our Clinical
10        Advisory Group.
11             When the mandate was coming along
12        and we knew that the mandate was coming, we
13        were prepared for it.  The clinical advisory
14        group asked myself to establish a committee
15        that would look at all of our medical
16        exemption requests that came in.  I
17        established the committee, and that
18        committee was approved by the senior
19        Clinical Advisory Group for COVID.
20             So we did a couple things.  Dr.
21        Barone, I did just kind of -- I put together
22        just some documents that I thought the
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page87 of 190

PROCEEDINGS - November 22, 2021

Page 36

1          committee -- not a lot, just a handful of

2          documents that I thought would be germane to

3          the committee, if they haven't seen them

4          before.

5                  Document number 1 is just the New

6          York State mandate.  10 NYCRR 2.61 is the

7          name of it.  That's a document that I do

8          think that the committee should have a look

9          at.  It's what dictated Northwell's

10         mandatory enforcement of the State's

11         mandatory guidelines.  It's rather lengthy.

12         I mean it doesn't have to be read in any

13         great detail but I do think it's important

14         that the committee know that this was

15         established under New York State.

16                 I will tell you Northwell was very

17         much prepared to -- we were very close to

18         making a mandate of our own, a system

19         mandate, but we never got there because the

20         State sort of preempted the need for that.

21         We established our mandatory vaccination for

22         COVID underneath the State guideline.

Case 23-476, Document 34, 06/07/2023, 3526224, Page88 of 190

PROCEEDINGS - November 22, 2021

1           There's really no particular point here that

2      I think needs to be pointed out other than

3      it's several pages of what New York State

4      established.  So I'll just leave it at that.

5      At some point, if the committee has any

6      questions to me regarding that, I'll be more

7      than happy to come back to them.

8           DR. BARONE:  Can I ask you one

9      question?  Is there any specific, in the

10     State guidelines, exemptions, medical

11     exemptions or criteria for medical

12     exemptions written in the guidelines?

13          MR. LOWE:  There are not.  That's a

14     very good question.  There are no criteria

15     for exemptions.  That's something our

16     Clinical Advisory Group had to manage on its

17     own.  It's a very good question.  The State

18     does not dictate what is or is not a medical

19     exemption.  That's covered very much by the

20     CDC guidelines, which I'll reference later.

21          DR. BARONE:  Thank you.

22          MR. LOWE:  You got it.

PROCEEDINGS - November 22, 2021

Page 38

```
 1                So folks, the next document that I
 2        want to show is just to demonstrate that our
 3        -- let me see here.  Document 2, the EHS
 4        policy.  So we rapidly put this State
 5        mandate into our EHS policy, which is
 6        Exhibit 2.  This outlines, Dr. Barone, all
 7        the things that we require for Employee
 8        Health Service, the things you're familiar
 9        with, measles, mumps, rubella, annual
10        testing.  Whatever it may be.  It's just our
11        general Employee Health Service policy.  We
12        did go ahead and immediately put that into
13        our policy.  Again, I'm not pointing out any
14        particular paragraph or anything.  I just
15        want the committee to be aware that we did,
16        in due diligence, make this part of our
17        policy.  That would be under section B,
18        number 3, COVID vaccination.
19            DR. BARONE:  Can we scroll to that,
20        please?  Okay.
21            MR. LOWE:  All right.  It would be
22        3-B.
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page90 of 190

PROCEEDINGS - November 22, 2021

Page 39

```
 1            DR. BARONE:  Can you go back for a
 2      second?  So specifically -- go up a little
 3      more.  I saw that proof of -- it had to do
 4      with proof of immunity.
 5            DR. LOWE:  Right.  That would have
 6      been for measles, mumps, rubella.
 7            DR. BARONE:  Right.  I think it
 8      specifically excludes COVID.
 9            DR. LOWE:  Right.  COVID is proof of
10      adequate vaccination.
11            DR. BARONE:  I just want to -- can you
12      find that again?
13            MS. BRUNSON:  I'll scroll.  You let me
14      know where you see it.
15            DR. BARONE:  I thought it would be
16      important based on -- go up a couple more.
17            MR. LOWE:  Keep going down.
18            DR. BARONE:  I think this is
19      important.  One of Dr. D'Cunha's statements
20      was about the adequacy of her own natural
21      immunity.  This policy specifically excludes
22      that as being adequate --
```

PROCEEDINGS - November 22, 2021

Page 40

```
 1              MR. LOWE:  It does.
 2              Scroll down a little bit more.  So
 3         it's proof of adequate vaccination, whereas
 4         measles, mumps, rubella we have adequate
 5         immunity for vaccination.  So thank you for
 6         pointing that out.
 7              DR. EL-SAYEGH:  Does Northwell policy
 8         also state anywhere about any medical
 9         exemption?
10              MR. LOWE:  No.  It was not in the
11         policy.  That was all handled by procedure,
12         and that is in the medical exemption
13         request.
14              DR. BARONE:  Okay.
15              DR. LOWE:  It was not policy.  That
16         was more procedure than policy.
17              DR. ZWEIFLER:  The decision to not
18         allow immunity, that was debated and a
19         discussed decision by the committee?  Can
20         you elaborate?
21              DR. LOWE:  It was discussed.  It was
22         discussed.  I wouldn't say debated.  I think
```

**JA-89**

PROCEEDINGS - November 22, 2021

Page 41

```
 1              the committee was unanimous.  The CDC
 2              guidelines clearly -- do not clearly state
 3              that you could be vaccinated following a
 4              history of COVID as long as you're well
 5              enough to be off of quarantine.  So very
 6              early on after COVID there are no
 7              contraindications to being vaccinated if you
 8              had a history of COVID.
 9                   So we can -- I think we're good with
10              that.
11                   I did want to go to Dr. D'Cunha's
12              medical exemption request.  I don't know if
13              you've already looked at that.  I can share
14              that with you.
15                   Dr. D'Cunha, it's kind of HIPAA but I
16              know it was submitted to the committee.  I'm
17              assuming it's okay with you if I reference
18              that.  Is that correct?
19                   DR. D'CUNHA:  That's correct.
20                   DR. LOWE:  I have your permission?
21                   DR. D'CUNHA:  Yes.
22                   DR. LOWE:  So folks, here is the
```

PROCEEDINGS - November 22, 2021

Page 42

```
 1          process.  It had to be requested by the

 2          employee.  The request came from -- it did

 3          come from Dr. D'Cunha.

 4                  If you could scroll down, Tamira.

 5                  There is some handwriting there.

 6          Folks, I will tell you my office -- you

 7          know, the entire committee took each of

 8          these medical exemption requests very

 9          seriously.

10                  You can stop right there, Tamira.

11          That's fine.

12                  I personally read everything that came

13          in from every single request.  I looked at

14          the handwriting, the handwritten notes of

15          this medical accommodation request, you

16          know, to try and identify what the medical

17          concern was.  I didn't see a medical concern

18          here.  This mostly spoke to I think some

19          State laws, some Federal laws and some other

20          type of concerns.  I did not see the medical

21          concern there.

22                  Tamira, if you scroll down, Dr.
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page94 of 190

PROCEEDINGS - November 22, 2021

Page 43

1          D'Cunha did submit medical documentation,

2          meaning a note from a physician.  By the

3          way, also sent to us was this -- Tamira,

4          keep going down.  This was her antibody

5          level, greater than 250.  This is following

6          her COVID.

7                  DR. BARONE:  Can you tell me the date

8          of this?

9                  DR. LOWE:  Yes.

10                 DR. BARONE:  If you scroll up.

11                 DR. LOWE:  It looks to be --

12                 DR. BARONE:  8/3.  Okay.

13                 DR. SOTTILE:  Is there a statement

14         from her OB/GYN that he is in agreement with

15         Candice not receiving the vaccine?

16                 DR. LOWE:  No.  Quite the contrary.

17         Right here, this is the doctor's note.  So

18         this is from Dr. Christopher LaPorta.  I'll

19         read it.  Dr. D'Cunha, date of birth,

20         (redacted), is currently under my care for a

21         current pregnancy EDC 3/6/22.  She currently

22         resides at 363 Graves Avenue, Staten Island

Case 23-476, Document 34, 06/07/2023, 3526224, Page95 of 190

PROCEEDINGS - November 22, 2021

Page 44

```
 1          10314.   COVID antibodies on 8/3/21 greater
 2      than 250.   Request delaying administration
 3      to after delivery.   I attest that I am not
 4      related to this patient.   Thank you for your
 5      consideration in this matter.
 6          DR. SOTTILE:   That delay in
 7      administration until after her due date, was
 8      that considered?
 9          DR. LOWE:   So our committee looked at
10      the issue of pregnancy -- the Clinical
11      Advisory Group looked at the issue of
12      pregnancy very seriously.   Again, we looked
13      for the -- primarily to the CDC.   There is
14      no contraindication to being vaccinated
15      during pregnancy.   We felt as though if we
16      were going to follow the CDC guidelines, we
17      were going to follow the CDC guidelines for
18      all groups that the CDC guidelines address,
19      including people who are pregnant,
20      undergoing fertility and/or lactating.   The
21      CDC clearly states that it is not only a
22      contraindication but it's a recommendation.
```

PROCEEDINGS — November 22, 2021

Page 45

1              Folks, given any issue that may come

2       up within the CDC guidelines, if we look to

3       either support or contradict what the

4       guidelines were saying, we would turn to a

5       professional -- the professional

6       organization that's most universally

7       recognized as the entity to be an expert in

8       that area.  So we looked at guidelines from

9       the American College of Rheumatology if

10      there was a rheumatology related, American

11      Allergy, American College of Obstetricians

12      and Gynecologists.  We looked at all those

13      professional guidelines.  So although the

14      CDC was our primary document, very well

15      written, very extensive, really looking to

16      see what is a contraindication, why

17      shouldn't somebody be vaccinated, I don't

18      want to say that we only looked at the CDC

19      guidelines.  We did look for outside

20      expertise, and of course we also looked

21      inward.  At Northwell we have incredible,

22      incredible medical expertise in our health

PROCEEDINGS - November 22, 2021

Page 46

1        system.  We brought in experts from within

2        our own health system and sought guidance

3        from them when we thought it was necessary.

4             DR. ZWEIFLER:  After this letter are

5        there more documents or that was the end of

6        the medical exemption request?

7             DR. LOWE:  That was the end of --

8        there is a -- there's an e-mail I have from

9        Dr. D'Cunha on September 23rd.  It's more of

10       the same, quite frankly.  I don't really

11       think there's anything different or unique

12       in here.  It's basically a personal note --

13       in my opinion, a personal note about her

14       disappointment and things along those lines.

15       My office received no further medical

16       documentation, anything that was different.

17            DR. D'CUNHA:  Dr. Lowe, may I just

18       point out a few things?  You mentioned that

19       in my medical accommodation request, that I

20       did not state anything about pregnancy.  In

21       my handwritten note, one of the first things

22       I say in there is I understand all of the

Case 23-476, Document 34, 06/07/2023, 3526224, Page98 of 190

PROCEEDINGS - November 22, 2021

1           foregoing to reference and be in accord with

2           current State and Federal law regarding

3           pregnancy and/or disability and reasonable

4           accommodation in the workplace.  I did

5           mention the fact about pregnancy.  There's

6           also the note from my physician stating that

7           I am pregnant.  The e-mail that I provided

8           with regard to my re-appeal shared a lot of

9           articles and a lot of papers and studies

10          that were done which indicated that there

11          was still an ongoing effort to establish the

12          safety of the vaccine in pregnant women.

13          All four package inserts for all four

14          vaccines that are currently available

15          mention the fact that you need to discuss

16          this with your OB.  They also mention

17          enrolling in a clinical trial in order to

18          continue monitoring women to see the side

19          effects.  The various data websites posted

20          close to 3,000 miscarriages.  So I'm not

21          entirely sure where the safety establishment

22          has been declared in terms of pregnancy.

PROCEEDINGS — November 22, 2021

Page 48

```
1              DR. LOWE:  Noted.  I've established
2       that the guidelines that the committee
3       followed, there is no contraindication to
4       pregnancy, and that was the standards by
5       which we moved forward to the highest levels
6       of the organization.
7              DR. EL-SAYEGH:  Can you share with us
8       the CDC that you just mentioned about
9       medical exemption, or what you referred to
10      earlier?
11             DR. LOWE:  So it's the CDC -- it's the
12      interim clinical considerations for the use
13      of COVID-19 vaccination.  It's rather
14      lengthy.
15             DR. BARONE:  Did you submit that to
16      the committee?
17             DR. LOWE:  Actually, I did not.  I
18      mean it's -- it's easily available online.
19      If you'd like, I could get this to the
20      committee.
21             DR. BARONE:  I think just the section
22      in regard to pregnancy may be useful to the
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page100 of 190

PROCEEDINGS - November 22, 2021

Page 49

```
1          committee.
2               DR. LOWE:  Okay.  Is that something
3          you want me to pause and work on now to get
4          to you or we can get it to you after this?
5               DR. BARONE:  I think you can get it --
6               DR. LOWE:  How would I get something
7          to the committee?  I do have somebody in my
8          office that can help send stuff over.
9               DR. BARONE:  Why don't we try to work
10         on getting it before the meeting ends, this
11         way we can make sure everyone was privy to
12         that.  Again, all I need is really the
13         section.  Maybe you can PDF the section on
14         pregnancy.
15              DR. LOWE:  How can I get it to you?
16              DR. BARONE:  Tamira, is there a way he
17         can e-mail that to you, a PDF, and you can
18         share it?
19              MS. BRUNSON:  Dr. Lowe, do you have my
20         e-mail address, or do you want me to e-mail
21         you and you can reply?
22              DR. LOWE:  Yes.  Also e-mail it to
```

（ページ上部の赤字）

PROCEEDINGS – November 22, 2021

Page 50

```
1              Tracy Striano, please.
2                   MS. BRUNSON:  Okay.
3                   DR. BARONE:  Thank you.
4              John, this is your witness.  Is there
5         anything else you want Dr. Lowe to try to
6         comment on?
7                   DR. LOWE:  Dr. Barone, I don't mean to
8         interrupt.  This will be the section here.
9         Can you read that?  I will ask my secretary
10        -- my administrative assistant to send it
11        over to you folks.  It's consideration
12        involving pregnancy, lactation and
13        infertility. Okay.
14                  DR. BARONE:  Terrific.
15                  DR. LOWE:  I can pause and ask her to
16        start working on that or I can stay with
17        you.
18                  DR. SOTTILE:  I'm just wondering if
19        there was any communication between EHS and
20        Dr. LaPorta regarding a decision and any
21        feedback from Dr. LaPorta, or was that just
22        end of story?
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page102 of 190

PROCEEDINGS - November 22, 2021

Page 51

1          DR. LOWE:  So folks, Northwell in

2     general did a lot of education of physicians

3     across the health system to sort of counter

4     what we considered -- what we considered to

5     be not the standard for our Northwell

6     patients.  You have to understand, most  --

7     not all, not all exemptions came from

8     Northwell Health.  We didn't have that kind

9     of reach. We do have the weekly chief

10    medical officer update.  It's almost an hour

11    long.  That goes out to all the physicians.

12    We did a lot of education on that.  Letters

13    from the chief medical officer.  Really,

14    quite frankly, asking physicians to stick by

15    known guidelines and expertise.

16          So there were literally hundreds,

17    hundreds of medical exemption requests

18    across all sorts of different reasons.

19    Individually that would have been almost

20    impossible to do.  We did recognize as a

21    committee that there needed to be a lot of

22    education of our Northwell physicians, and

PROCEEDINGS – November 22, 2021

Page 52

```
 1              we did that through the chief medical

 2              officer.  So I don't know of an individual

 3              conversation, it didn't come from me of an

 4              individual conversation, with any physician

 5              with perhaps one or two exceptions where I

 6              needed to speak to them in order to --

 7              pregnancy and history of COVID was a very

 8              common request.  Our committee had looked at

 9              many, many of these.  We universally decided

10              that pregnancy, without some other medical

11              thing that would make us question it, in and

12              of itself was not a contraindication, and

13              again was supported by CDC, ACOG, our

14              obstetrical leadership.  And history of

15              COVID.  Those are two things that really

16              weren't even that challenging for the

17              committee because we felt as though there

18              was so much good guidance out there, solid

19              clinical guidance, that that didn't really

20              need individual -- I didn't really -- we

21              didn't really need to hear other opinions on

22              that was our position.  Okay.
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page104 of 190

PROCEEDINGS — November 22, 2021

Page 53

```
1            DR. D'CUNHA:  I just have one last
2       question.  What is the purpose of
3       vaccination?  The COVID-19, what is the
4       purpose of it?
5            DR. LOWE:  Dr. Barone, is this -- I'm
6       not -- I'll answer if you'd like me to but I
7       don't know the point of it right now, quite
8       frankly.
9            DR. BARONE:  Just a short answer.  I
10      think since I'm going to -- you're going to
11      leave the committee, I think it's just --
12      it's due process to let Dr. D'Cunha at least
13      ask you a question or two.
14           Dr. D'Cunha, I'm not going to let you
15      get into a big debate.
16           DR. LOWE:  I would say particularly in
17      this setting of a global pandemic in a
18      healthcare institution where we are
19      absolutely responsible for the safety of our
20      patients, the purpose of the vaccine --
21      mandatory vaccine for healthcare workers and
22      Northwell's desire and obligation to enforce
```

PROCEEDINGS - November 22, 2021

Page 54

```
1              that mandate was about keeping our patients

2         safe.  I will end my comments there.

3              DR. BARONE:  Dr. Lowe, I just want to

4         -- you brought this up as a question in my

5         mind.  I just want to reemphasize it so I'm

6         just a hundred percent crystal clear.  In

7         general, all requests for deferral of

8         vaccine based on pregnancy or prior immunity

9         were --

10             DR. LOWE:  Declined.

11             DR. BARONE:  -- declined?  Would that

12        be a fair statement?

13             DR. LOWE:  I would say there were

14        many, many, many, many in each of those

15        categories, and they were universally

16        declined as a reasonable medical exemption

17        based on the data that we have.  So yes.

18             DR. BARONE:  Okay.  Dr. Sottile,

19        anything else for Dr. Lowe?

20             DR. SOTTILE:  No.  We can bring on

21        Vicki Kahaner.

22             DR. BARONE:  Dr. D'Cunha, anything --
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page106 of 190

PROCEEDINGS - November 22, 2021

1          I don't want to get into a debate of science

2          here.   Anything in regards to process or

3          anything else you want to ask Dr. Lowe

4          about?

5                DR. D'CUNHA:   No.   That's fine.   We'll

6          get -- because the whole reason for getting

7          the vaccine, the COVID-19 vaccine, is to

8          establish antibodies.   When you acquire

9          COVID, you have antibodies.   I don't

10         understand why that is not accepted.   But as

11         Dr. Lowe mentioned, anybody who has had

12         COVID and who is pregnant was denied.   I

13         will leave it at that.

14               DR. BARONE:   I just wanted to

15         establish that you weren't singled out for

16         any reason.   That's what I wanted to make

17         clear to myself in my mind, that that was

18         kind of the policy.

19               DR. BARONE:   Committee members,

20         anything else for Dr. Lowe before I let him

21         go?

22               DR. EL-SAYEGH:   Dr. Lowe, did you

PROCEEDINGS - November 22, 2021

Page 56

1        request from Dr. D'Cunha to get you more

2        medical evidence why she needed to be exempt

3        from the vaccine or her request was declined

4        and that was it?

5              DR. LOWE:  I'm sorry, Doctor.  I

6        apologize.  I don't fully understand the

7        question.

8              DR. EL-SAYEGH:  Based on the letter

9        that was submitted by the OB/GYN, did you

10       feel that she needed -- you needed or the

11       committee needed more information why she's

12       to be exempt from the vaccine besides the

13       fact that she's pregnant and she did not

14       provide you with this information or the

15       sole reason --

16             DR. LOWE:  No.  I would say honestly,

17       honestly -- again, we had so many of these

18       very similar pregnancies with a history of

19       COVID or just a history of COVID.  We had

20       debated that so many times and we had such

21       tremendously solid guidelines.  I mean ACOG

22       strongly recommended -- I mean the language

Case 23-476, Document 34, 06/07/2023, 3526224, Page108 of 190

PROCEEDINGS – November 22, 2021

1          is very clear.  CDC, the language is very

2          clear, strongly recommend.  I didn't feel it

3          was necessary in this particular case to go

4          back and establish anything with this

5          doctor.  There was no detail.  There was no

6          further decision making that really needed

7          to be here from our opinion.  Both of these

8          were, as I said, common, and they were

9          denied as medical exemptions to the

10         vaccination almost universally.

11                DR. BARONE:  Okay.  Thank you, Dr.

12         Lowe.

13                DR. LOWE:  I'm going to be sending

14         this to you right now.

15                DR. BARONE:  I appreciate it.

16                DR. LOWE:  Procedurally I'm going to

17         stay -- I'll go back to the waiting room and

18         wait to hear from you or am I done?

19                DR. BARONE:  Would it be -- can you do

20         other work while you're in the waiting room?

21                DR. LOWE:  Absolutely.  Absolutely.

22                DR. BARONE:  I don't think I'll need

Case 23-476, Document 34, 06/07/2023, 3526224, Page109 of 190

**JA-106**

PROCEEDINGS - November 22, 2021

Page 58

```
 1          to recall you but I would appreciate you

 2          hanging around while you do your other work

 3          just in case.

 4                  DR. LOWE:  If I'm gone -- I'm in the

 5          clinic today, as you can tell by my dress.

 6          We're a skeletal staff.  I'm trying hard to

 7          get my staff out on some vacation after all

 8          this time. I'm going to pop my head in the

 9          clinic.  I'll be checking very, very

10          frequently.

11                  DR. BARONE:  I appreciate your time.

12                  DR. ZWEIFLER:  Can I ask a final

13          question?

14                  DR. BARONE:  Sure.

15                  DR. ZWEIFLER:  I'm just curious.  It

16          sounds like, if I understand correctly, that

17          Dr. D'Cunha presented some articles or some

18          data about miscarriages in pregnancies.  Did

19          the committee review the data she presented

20          and look at that or -- I don't know if I'm

21          understanding exactly what happened with

22          that evidence you guys looked at.
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page110 of 190

PROCEEDINGS - November 22, 2021

```
 1              DR. LOWE:  So again I'm going to go
 2         back to what we used to look or to see if
 3         there was a guidance of the recognized
 4         entities.  Again, that was the American
 5         College of Obstetricians.  Even the Maternal
 6         Fetal Society.  If you started going out
 7         into the internet sphere to look for a
 8         reason not to get vaccinated, you could find
 9         it.  We really felt as though this had to be
10         based on truly the established guidelines
11         and those well recognized, respected
12         professional entities.  Again, there's so
13         much information out there.  I'm not going
14         to say necessarily misinformation, but a lot
15         of it is misinformation that -- we did not
16         take every article or every internet site or
17         every -- everything that somebody could find
18         out there back to the committee for
19         discussion.  We did not feel as though that
20         was an approach for us enforcing a State
21         mandate, for not just pregnancy but for
22         anything.
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page111 of 190

PROCEEDINGS - November 22, 2021

Page 60

```
 1            DR. SOTTILE:  But your committee did
 2       look into the validity of those particular
 3       articles that Candice sent?  Was that looked
 4       into or were they just discarded?  Were
 5       those articles looked at and the validity of
 6       those articles?
 7            DR. LOWE:  They were.  They were
 8       reviewed by the committee, but I would not
 9       use your terminology of discarded.
10       Honestly, if it wasn't from one of the
11       recognized -- I don't know what society --
12       the recognized society of podiatric surgery,
13       or whatever that may be.  You really could
14       tell from the outset that -- those were the
15       guidelines that we used.  The term
16       discarded, like I said, I read everything
17       that came in.  Everything was sent to the
18       committee, so --
19            DR. SOTTILE:  Thank you.
20            DR. BARONE:  Thank you.
21            Okay.  So I'm going to ask Dr. Lowe to
22       be removed from the meeting.  He's going to
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page112 of 190

PROCEEDINGS - November 22, 2021

Page 61

```
 1              remain on standby.
 2                    Can we, Gus, put the next witness up?
 3                    MR. PHILLIPS:  Dr. Lowe, if you look
 4              at the bottom of your screen there will be a
 5              breakout room icon.
 6                    DR. LOWE:  I do not see that.
 7                    MR. PHILLIPS:  Do you see the invite
 8              now?
 9                    DR. LOWE:  I see there's a drawing of
10              an icon for the head and shoulders. Maybe I
11              should move my picture.
12                    MR. PHILLIPS:  Give me one second.
13              I'll close the rooms and then I'll reassign
14              you.
15                    Do you want me to wait before I let in
16              Ms. Kahaner?
17                    DR. BARONE:  No.  You can let her in
18              right away.
19                    (Whereupon, an off-the-record
20              discussion was held.)
21                    DR. BARONE:  Ms. Kahaner, can you
22              spell your name for the court reporter?
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page113 of 190

PROCEEDINGS - November 22, 2021

```
 1              MS. KAHANER:  K-A-H-A-N-E-R.

 2              DR. BARONE:  Can you give her your

 3      title, please?

 4              MS. KAHANER:  Absolutely.  I'm vice

 5      president of Employee Relations for

 6      Northwell Health.

 7              DR. BARONE:  I understand you're here

 8      because you helped make determinations or

 9      you and others helped make determinations on

10      religious exemption requests in regard to

11      the COVID-19 vaccine mandate.

12              MS. KAHANER:  Correct.  Part of my

13      team is the Advice and Council Center.  The

14      Advice and Council Center is a centralized

15      department that manages employee relation

16      issues throughout the organization, such as

17      disciplinary, advice for managers,

18      investigations, as well as accommodation

19      requests that come in.

20              DR. BARONE:  Okay.  Dr. Sottile, do

21      you want to ask your witness any questions

22      or let her make a statement?  It's your
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page114 of 190

PROCEEDINGS - November 22, 2021

Page 63

```
 1        witness.
 2             DR. SOTTILE:  I think, Vicki, if you'd
 3        like to make a statement to inform us
 4        exactly what Dr. D'Cunha's religious
 5        exemption request was.
 6             MS. KAHANER:  Sure.  Do you want me to
 7        go to her request or do you want me to go
 8        through the process that we --
 9             DR. SOTTILE:  You can go through the
10        process.  Thank you.
11             MS. KAHANER:  Sure.  So I want to
12        start first with where we were as an
13        organization in regard to the mandate and
14        the religious exemptions.
15             Tamira, I think you have an Exhibit 5.
16        If we want to put that up.  Exhibit 5 is a
17        series of e-mails that are dated between
18        August 2nd and October 4th.  So in total
19        there are eight e-mails in here that were
20        sent, some to the entire organization and
21        some to those that were just not vaccinated.
22        So very quickly I'll take you through the
```

PROCEEDINGS - November 22, 2021

Page 64

```
1              dates of each of the letters in the order

2              that they are listed in Exhibit 5.

3                   August 2nd was an e-mail that was sent

4              to all team members informing them that we,

5              as an organization, are mandating the

6              vaccine, and that mandate will be in effect

7              as of August 16th.  Failure to be vaccinated

8              would lead to weekly PCR testing.  And so

9              that was the first announcement that went

10             out, and that was sent by Michael Dowling

11             and Mark Solazzo.

12                  The second letter was dated August

13             10th.  These were all sent by e-mail to

14             employees' e-mail addresses in the

15             organization.  The August 10th was sent to

16             those team members that were still not

17             vaccinated, reminding them that we have a

18             mandate in place effective August 16th, and

19             failure to be vaccinated by that date would

20             lead to weekly PCR testing, just putting it

21             out there one more time to them.

22                  Then the third letter is August 18th,
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page116 of 190

PROCEEDINGS - November 22, 2021

Page 65

1          and this was sent right after the State

2          mandate was announced.  It was informing our

3          team members about the State mandate, and

4          PPE, and the date of the requirement to have

5          the vaccine as per the State mandate, as

6          well I think in here we give information

7          about how to get the vaccine.  We might also

8          in here talk about the PCR testing that has

9          to be done by everyone between that date and

10         the 27th.

11                Then there was a September 3rd e-mail

12         that was a reminder e-mail about the testing

13         requirement and the vaccine requirement.  A

14         lot of similar information.  That went out

15         on September 3rd.

16                September 15th we sent out another

17         e-mail because there seemed to have been a

18         lot of confusion in regards to a temporary

19         restraining order that the court had issued

20         in regard to religious exemptions.  We

21         wanted to inform the team members that we

22         will be compliant with the law and tried to

PROCEEDINGS - November 22, 2021

Page 66

```
 1          explain exactly what that temporary
 2          restraining order meant.  A lot of people
 3          were under the impression that the mandate
 4          was put on hold, so we were making an
 5          attempt to make sure that everybody was
 6          aware it was still 9/27 as to the date that
 7          it must be complied with, that we were
 8          continuing to receive religious
 9          accommodation requests and that we would be
10          determining what we would do for those as
11          time moved forward.
12               The next e-mail that was sent was on
13          the 21st of September, and this was
14          announcing to all team members what our
15          operational plans were as we approached the
16          9/27 deadline date and to ensure everybody
17          -- to ensure everybody that we had a plan in
18          place and we were ready operationally to
19          deal with anything that might come about.
20               The 9/28 e-mail was informing team
21          members that were not vaccinated that the
22          termination -- if failure to get the
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page118 of 190

PROCEEDINGS - November 22, 2021

1       vaccination at that point was going to be

2       leading to termination, and announcing also

3       that we had terminated several leaders

4       already for not being vaccinated.

5              And then on the 4th -- the final

6       e-mail in this packet was on October 4th

7       informing everybody that we had reached a

8       hundred percent compliance with the vaccine

9       mandate and the only outliers for those

10      would be pending exemption requests.  I'm

11      not sure if that's in the e-mail but that

12      was our position at that point in time.

13             So that's Exhibit 5.  You'll have the

14      opportunity to read those, I'm sure, after

15      this hearing.

16             We had put a plan in place as to how

17      we would manage religious exemptions.  We

18      had created a form that could be utilized by

19      individuals requesting religious exemption.

20      That form was to be given to their local

21      site HR who would then forward it to the

22      Advisory Council Center, which is my team.

PROCEEDINGS - November 22, 2021

Page 68

1          We would open up a case and we would manage

2          it going forward from there.

3              We had many discussions with senior

4          leadership as well as the clinicians, the

5          top clinicians in the organization, about

6          how we wanted to manage religious exemption

7          requests and what the law required.  What we

8          talked about was the safety of our patients

9          and the rest of the team members to have

10         unvaccinated individuals continue to work in

11         the workplace, and felt that we were putting

12         people at risk unnecessarily.  So the

13         decision was that anybody that put in a

14         religious exemption request at that point,

15         meaning after the TRO was issued, we would

16         be denying those requests that came in for

17         anybody that was patient facing or that we

18         believed would be putting others at risk if

19         they continued to work in the workplace.  So

20         that was a decision that came about after

21         significant discussion as to the protection

22         that we wanted to give our patients and the

Case 23-476, Document 34, 06/07/2023, 3526224, Page120 of 190

PROCEEDINGS - November 22, 2021

```
 1          expectation our patients had.

 2               So I think, Tamira, if you can put up

 3          Exhibit 6.

 4               Exhibit 6 will show you the form

 5          itself that we asked everybody to fill out.

 6          This is the resident form that was signed on

 7          September 3rd.  I don't believe my team

 8          received it for a couple weeks.  I'm not sure

 9          where the delay might have been, but we

10          received it on the 30th of September and

11          opened a case.  You can see in here that she

12          changed some of the language, or, you know,

13          wrote some additional language on to the

14          team acknowledgement.

15               If you scroll down you will see her

16          specific -- on the next page will be her

17          specific request for a religious exemption.

18          I'm sorry.  It must be the third page.  So

19          on the third page she describes why she's

20          objecting on religious grounds for the

21          religious -- why she's requesting the

22          religious exemption, and she sets forth her
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page121 of 190

**JA-118**

PROCEEDINGS - November 22, 2021

```
1        objection to have any vaccine that had fetal
2        cells involved in the development of it.  So
3        this is what we had from her and this is
4        what we accepted from her.
5            Then what I can say is that we
6        accepted her statements as legitimate.  We
7        did not -- we did not pushback or object to
8        what she was saying.  We took it as fact
9        that she did have a sincere health belief,
10       and then we moved on to the next part of the
11       analysis which was would it create an undue
12       hardship.
13           And then, Tamira, if you can put up
14       Exhibit 7.
15           Exhibit 7 is the religious exemption
16       denial that my team sent out on behalf of HR
17       informing her that we had received it.  We
18       talk about the State mandate in there and we
19       talk about why we are denying it, which was
20       that we believed it created an undue
21       hardship because she is patient facing and
22       dealing directly and caring for patients,
```

PROCEEDINGS - November 22, 2021

Page 71

```
 1              which was consistent with the determination

 2              that we made as an organization to what

 3              would constitute an undue hardship for us.

 4              This was dated on October 1st.  I'm not sure

 5              when she received it but it was likely that

 6              the e-mail went out with this attached on

 7              October 1st.  That was the denial.

 8                   So that was our process and that

 9              was the timeframe.  I'm not sure exactly

10              what occurred after that. I wasn't involved.

11              This was the religious exemption process.

12                   I'd be happy to answer any questions.

13              DR. SOTTILE:  I have a question.  Did

14              you consider Dr. D'Cunha's religious

15              exemption based on her individual request or

16              had you already made up your mind that

17              Northwell was no longer accepting any

18              religious exemptions and that she was going

19              to be predetermined to be denied?

20              MS. KAHANER:  No.  We accepted -- so

21              there was a period of time where the State

22              had indicated that they would not be
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page123 of 190

PROCEEDINGS - November 22, 2021

1          permitting religious exemptions.  That was
2          in August.  At that point in time we were
3          denying religious exemptions because the
4          State said they would not be permitting
5          them.  Then the temporary restraining order
6          was issued in December, and so anybody that
7          had received a denial was reconsidered based
8          on the fact that there was a temporary
9          restraining order issued.  So the
10         determination was made pursuant to the
11         guidance by the courts on religious
12         exemptions as to once you determine that
13         it's sincerely a health belief, as I stated
14         earlier we took the position it was a
15         sincere health belief, we would consider it
16         under the guidance of the EEOC and the
17         Federal courts as to whether or not an undue
18         hardship would be presented if we were to
19         grant it.  It was determined that clinicians
20         that were patient facing, anybody that was
21         unvaccinated in that scenario would create
22         an undue hardship.  So we did consider it

Case 23-476, Document 34, 06/07/2023, 3526224, Page124 of 190

**JA-121**

PROCEEDINGS – November 22, 2021

```
 1          fully and consistent with the guidance by
 2          the courts.
 3               DR. SOTTILE:  Did you accept any
 4          religious exemptions from any physician or
 5          resident fellow in direct patient contact?
 6               MS. KAHANER:  So we accepted the
 7          submission, but anybody that -- again,
 8          anybody that had direct patient contact
 9          would have been denied regardless of title.
10          It would have been physicians, nurses, PCAs.
11          Anybody that was going to be dealing
12          directly with patients was denied.
13               DR. SOTTILE:  Thank you.
14               DR. BARONE:  What is the current state
15          of affairs in regards to religious
16          exemptions in New York, you know, by the
17          courts?
18               MS. KAHANER:  So the Second Circuit
19          issued a determination in regard to two
20          cases.  I don't know exactly, you know, what
21          date it was issued.  Essentially it
22          supported the position that we took in
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page125 of 190

PROCEEDINGS - November 22, 2021

1          regard to anybody that is dealing directly

2          with patients would be creating an undue

3          hardship if they were not vaccinated.   I

4          know that there is language in the Second

5          Circuit decision that does support the

6          position that we did take.

7               DR. BARONE:  Would you say that your

8          -- I don't know if these are the right words

9          -- your hands are tied by the State, that

10         you really don't have an option of offering

11         religious exemptions?

12              MS. KAHANER:  I wouldn't say that. I

13         think that as an organization we had come to

14         that conclusion prior to the court issuing

15         that decision.  When the decision was issued

16         we felt very validated because it was the

17         same reasoning that we went through as to

18         make those determinations.  So I would say

19         that our decision was supported by the

20         courts.

21              We are still reviewing religious

22         exemptions that are currently pending for

Case 23-476, Document 34, 06/07/2023, 3526224, Page126 of 190

PROCEEDINGS - November 22, 2021

1        those people that are not patient facing.

2        So we are still reviewing some.  There are

3        still some that are pending out there.

4              I don't know if that answered your

5        question or not.

6              DR. BARONE:  It does.  I don't know if

7        -- is the State mandate, again for receiving

8        the COVID vaccine, only for patient-facing

9        employees or is it for all?

10             MS. KAHANER:  It's for people that

11       work in covered entities.  Covered entities

12       are Article 28s.  There's a whole list of

13       what is considered a covered entity.  Then

14       the covered personnel are those that work

15       within the covered entities.

16             DR. BARONE:  I got it.

17             MS. KAHANER:  That's the State

18       mandate.  Our mandate was for every employee

19       within Northwell regardless of whether or

20       not they were in a covered entity pursuant

21       to the State mandate.

22             DR. BARONE:  Dr. Sottile, any

JA-124

PROCEEDINGS – November 22, 2021

Page 76

1          additional questions?

2                DR. SOTTILE:  No, thanks.  None for

3          me.  Thank you.

4                DR. BARONE:  Committee members?

5                DR. ZWEIFLER:  No.

6                DR. BARONE:  Dr. D'Cunha, since I'm

7          going to let the witness leave in a second,

8          do you want to ask her a question?

9                DR. D'CUNHA:  I just want to clarify

10         with regard to the blurriness in regards to

11         my religious exemption submittal.  I had

12         actually submitted it in the first week of

13         September.  On September 30th I was

14         contacted by Kate Rafla who told me that

15         they could not find my religious exemption.

16         I had turned it in to the Northwell Health

17         site HR office.  I was told at the time that

18         religious exemptions weren't being accepted

19         but that a copy of my religious exemption

20         was made and that it will be kept with my

21         file.  So then I was reached out to on

22         September 30th by Kate Rafla.  I had no idea

Case 23-476, Document 34, 06/07/2023, 3526224, Page128 of 190

PROCEEDINGS - November 22, 2021

1        that my copy of my religious exemption had

2        been misplaced.  I had sent it to her late

3        that evening via fax.  It was sent to Kate

4        Rafla, and then the very next day, in the

5        morning, in the middle of seeing patients, I

6        received an e-mail saying that my religious

7        exemption was denied and within the hour I

8        was told that I would be terminated as of

9        that day.

10           So I just wanted to clarify that

11       timeline because that part was not known.

12           MS. KAHANER:  And that would be

13       correct.  I just want to add that at the

14       time on the 3rd we were not accepting

15       religious exemptions because a TRO had not

16       yet been issued and the State had said that

17       no religious exemptions would be permitted.

18       That makes sense that the site would not

19       have forwarded it to my office.  Then when

20       things opened up again after the TRO, there

21       were some individuals that had requests that

22       didn't make it in, but eventually every

PROCEEDINGS - November 22, 2021

Page 78

```
 1        request did make it to us and was

 2        considered.

 3            DR. BARONE:  Thank you.  Is it

 4        possible that you can hang out in the

 5        waiting room in case we need to recall you?

 6        I don't know if I need to.  I don't know if

 7        you have another place you need to go to.

 8            MS. KAHANER:  I am fine to hang out

 9        for a least another hour, hour and fifteen

10        minutes.

11            DR. BARONE:  Good.  I don't think it

12        will be longer than that.  I appreciate you.

13        Go do your work and we'll recall you in case

14        there's any clarifying issues we need.

15            MS. KAHANER:  Thank you very much.

16            DR. BARONE:  I appreciate it.

17            Dr. Sottile, any other witnesses or

18        comments or anything you want to show the

19        committee?

20            DR. SOTTILE:  No. I think we have all

21        the facts on the table.  There's not much to

22        discuss here.  It was a mandate, and
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page130 of 190

**JA-127**

PROCEEDINGS — November 22, 2021

Page 79

1          unfortunately Candice did not follow that

2          mandate so we had to pursue this as an

3          adverse action -- unusual adverse action.

4          It has to be taken as an adverse action if

5          we're not following the policy.  So I have

6          nothing further.

7               DR. BARONE:  Thank you.

8               Do any committee members have anything

9          to ask Dr. Sottile in regards to his

10         presentation?

11              DR. EL-SAYEGH:  I just have a quick

12         question.  Which exemption was filed first,

13         the religious one or the medical one?

14              DR. D'CUNHA:  The religious one first

15         and then the medical one after that.

16              DR. EL-SAYEGH:  Thank you.

17              DR. BARONE:  Okay.  So I think we turn

18         the meeting now to Dr. D'Cunha.  You now

19         have the opportunity to present witnesses or

20         documents that you want to share that

21         haven't been shared with the committee

22         already.

Case 23-476, Document 34, 06/07/2023, 3526224, Page131 of 190

PROCEEDINGS - November 22, 2021

Page 80

1          DR. D'CUNHA:  So I don't have any

2      witnesses.  As far as some of the links and

3      the things that I spoke about earlier in my

4      earlier statement, I can send that over to

5      Tamira once I get her e-mail address.  I can

6      send that over so you can have that to look

7      over.  I can also send you the links to the

8      articles that I did talk about in my medical

9      exemption re-appeal.  I do think if we're

10     going to accept some studies but neglect

11     others, then that's not really looking at

12     the science itself.  It's kind of being

13     biased in that regard.  If we're looking at

14     articles, we need to consider all articles.

15     We need to look at the various data.  Once I

16     get Tamira's information, I can send all of

17     those things over.

18          With regard to the decision that

19     Northwell has currently taken terminating my

20     employment and my training, it just -- right

21     now, as of this point in time, it feels that

22     if you have a religious belief and if you

Case 23-476, Document 34, 06/07/2023, 3526224, Page132 of 190

```
 1              are pregnant, you are not being considered

 2              as a person or as an individual.  You are

 3              being considered as a number, as somebody

 4              who can only do harm to patients.

 5                   Last year, before the vaccines were

 6              there, we all worked without a vaccination.

 7              We took precautions, we worked and we did

 8              the best we could, and I did that again

 9              while being pregnant.

10                   To me it's not a very difficult

11              situation to see that yes, there was a

12              mandate put out, but we don't treat

13              individuals based on a general assumption.

14              For instance, we see a lot of diabetic

15              patients.  Not every single diabetic patient

16              that comes in gets the same medication to

17              control their blood sugar levels.  Everybody

18              is different and they get different

19              medications or different cocktails of

20              medications based on their individual health

21              and based on the fact that that's how we

22              treat and go about in medicine.
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page133 of 190

PROCEEDINGS - November 22, 2021

Page 82

```
1              The fact that I am questioning things.

2         The fact that I'm saying look at me as an

3         individual and treat me as a human being is

4         not being taken into consideration.  I ask

5         for you to take that into consideration when

6         making your decision.

7              DR. BARONE:  Thank you.

8              DR. SOTTILE:  I would just like to add

9         that Dr. D'Cunha was in good standing.  She

10        had completed all of her milestones

11        successfully through her PGY one year.  She

12        was a good resident and was here working

13        throughout the COVID during the deployment.

14        So I would just like to add that, that, you

15        know, she -- her qualifications and her

16        milestones were all met and there was no

17        problem ever with Dr. D'Cunha.

18             DR. BARONE:  Thank you.

19             MS. BRUNSON:  Dr. D'Cunha, is your

20        e-mail address candiceres90@gmail.com?

21             DR. D'CUNHA:  Yes.

22             MS. BRUNSON:  I just e-mailed you my
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page134 of 190

PROCEEDINGS — November 22, 2021

```
 1          information.

 2                  DR. D'CUNHA:  I will send everything

 3          over.

 4                  DR. EL-SAYEGH:  Just one question.

 5                  DR. BARONE:  Okay.  Tamira, do you

 6          have that CDC document yet that Dr. Lowe was

 7          going to send over?

 8                  MS. BRUNSON:  I just got it.  Do you

 9          want me to pull it up?

10                  DR. BARONE:  Don't pull it up yet.  I

11          think we have a question.  Be ready in a

12          second.

13                  Did you have a question, Dr.

14          El-Sayegh?

15                  DR. EL-SAYEGH:  Yes.  Did Employee

16          Health share with you the articles and the

17          guidelines from ACOG and from the CDC that

18          they followed to make that decision of

19          declining your medical exemption?

20                  DR. D'CUNHA:  Are you asking if I was

21          sent any of those articles?  No, I wasn't.

22                  DR. BARONE:  Okay.  Tamira, can you
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page135 of 190

PROCEEDINGS - November 22, 2021

1          put up that article just so we can have it
2          on the record that we viewed it?
3                  I think we have to scroll down to -- I
4          think it's a big -- I'm looking for
5          something with -- right there.  Good.  Go up
6          a little bit so we can just read the first
7          paragraph.  Scroll back up a little bit.
8          Thanks.  Scroll up a little bit to the
9          pregnancy section.  Continue to scroll.  You
10         can continue to scroll, please.  Thank you.
11                 Dr. D'Cunha, can I ask you a question?
12         Have you received what would be considered
13         routine vaccines in the past?
14                 DR. D'CUNHA:  Yes.
15                 DR. BARONE:  So like flu vaccines, all
16         the other ones that --
17                 DR. D'CUNHA:  Last year I declined the
18         flu shot because I was pregnant.  So I
19         declined the flu vaccine then.
20                 DR. BARONE:  Traditionally you get the
21         flu vaccine and the DTaP and the other ones?
22         I guess I would refer to them as traditional

Case 23-476, Document 34, 06/07/2023, 3526224, Page136 of 190

PROCEEDINGS - November 22, 2021

Page 85

1          vaccines.

2                    DR. D'CUNHA:  Yes.

3                    DR. BARONE:  You can stop screen

4          sharing, please.  Thanks, Tamira.  It makes

5          it easier for me to see everyone's face.

6                    You said you had a previous child?

7                    DR. D'CUNHA:  Yes.  I had my first

8          child October of last year.  I'm currently

9          pregnant with my second child.

10                   DR. BARONE:  Does this pregnancy

11         differ in regards to -- I guess I assume

12         your first child -- your first pregnancy

13         was, I don't want to use the word routine.

14                   DR. D'CUNHA:  Yes.

15                   DR. BARONE:  I would assume the second

16         pregnancy, again and please excuse my term

17         routine, but I know being pregnant is not a

18         routine thing.

19                   DR. D'CUNHA:  Right.  So far

20         everything, by the grace of God, has been

21         fine.

22                   DR. BARONE:  Okay, good.  And if you

PROCEEDINGS - November 22, 2021

Page 86

```
1          weren't pregnant would you have elected to
2          receive the vaccine?
3               DR. D'CUNHA:  My religious belief does
4          not want me to do that.  I have been a
5          practicing Catholic my entire life.  Ever
6          since I have learned of the involvement of
7          aborted fetal cells in the use of the
8          vaccine production or in terms of testing, I
9          have tried to stray away from those vaccines
10         and find ethical alternatives, not only for
11         myself but for my first born.  Whenever a
12         reason arises to wait to the ethical vaccine
13         comes out, I will be waiting until an
14         ethical vaccine comes out.  So I am against
15         the fact that children who are unborn and
16         have no say in the matter have been used
17         without their information, without their
18         consent in the production of vaccines.  It
19         doesn't feel right to me.  It doesn't sit
20         well with my religious practices or my
21         beliefs.  I wouldn't get it either way.
22              DR. BARONE:  So if -- I think your
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page138 of 190

PROCEEDINGS - November 22, 2021

1        OB/GYN's statement said delay vaccine until

2        after you're not pregnant.

3             DR. D'CUNHA:  He mentioned delay.

4        That was based on a medical perspective and

5        what he thought.  It's not necessarily

6        reflecting my religious belief.  That was

7        what he thought in regards to from a medical

8        standpoint.

9             DR. BARONE:  Right.  My comment is so

10       you -- after you've delivered you're not

11       planning on receiving the vaccine based on

12       your religious --

13            DR. D'CUNHA:  Based on my religious

14       beliefs.  Correct.

15            DR. BARONE:  Even if they say, you

16       know, a reason for subsequent employment?

17            DR. D'CUNHA:  Could you repeat the

18       last sentence?

19            DR. BARONE:  I guess potentially after

20       you deliver, if the medical exemption goes

21       away --

22            DR. D'CUNHA:  Right.

PROCEEDINGS – November 22, 2021

Page 88

1          DR. BARONE:  -- and someone offered

2     you a job but you needed the vaccine, you

3     would not get the vaccine in order to be

4     employed?

5          DR. D'CUNHA:  Correct.  If there was

6     an ethical alternative, I would take that

7     into consideration.  As of now all four

8     vaccines that are available have used

9     aborted babies in terms of the production or

10    in terms of testing.  So at this time; no, I

11    would not.

12         DR. BARONE:  So I would assume that

13    although you filed both a medical and a

14    religious exemption, I don't know if this is

15    the right word, but the religious exemption

16    is the more defining one in your decision

17    not to get the vaccine based on what you're

18    telling me now?

19         DR. D'CUNHA:  I think I would have

20    liked both to be taken into consideration,

21    because at this point in time they have

22    halted my training in October whereas if the

Case 23-476, Document 34, 06/07/2023, 3526224, Page140 of 190

PROCEEDINGS - November 22, 2021

1          company had considered my medical exemption

2          I would have been almost through with my

3          second year of training.  Now one-third of

4          the way, or less than one-third of the way

5          through my second year they are holding my

6          training, holding my health insurance,

7          holding my income.  My daughter was a

8          dependent on my health insurance, and that

9          was taken away from her as well.  So a lot

10         has been taken away from me in this process.

11             DR. BARONE:  I understand the medical

12         exemption would have helped continue your

13         benefits until that time.

14             DR. D'CUNHA:  My benefits, my

15         training.  I mean we've all been through

16         this process.  We put in years of not just

17         sacrifice and time and income and all sorts

18         of things, but there's hard work put into it

19         too.  Why would anybody want their training

20         to be halted midway through?

21             DR. BARONE:  I appreciate that.

22             I think some of the committee members

PROCEEDINGS — November 22, 2021

Page 90

```
 1          were trying to ask questions.  I'll be quiet
 2          and let you guys go.
 3               DR. SOTTILE:  Candice, I just want the
 4          committee to understand that you have an
 5          understanding that your career may be
 6          terminated if you fail to get vaccinated in
 7          the future.  I just want the committee to
 8          understand that you do understand that if
 9          you decide not to be vaccinated, your whole
10          career may be terminated.  You do understand
11          that?
12               DR. D'CUNHA:  I understand to the
13          extent that as of right now there is no
14          accommodation for someone's religious
15          exemption being made.  So if a religious
16          exemption was to be accepted, because that
17          conversation has been changing on a weekly,
18          monthly basis.  To that effect, if that
19          decision was to change once again in the
20          court system, then anybody who was
21          terminated for a religious exemption not
22          being accepted should be reconsidered again.
```

Case 23-476, Document 34, 06/07/2023, 3526224, Page142 of 190

PROCEEDINGS - November 22, 2021

1          DR. ZWEIFLER:  About supporting

2     documentation from a religious leader, I am

3     not sure if I'm misinformed but my

4     understanding was that the head of the Roman

5     Catholic religion did not support that

6     position.

7          DR. D'CUNHA:  Yes.  So the pope is not

8     infallible.  He can make an opinion but he

9     is not infallible.  Every person, every

10    Catholic, every practicing Catholic, we are

11    part of the Catechism of the church.  The

12    pope can have an opinion, and I do respect

13    the pope for his opinion, but he is not

14    infallible.  I think that's something one

15    has to take into consideration.  This was an

16    opinion on a medical matter, not a faith

17    matter.  That has to be taken into

18    consideration.  That's part of our Catechism

19    as well.

20         DR. ZWEIFLER:  Was there an

21    alternative religious support for this

22    position?

Case 23-476, Document 34, 06/07/2023, 3526224, Page143 of 190

PROCEEDINGS - November 22, 2021

```
 1          DR. D'CUNHA:  There has been a split
 2     within the Catholic church on the opinion
 3     regarding the vaccination because there is
 4     the matter of the aborted babies being used
 5     and continuing to be used in the production
 6     or testing of the vaccine.  Until an ethical
 7     form of testing and production is taken into
 8     consideration, this vaccine is not going to
 9     be fully accepted by everybody in the
10     Catholic church.  I think when an ethical
11     alternative comes into play, then we can
12     talk some more.  Until then, the court has
13     -- the court should rule to allow people to
14     have a religious belief, because if we don't
15     have our religious beliefs than where is our
16     freedom to believe in what we believe in?
17          DR. BARONE:  Dr. El-Sayegh, do you
18     have any last questions for Dr. D'Cunha?
19          DR. EL-SAYEGH:  I'm okay.  Thank you.
20          DR. BARONE:  If there's no objection,
21     I'm going to -- don't close out, Gus. I may
22     want to have the committee members stay on.
```

PROCEEDINGS - November 22, 2021

Page 93

1          If I have no objection, I'm going to adjourn

2      the meeting.  Any objection?  Dr. D'Cunha?

3              DR. D'CUNHA:  No.

4              DR. BARONE:  Dr. Sottile?

5              DR. SOTTILE:  No.

6              DR. BARONE:  All right.  So Michelle,

7      you can have the meeting as brought to a

8      close.

9

10             (Whereupon, the proceedings were

11     concluded at 10:40 a.m.)

12

13

14

15

16

17

18

19

20

21

22

PROCEEDINGS - November 22, 2021

Page 94

1

2                C E R T I F I C A T I O N

3

4

5            I, MICHELLE CONERO, a Notary Public

6    for and within the State of New York, do hereby

7    certify:

8            That hereinbefore set forth is a true

9    record of the proceedings.

10           I further certify that I am not

11   related to any of the parties to this proceeding

12   by blood or by marriage and that I am in no way

13   interested in the outcome of this matter.

14           IN WITNESS WHEREOF, I have hereunto

15   set my hand this 1st day of December 2021.

16

17

18

19

20   _____

          MICHELLE CONERO

21

22

**JA-143**



**Cohen Children's Medical Center**
Northwell Health℠


DONALD AND BARBARA
ZUCKER SCHOOL *of* MEDICINE
AT HOFSTRA/NORTHWELL

269-01 76ᵗʰ Ave, Suite C-028
New Hyde Park, NY 11040
Phone: (718) 470-3204

Stephen R. Barone, MD, FAAP
Vice Chairman for Education
Program Director
Cohen Children s Medical Center
Associate Professor of Pediatrics
Zucker Northwell School of Medicine

## REPORT OF THE ADVERSE ACTION REVIEW COMMITTEE

**TO:**     John Sottile, M.D.
              Candice D'Cunha, D.P.M.

**FROM:**  Adverse Action Review Committee

**DATE:**  December 23, 2021

___

Committee Members:

Stephen Barone, M.D., Program Director, Pediatric Residency Program, Cohen's Children's Medical Center (Chair)
Suzanne El-Sayegh, M.D., Associate Chair of Medicine and Program Director, Internal Medicine Residency Program, Staten Island University Hospital
Rebecca Zweifler, M.D., PGY-3, Internal Medicine Residency Program, Lenox Hill Hospital

Pursuant to Northwell Health's Office of Academic Affairs ("OAA") Policy #7, Due Process For Adverse Actions Taken Against Residents/Fellows, Section III 5(c), this Adverse Action Review Committee ("Committee") was appointed to provide Candice D'Cunha, D.P.M. ("Dr. D'Cunha") with a review of the October 5, 2021 termination decision ("Adverse Action") of the Staten Island University Hospital Podiatric Medicine and Surgery Residency Program ("Program").

___

### CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527

6325727v.9

*setting new standards in children's healthcare*

**JA-144**

The Committee held its review meeting on November 22, 2021. Because Dr. D'Cunha elected to proceed without being represented by an attorney, pursuant to OAA Policy #7A, neither the Program nor Committee had an attorney present at the review. The meeting was transcribed by a stenographer, and a copy of the transcript was provided to the Committee, to the Program, and to Dr. D'Cunha.

The Committee heard testimony from John Sottile, M.D., Program Director of the SIUH Podiatric Residency Program, from William Lowe, M.D., Medical Director of Northwell Health's Employee Health Service, from Vicki Kahaner, Vice President of Northwell Health Employee Relations, and from Dr. D'Cunha.

Documents accepted into evidence consisted of exhibits submitted by the Hospital, numbers 1-15; described in detail below. In addition, the Program provided the Committee with CDC guidelines concerning vaccination of pregnant persons, which the Committee will deem Program Exhibit 16. Dr. D'Cunha also provided the Committee with exhibits, also described below.

## THE PROGRAM'S EXHIBITS

Exhibit 1:   A copy of 10 N.Y.C.R.R. §2.61, which is the New York State regulation that requires healthcare worker to be vaccinated against COVID-19. §2.61, effective August 26, 2021 provides, in relevant part:

(a)(1)   Covered entities...include (i) any facility or institution included in the definition of hospital in section 2801 of the Public Health Law...

(2)   Personnel...shall mean all persons employed or affiliated with a covered entity...including students...who engage in activities such that if they were infected with COVID-19 they could potentially expose other covered personnel, patients or residents to the disease.

---

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

(c)      Covered entities shall continually require persons to be fully vaccinated against COVID-19 with the first dose by September 27, 2021 for general hospitals…absent receipt of an exemption…

(d)(1)      Medical exemption…If any licensed physician…certifies that immunization with COVID-19 vaccine is detrimental to the health…based on a pre-existing health condition, [the vaccine requirement] shall be inapplicable only until such immunization is found no longer to be detrimental to such [person's] health.

Exhibit 2:      Northwell Health's Human Resources Policy and Procedure Manual, Part 10, Section 1. At page 5, it provides that all team members must be vaccinated against COVID-19, and that failure to do so may result in termination of privileges/employment/relationship with Northwell.

Exhibit 3:      Dr. D'Cunha's September 9, 2021 request for a medical exemption from the vaccine requirement based on her pregnancy and natural immunity.

Exhibit 4:      September 20, 2021 letter to Dr. D'Cunha advising that her request for a medical exemption is denied; and September 29, 2021 letter to Dr. D'Cunha advising that after re-submission, her request for a medical exemption is still denied.

Exhibit 5:      A series of eight emails from Northwell Health to all employees advising them of the vaccine mandate.

Exhibit 6:      Dr. D'Cunha's request for a religious exemption, dated September 3, 2021. Dr. D'Cunha states that as a Roman Catholic, she is opposed to taking a vaccine developed using aborted fetal cells.

Exhibit 7:      October 1, 2021 letter to Dr. D'Cunha advising that her religious exemption request is denied.

Exhibit 8:      Dr. D'Cunha's PGY-2 contract.

Exhibit 9:      OAA Resident/Fellow Manual.

Exhibit 10:      Northwell Health Code of Ethical Conduct.

Exhibit 11:      October 5, 2021 letter to Dr. D'Cunha advising that in the absence of vaccination, her employment as a resident in the Program will be terminated effective October 7, 2021.

Exhibit 12:      October 7, 2021 letter to Dr. D'Cunha advising that her participation in the Program is terminated and she has a right to request a review.

Exhibit 13:      Acknowledgment of receipt of notice of termination, signed by Dr. D'Cunha and dated October 8, 2021.

---

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

6325727v.9

Exhibit 14:    October 11, 2021 email from Dr. D'Cunha stating the following reasons for her request for a review:

1. There is no rational basis to terminate her for refusing the COVID-19 vaccine while she is pregnant, as a) the safety of the vaccine for pregnant women is not established; b) studies indicate cause for concern; and c) she has natural immunity.

2. Her termination violates the Pregnancy Discrimination Act.

3. Her termination violates the Civil Rights Act of 1964.

4. Termination based solely on vaccination status is inconsistent with due process.

Exhibit 15:    November 4, 2021 letter to Dr. D'Cunha notifying her that the review will take place on November 22, 2021, identifying the review committee members, and providing copies of OAA Policies #7 and 7A.

Exhibit 16:    CDC Guidelines, last updated November 19, 2021, regarding vaccination of pregnant persons against COVID-19. The CDC Guidelines provide in relevant part:

**Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States**

COVID-19 vaccination is recommended for everyone aged 5 years and older in the United States for the prevention of coronavirus disease 2019 (COVID-19)...

COVID-19 vaccination is recommended for people who are pregnant, lactating, trying to get pregnant now, or who might become pregnant in the near future...

There is no evidence that any of the COVID-19 vaccines affect current or future fertility...

A growing body of evidence on the safety and effectiveness of COVID-19 vaccination—in both animal and human studies—indicates that the benefits of vaccination outweigh any known or potential risks of COVID-19 vaccination during pregnancy...

COVID-19 vaccination is recommended for all people who are pregnant. A conversation between the patient and their clinical team may assist with decisions about the use of a COVID-19 vaccine; however, approval by a healthcare professional is not required before vaccination.

---

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

6325727v.9

## DR. D'CUNHA'S EXHIBITS

After the review meeting, Dr. D'Cunha provided the OAA with the following, which we made available to and reviewed by the Committee:

1. September 2, 201 letter from Christopher LaPorta, M.D., advising that Dr. D'Cunha is under his care for her current pregnancy.  The letter states that her current COVID antibodies on August 3, 2021 are greater than 250, and further states "Request delaying vaccine administration to after delivery."

2. A copy of Dr. D'Cunha's COVID-19 Antibody test result dated August 4, 2021.

3. Letter from Dr. D'Cunha to Employee Health Service requesting reconsideration of its denial of her request for a medical exemption.

4. A December 14, 2020 statement by the Academy of Breastfeeding Medicine.

5. Undated vaccine data report that appears to be from "MotherToBaby" regarding observational studies.

6. November 5, 2021 letter from the CDC to Elizabeth Brehm, Esq., regarding a Freedom of Information Act request.

7. A printed copy of Dr. D'Cunha's opening statement.

## STANDARD OF REVIEW

Pursuant to OAA Policy #7A, Adverse Action Review and Appeal Rules and Regulations, Section II A(4) (Binder, Tab 9), to reverse the Adverse Action, the Trainee shall have the burden to persuade the Committee that the Trainee failed to receive notice of his/her deficiencies in the ACGME Core Competencies and a reasonable opportunity to remedy same; or that the Adverse Action lacks any factual basis or is not in compliance with ACGME, AOA, CODA, CPME or Northwell policies, including those contained in the house staff manual.

---

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

6325727v.9

## SUMMARY OF EVIDENCE PRESENTED

### The Program's Evidence

The Program first witness was Dr. Sottile.  He testified to the following in his opening statement:  Dr. D'Cunha started her PGY-1 year in June, 2020.  During the summer of 2021, the State issued a vaccine mandate for all health care workers, requiring vaccination by September 27, 2021.  Northwell adopted a similar policy.

Dr. D'Cunha chose not to be vaccinated.  Dr. Sottile discussed it with her several times but she did not change her decision, and accordingly was terminated on October 7, 2021. (T. 12-14).

Next, Dr. D'Cunha provided an opening statement, which consisted of the reasons for her appeal, as set forth in Program Exhibit 14, which is her October 11, 2021 email described above. Dr. D'Cunha then read a statement that analogized the vaccine mandate to forced medical treatment and medical research without informed consent eugenics, Nazism, and coercion. (T. 16-25).

Dr. Sottile then testified, and reviewed the Program's time-line and exhibits as described above. (T. 26-32).

Dr. Lowe then testified to the following: He is the Medical Director of Northwell Health, Employee Health Service, and has served in that capacity for 10 years. (T. 33).  His office reviewed all requests for medical exemptions.

A Clinical Advisory Group ("CAG") was established, a high level senior clinical leadership group to address COVID-19 issues.  The CAG asked Dr. Lowe to form a committee

---

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

6

to review all medical exemption requests:  He did so and the committee was approved by the CAG. (T. 35).

Northwell was in process of preparing its own vaccine mandate but the state pre-empted that. (T. 36).

Northwell's Employee Health Services policy regarding vaccines is that vaccination or proof of natural immunity is okay for measles, mumps and rubella, but not for COVID, for which actual vaccine is required. (T. 39-40).

Dr. Lowe's committee reviewed Dr. D'Cunha's medical exemption request, and noted that it was not supported by a physician note stating that the COVID-19 vaccine would be harmful to her.

CDC Guidelines recommend COVID-19 vaccine for all people.  Dr. Lowe's committee decided to follow the CDC Guidelines, (T. 44).  It also looked at guidelines from the American College Obstetricians and Gynecologists ("ACOG").

"The committee decided that pregnancy, without some other medical thing that would make us question it, in and of itself was not a contraindication, and…was supported by CDC, ACOG [and] our clinical leadership." (T. 52).  Accordingly, all requests for deferred vaccine based on pregnancy or prior immunity were declined. (T. 54).

Regarding articles provided by Dr. D'Cunha, Dr. Lowe testified that if you go to the internet to look for a reason to not get vaccinated, you could find it.  There is a lot of

---

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

misinformation out there.  Dr. Lowe's committee felt that its decisions should be based on established guidelines by well recognized and respected professional entities. (T. 59).

The Committee then heard testimony from Vicki Kahaner, the Vice President of Employee Relations at Northwell Health. (T. 62).   Northwell's Advice & Counsel Center handled all religious accommodation requests.

Ms. Kahaner then reviewed eight emails sent to all Northwell Health employees from August 2 – October 4, informing and advising them regarding the vaccine mandate. (Program Exhibit 5).

All requests for religious accommodation were considered.  If the request was from an employee who was patient facing, it was denied as an undue hardship to Northwell.

Dr. D'Cunha, when asked by the Committee, testified that she would not get vaccinated even if not pregnant, due to her religious beliefs. (T. 86-88).

## COMMITTEE FINDINGS

The committee was unanimous in their decision that Dr. D'Cunha did not meet her burden to have the adverse action reversed.   This was based on the committee's determination that she received proper notification and due process throughout the timeline that led to her ultimate termination.

The reasons for the committee's decision are outlined below:

1.  Dr. D'Cunha asserts that her termination based solely on the vaccine mandate violates various laws and her due process rights.  The Committee is advised by counsel that

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

6325727v.9

multiple legal challenges to the mandate have been rejected by the courts, including the U.S. Supreme Court, which on December 13, 2021 denied an emergency request to block the mandate.  It is not the role of this Committee to review and decide the legality of a State healthcare regulation.  Because the regulation does not permit religious exemptions (as distinct from accommodations, discussed below), the denial of Dr. D'Cunha's request for a religious exemption was appropriate.

2. Northwell's policy that mandates the necessity of a COVID vaccine to maintain employment was provided to and discussed with D'Cunha on multiple occasions.  She declined all opportunities to receive the vaccine and comply.

3. The process Dr. Lowe described that led Northwell to decline Dr. D'Cunha's request for a medical exemption was deemed appropriate and was not applied to Dr. D'Cunha in a capricious manner.   The Committee does not feel it is in their purview to challenge the medical expertise of the Northwell's Clinical Advisory Group regarding the safety and benefits of the COVID vaccine in pregnancy.   The Committee feels that the CAG decision to follow guidance from the CDC and ACOG was reasonable and appropriate. Despite that view, the Committee did take the time to review the exhibits provided by Dr. D'Cunha and did not feel they were persuasive in view of CDC and ACOG guidance. There is wealth of information which describes breakthrough COVID disease in previously infected individuals and therefore the potential to spread the disease to others, including patients.  The Committee also notes that Dr. D'Cunha's medical exemption request was not supported by a note from a licensed physician certifying in that the

---

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

6325727v.9

COVID-19 vaccine would be detrimental to her health; thus the request did not meet the medical exemption requirement of §2.61.

4.  The process Ms. Vicki Kahaner described that led Northwell to decline Dr. D'Cunha's request for a religious accommodation was deemed appropriate and was not applied to Dr. D'Cunha in a capricious manner. The Committee is advised by counsel that employers may grant a religious accommodation (not an exemption) so long as the employee does not interact with patients, and may be denied if it would be an undue hardship. The Committee accepts Ms. Kahaner's testimony that it would be an undue hardship to grant a religious accommodation to Dr. D'Cunha.

5.  The Committee would like to note that its decision to affirm the decision to terminate Dr. D'Cunha was not based on performance issues, but rather her decision to not follow a Northwell policy and New York State regulation which requires vaccination for continued employment.

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO
NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

6325727v.9

## CONCLUSION

For the above reasons, the Committee votes unanimously to uphold the Dr. D'Cunha's termination from the Program.

Dated: December 23, 2021

By:   Stephen Barone, M.D.
      Committee Chair

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

12

6325727v.9

**JA-154**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
For General Information: (800) 669-4000
District Office: (212) 336-3620
General FAX: (212) 336-3625

**Candice D'Cunha**
**236 Graves St.**
**Staten Island, NY 10314**

*Re:     EEOC Charge No.520-2022-00721*
*Candice D'Cunha v. Staten Island University Hospital/Northwell Health*

**Dear Dr. D'Cunha:**

**This office is in receipt of your request for a *Notice of Right to Sue* on the above-referenced charge.**

**Ordinarily, a charging party or his/her counsel is not entitled to receive a *Notice of Right to Sue* upon request until the charge has been pending with the EEOC for at least 180 days. However,  an early *Notice of Right to Sue* is authorized by 29 C.F.R. § 1601.28(a)(2) if the Director determines that the Commission will not be able to complete its administrative process within 180 days of the date the charge was filed.**

**We have reviewed all of the circumstances of this case and have determined that issuing you the requested *Notice of Right to Sue* is warranted at this time.  Specifically, given our office's current workload, we have concluded that the EEOC will be unable to complete the processing of this charge within 180 days of the date the charge was filed.**

**Enclosed is your *Notice of Right to Sue*.  If you have any questions, please contact Investigator Glendora Young at (929) 506-5290.**

**On Behalf of the Commission**

_____                          _____For
**Date**                                                          **Judy Keenan**
                                                                        **Director**

**Enc.**

EEOC Form 161-B (11/2020)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE (*ISSUED ON REQUEST*)

| To: | **Candice D'cunha**<br>**236 Graves St**<br>**Staten Island, NY 10314** | From: | **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |
|---|---|---|---|

| | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2022-00721** | **Glendora M. Young,**<br>**Investigator** | **(929) 506-5290** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court** <u>**WITHIN 90 DAYS**</u> **of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

- [ ] More than 180 days have passed since the filing of this charge.

- [X] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

- [X] The EEOC is terminating its processing of this charge.

- [ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

- [ ] The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court** <u>**WITHIN 90 DAYS**</u> of your receipt of this Notice.  Otherwise, your right to sue based on the above-numbered charge will be lost.

- [ ] The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):**  You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred** <u>**more than 2 years (3 years)**</u> **before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

For

Enclosures(s)

**Judy A. Keenan,**
**District Director**

*(Date Issued)*

cc:  **Lorin Weiner**
**Director of Human Resources**
**STATEN ISLAND UNIVERSITY HOSPITAL/ NORTHWELL**
**HEALTH**
**475 Seaview Ave**
**Staten Island, NY 10305**

JA-156

Enclosure with EEOC
Form 161-B (11/2020)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *issued* to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit *before 7/1/10 – not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

Enclosures(s)

cc:

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):**   The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability.  *However, these terms are redefined, and it is easier to be covered under the new law.*

**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➤ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.
➤ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)),  **"major life activities"**  now include the operation of major bodily functions, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.**
➤ **Only one** major life activity need be substantially limited.
➤ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
➤ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
➤ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage:**
➤ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).
➤ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
➤ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.
➤ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note:  Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment.  Beyond the initial pleading stage, some courts will require specific evidence to establish disability.*  For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**JA-159**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- X

CANDICE D'CUNHA,

                Plaintiff,

    -against-

NORTHWELL HEALTH SYSTEMS,

              Defendant.

--------------------------------------------------------- X

Case No. 1:22-CV-00988 (MKV)

**DECLARATION OF DANIEL GOMEZ-SANCHEZ IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT**

Daniel Gomez-Sanchez, declares pursuant to 28 U.S.C. § 1746 that the following statements are true and correct under the penalty of perjury:

1.      I am a Shareholder with the law firm of Littler Mendelson, P.C., counsel for Defendant Northwell Health, Inc. ("Defendant") (incorrectly sued herein as Northwell Health Systems) in this action.

2.      I submit this Declaration in support of Defendant's Motion to Dismiss the Amended Complaint.

3.      Collectively annexed hereto as Exhibit 1 are true and correct copies of Plaintiff Candice D'Cunha's two Charges of Discrimination, both bearing Charge Number 520-2022-00721.

**JA-160**

Case 1:22-cv-00988-MKV   Document 22   Filed 06/07/22   Page 2 of 2

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Melville, New York
June 7, 2022

_____
Daniel Gomez-Sanchez

4861-4478-6977.3 / 085686-1018

JA-161

Case 1:22-cv-00000-MKV   Document 22-1   Filed 06/07/22   Page 2 of 3



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## CHARGE OF DISCRIMINATION

EEOC Form 5A (October 2017)

For Official Use Only – Charge Number:
**520-2022-00721**

| **Personal Information** | First Name: **Candice**   MI: _____   Last Name: **D'Cunha**<br>Address: **236 Graves St**   Apt.: _____<br>City: **Staten Island**   County: **Richmond**   State: **NY**   Zip Code: **10314**<br>Phone: **646-299-9382** Home ☐   Work ☐   Cell ☒   Email: **candiceres90@gmail.com** |
|---|---|
| **Who do you think discriminated against you?** | Employer ☒   Union ☐   Employment Agency ☐   Other Organization ☐<br>Organization Name: **Staten Island University Hospital Northwell**<br>Address: **475 Seaview Ave**   Suite: _____<br>City: **Staten Island**   State: **NY**   Zip Code: **10305**   Phone: **718-226-8114** |
| **Why you think you were discriminated against?** | Race ☐   Color ☐   Religion ☐   Sex ☒   National Origin ☐   Age ☐<br>Disability ☐   Genetic Information ☐   Retaliation ☐   Other ☐ *(specify)* |
| **What happened to you that you think was discriminatory?** | Date of <u>most recent job action</u> you think was discriminatory: _**Termination**_____<br>Also describe briefly <u>each job action</u> you think was discriminatory and when it happened (estimate).<br><br>On 9/9/2021, I submitted a medical exemption request to Northwell, regarding the covid vaccination mandate. At time of submittal, I was 3 months pregnant. Per bloodwork from 8/2021, I have covid antibodies in the highest range due to positive test for covid in 2/2021. I must get tested every week for covid since the vaccines have become available and have been wearing a mask at work. My medical exemption request included a letter from my obstetrician to delay administration of the vaccine due to pregnancy and unknown outcomes of the vaccine on pregnant women and unborn babies. On 9/20/2021, I was denied the medical exemption request. On 9/23/2021, I filed an appeal, which |
| **Signature and Verification** | I understand this charge will be filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address, phone, or email. I will cooperate fully with them in the processing of my charge in accordance with their procedures.<br><br>I understand by signing below that I am filing a charge of employment discrimination with the EEOC. I understand that the EEOC is required by law to give a copy of the charge, which includes my allegations and my name, to the organization named above. I also understand that the EEOC can only investigate charges of job discrimination based on race, color, religion, sex, national origin, age, disability, genetic information, or based on retaliation for filing a charge of job discrimination, participating in an investigation of a job discrimination complaint, or opposing job discrimination.<br><br>**I declare under penalty of perjury that the above is true and correct.**<br><br>Signature: _____   Date: _**10/26/2021**_ |

Equal Employment Opportunity Commission
New York District Office
Received   10 26 202

**JA-162**

Case 1:22-cv-00989-NRV Document 22-1 Filed 08/07/22 Page 3 of 3



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## CHARGE OF DISCRIMINATION

EEOC Form 5A (October 2017)

For Official Use Only – Charge Number:
**520-2022-00721**

| Personal Information | First Name: __Candice__  MI: _____  Last Name: __D'Cunha__<br>Address: __236 Graves St__  Apt.: _____<br>City: __Staten Island__  County: __Richmond__  State: __NY__ Zip Code: __10314__<br>Phone: __646-299-9382__ Home ☐  Work ☐  Cell ☒  Email: __candicere90@gmail.com__ |
|---|---|
| Who do you think discriminated against you? | Employer ☒  Union ☐  Employment Agency ☐  Other Organization ☐<br>Organization Name: __Staten Island University Hospital Northwell__<br>Address: __475 Seaview Ave__  Suite: _____<br>City: __Staten Island__  State: __NY__  Zip Code: __10305__  Phone: __718-226-8114__ |
| Why you think you were discriminated against? | Race ☐  Color ☐  Religion ☒  Sex ☐  National Origin ☐  Age ☐<br><br>Disability ☐  Genetic Information ☐  Retaliation ☐  Other ☐ *(specify)* |
| What happened to you that you think was discriminatory? | Date of <u>most recent job action</u> you think was discriminatory: _____<br>Also describe briefly <u>each job action</u> you think was discriminatory and when it happened (estimate).<br><br>On 9/3/2021, I submitted religious exemption (RE) request to Northwell SIUH North Site, regarding covid vaccine mandate, due to aborted fetal cells used in test/production of available vaccines. I was told that HR was not accepting RE at the time, but a copy of my request was made, the original returned to me, and was told I would receive a letter regarding RE decision. On 9/30/2021, I received a call from Kate Rafla asking if I had submitted a RE. I was then asked to re-submit RE as it was misplaced by HR office. On 10/1/2021 9:55AM, I was denied RE over email. Later that day, I was presented with a termination letter backdated to 9/28/2021, stating 9/28 as my last day. My director witnessed the backdated letter and initialed it, testifying to the fact this was incorrect. I was never notified of termination prior to 10/1. The backdating of termination has major implications on the duration of my insurance and pay and disregards my sincerely held religious reasons for requesting RE. The termination was executed without regard to my religious beliefs, which were clearly stated when I submitted my need for a religious exemption. However, others who do not share my religious beliefs were not terminated. |
| Signature and Verification | I understand this charge will be filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address, phone, or email. I will cooperate fully with them in the processing of my charge in accordance with their procedures.<br><br>I understand by signing below that I am filing a charge of employment discrimination with the EEOC. I understand that the EEOC is required by law to give a copy of the charge, which includes my allegations and my name, to the organization named above.  I also understand that the EEOC can only investigate charges of job discrimination based on race, color, religion, sex, national origin, age, disability, genetic information, or based on retaliation for filing a charge of job discrimination, participating in an investigation of a job discrimination complaint, or opposing job discrimination.<br><br>**I declare under penalty of perjury that the above is true and correct.**<br><br>Signature: _____  Date: __10/26/2021__ |

Equal Emp oyment Oppo un ty Commiss on
New  o k Dist ict O ice
Rece ved   0 26 202

JA-163

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  2/28/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CANDICE D`CUNHA,

                                    Plaintiff,

                    -against-

NORTHWELL HEALTH SYSTEMS,

                                    Defendant.

1:22-cv-0988 (MKV)

**MEMORANDUM OPINION
AND ORDER GRANTING
MOTION TO DISMISS**

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff Candice D`Cunha, a former medical resident at Staten Island University Hospital

("SIUH"), asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et*

*seq.* ("Title VII") and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*

("ADA").  Defendant Northwell Health Systems ("Northwell") moves to dismiss under Federal

Rule of Civil Procedure 12(b)(6).  For the reasons below, the motion to dismiss is GRANTED.

**BACKGROUND**[1]

D`Cunha began her medical residency at SIUH in June 2020.  Amended Complaint ¶ 17

[ECF No. 10] ("Am. Compl.").  In August 2021, SIUH's parent company, Northwell, announced

a mandate requiring that, subject to religious or medical exemptions, all employees receive a

COVID-19 vaccine by September 27, 2021.  Am. Compl. ¶¶ 12, 22.

D`Cunha submitted a religious exemption request on September 3, 2021.  Am. Compl.

¶ 26; *see also* Am. Compl. Exhibit A ("Exhibit A").  Specifically, D`Cunha contended that the

"vaccines . . . available for the treatment of COVID-19 involve[d] the use of cell lines derived

from aborted fetuses" and that vaccination conflicted with her religious beliefs as "a lifelong

---

[1] The facts are taken from the Complaint, and for purposes of this motion, are accepted as true.  *See Ashcroft
v. Iqbal*, 556 U.S. 662, 678 (2009).

practicing Roman Catholic." Exhibit A. D'Cunha also submitted a medical exemption request. Am. Compl. ¶ 28; *see also* Am. Compl. Exhibit B ("Exhibit B"). That form requested an exemption due to D'Cunha's pregnancy. Exhibit B. D'Cunha also attached a note from her obstetrician, which included the notation: "[r]equest delaying vaccine administration to after delivery." Exhibit B.

Northwell denied D'Cunha's request for a medical exemption and her subsequent appeal of that decision. Am. Compl. ¶¶ 29–31; *see also* Am. Compl. Exhibits C, D. D'Cunha then re-submitted her religious exemption request, which Defendant denied as well, citing undue hardship. Am. Compl. ¶¶ 33–34; *see also* Am. Compl. Exhibit F ("Exhibit F").

On October 1, 2021, and again on October 8, 2021, Northwell provided D'Cunha a termination letter. Am. Compl. ¶¶ 35, 37. D'Cunha requested an appeal and participated in an internal hearing to review her termination. Am. Compl. ¶ 38. Following that hearing, Northwell denied the appeal and finalized D'Cunha's termination. Am. Compl. ¶ 39.

D'Cunha filed two charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Am. Compl. ¶ 42; *see also* Declaration of Daniel Gomez Exhibit 1 [ECF No. 22-1] ("Charges").[2] The first charge—which checks the box only for sex discrimination—alleges that D'Cunha was wrongfully terminated due to her pregnancy, despite the fact that she provided a letter from her obstetrician recommending she "delay administration of the vaccine." Charges 1. The first charge also mentions that D'Cunha has "[COVID-19] antibodies in the highest range due to positive test for [COVID-19] in 2/2021." Charges 1. The second charge—

---

[2] D'Cunha did not attach a copy of her charges to the Amended Complaint. However, Defendant provided a copy to the Court. On a motion to dismiss, "the Court may consider documents that are referenced in the complaint, documents that the plaintiff[] relied on in bringing suit and that are either in the plaintiff['s] possession or that the plaintiff[] knew of when bringing suit, or matters of which judicial notice may be taken." *Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90 v. Intercept Pharms., Inc.*, No. 21-CV-0036 (LJL), 2022 WL 837114, at *6 (S.D.N.Y. Mar. 21, 2022) (citation omitted). The Court considers the charges because they are referenced in the complaint, D'Cunha relied upon them in filing this suit, and they are in her possession.

which selects only the box for religious discrimination—explains that D'Cunha "submitted [a] religious exemption" request "due to aborted fetal cells used in test/production of available vaccines." Charges 2. The EEOC issued a right to sue letter. Am. Compl. ¶ 43; Am. Compl. Exhibit L.

D'Cunha timely filed this action within 90 days of receiving her right to sue letter. *See* Complaint [ECF No. 1]. She filed an Amended Complaint as of right several weeks later. *See* Am. Compl. The Amended Complaint asserts three causes of action: (1) sex discrimination under Title VII, (2) religious discrimination under Title VII, and (3) disability discrimination under the ADA. Am. Compl. ¶¶ 50–60. D'Cunha asks the Court to "[h]old unlawful . . . Northwell's vaccine mandate," issue a permanent injunction enjoining Northwell "from failing to accommodate . . . D'Cunha and . . . reinstate her to full employment status," and award compensatory and punitive damages, in addition to litigation costs. Am. Compl. Prayer for Relief.

Defendant moves to dismiss under Rule 12(b)(6). *See* Motion to Dismiss [ECF No. 21]; Memorandum of Law [ECF No. 23] ("Def. Mem."). Plaintiff opposed the motion. *See* Response in Opposition to Motion to Dismiss [ECF No. 24] ("Pl. Opp.").[3] Defendant replied. *See* Reply Memorandum of Law [ECF No. 26]. Since briefing concluded, the parties have filed numerous notices of supplemental authority. *See* Notices [ECF Nos. 27, 28, 29, 30, 31].

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the Complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court

---

[3] Without any explanation or seeking leave from the Court, Plaintiff filed two Opposition Briefs. The first was filed on June 28, the date Plaintiff's response was due. *See* Pl. Opp.; Order [ECF No. 20]. The second, which appears to be substantially similar, was filed the following day, after Plaintiff's deadline to respond had passed. *See* Response in Opposition to Motion [ECF No. 25]. Because it was filed out of time and without leave, the Court disregards Plaintiff's second Opposition Brief.

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  While the Court "must accept as true all of the allegations contained in a complaint," this "tenet . . . is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  In considering this motion, the Court "must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999).

## ANALYSIS

D'Cunha contends in this action that Northwell discriminated against her on the basis of her sex and religion in violation of Title VII.  She also asserts disability discrimination in violation of the ADA.

**I.      Plaintiff Fails to Plausibly Allege a Title VII Claim**

Title VII prohibits an employer from discriminating "against any individual . . . because of such individual's . . . religion [or] sex."  42 U.S.C. § 2000e-2(a)(1).  To survive a motion to dismiss, D'Cunha must plausibly allege "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citation omitted); *see also Small v. New York City Dep't of Educ.*, No. 1:21-CV-1527-GHW, 2023 WL 112546, at *5 (S.D.N.Y. Jan. 5, 2023).

1.      *Religious Discrimination*

The Complaint does not plausibly state a claim for religious discrimination.

As an initial matter, D'Cunha fails to allege facts "giv[ing] rise to an inference of discrimination." *Vega*, 801 F.3d at 83.  The Complaint does not contend that D'Cunha's "performance [was criticized] in [religiously] degrading terms" or that "invidious comments" were

4

made "about others in [her] protected group." *Littlejohn v. City of New York*, 795 F.3d 297, 312

(2d Cir. 2015).  Nor does she allege "more favorable treatment of employees not in [her] protected

group."[4]  *Id.*  Indeed, D'Cunha alleges she was terminated "*because* Northwell insisted that [she]

take a vaccine"—*not* because of her religion.  Am. Compl. ¶ 3 (emphasis added).

D'Cunha responds that her termination was discriminatory because Northwell "fail[ed] to

accommodate [her] religious beliefs."  Pl. Opp. 6.  But an employer does not discriminate on the

basis of religion if he demonstrates "he is unable to reasonably accommodate . . . an employee's

. . . religious observance or practice without undue hardship on . . . the employer's business."  42

U.S.C. § 2000e(j).  "An accommodation is said to cause an undue hardship whenever it results in

'more than a de minimis cost' to the employer." *Baker v. The Home Depot*, 445 F.3d 541, 548 (2d

Cir. 2006) (citation omitted).

Here, the only accommodation D'Cunha requested was a vaccine exemption.  Am. Compl.

¶ 56.  That request, however, is foreclosed by *We the Patriots USA, Inc. v. Hochul*, in which the

Second Circuit held that "Title VII *does not require* covered entities to provide the accommodation

that Plaintiffs prefer—in this case, a blanket religious exemption allowing them to continue

working at their current positions unvaccinated."  17 F.4th 266, 292 (2d Cir. 2021), *opinion

clarified*, 17 F.4th 368 (2d Cir. 2021) (emphasis added).  Moreover, the Complaint and attached

exhibits evidence that accommodating D'Cunha's request would have posed "an undue hardship"

for Northwell.  Am. Compl. ¶ 34; Exhibit F.  Specifically, Northwell informed D'Cunha that her

reporting unvaccinated to a "worksite [providing] direct patient care" posed "an unacceptable

health and safety threat to patients, co-workers, and visitors."  Exhibit F.  That is "more than a de

---

[4] Although D'Cunha contends that, "[u]pon information and belief," Northwell "granted exemptions to several of its employees in order to accommodate their religious beliefs," Am. Compl. ¶ 44, she fails to plead the religious affiliation of these other individuals—*i.e.*, whether they were in (or outside of) her protected group, their job responsibilities, or their reasons for seeking and obtaining an exemption.

minimis cost." *Baker*, 445 F.3d at 548; *see also Does 1-2 v. Hochul*, Case No. 21-CV-5067, 2022 WL 4637843 (E.D.N.Y. Sept. 30, 2022) (dismissing Title VII claim where "[d]efendants persuasively argue[d] that . . . exempting the plaintiffs from the vaccine requirement would expose vulnerable patients and nursing home residents, as well as other healthcare workers, to the COVID-19 virus, which is obviously a significant hardship").

In her Opposition, D'Cunha quibbles with Northwell's assertion of undue hardship, proffering scientific articles that, she contends, suggest "there can be no undue hardship." Pl. Opp. 8–10. However, "evidence outside of a complaint cannot save a futile amended pleading." *Klinkowitz v. Jamaica Hosp. Med. Ctr.*, No. 20-CV-4440-EK-SJB, 2022 WL 818943, at *9 (E.D.N.Y. Mar. 17, 2022). Although D'Cunha asserts she "was well-qualified for her position," Pl. Opp. 6, D'Cunha's "own standards, or subjective view of [her] performance, is not relevant to the analysis," *Martin v. City Univ. of New York*, No. 17 CIV. 6791 (KPF), 2018 WL 6510805, at *8 (S.D.N.Y. Dec. 11, 2018) (citing *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 29 (2d Cir. 1997)). Indeed, "[e]mployers have broad discretion to determine the necessary job qualifications," *Sulehria v. City of New York*, 670 F. Supp. 2d 288, 309 (S.D.N.Y. 2009). Accordingly, "courts look to the criteria the *employer* has specified for the position." *Id.* (emphasis added). Here, Northwell determined that vaccination was a condition of employment for its patient facing healthcare workers, including D'Cunha. Am. Compl. Exhibit F.

Importantly, the Second Circuit has instructed that vaccination is a proper "condition of employment in the healthcare field." *We The Patriots*, 17 F.4th at 294; *see also Kane v. de Blasio*, No. 21 CIV. 7863 (NRB), 2022 WL 3701183, at *14 (S.D.N.Y. Aug. 26, 2022) (collecting cases). The Complaint alleges that Northwell implemented such a mandate—employees were *required* to receive "a COVID-19 vaccine or receive a religious or medical exemption by September 27, 2021." Am. Compl. ¶ 22. As of September 27, D'Cunha had not received a vaccine or an

6

exemption.  *See* Am. Compl. ¶¶ 3, 31, 34.  Accordingly, the Complaint fails to allege she was "qualified for her position."  *Vega*, 801 F.3d at 83; *see* Def. Mem. 5–6.  The religious discrimination claim is dismissed.

    2.   <u>Sex Discrimination</u>

    D'Cunha alleges Northwell discriminated against her on the basis of her sex, which includes "the basis of pregnancy."  § 2000e(k).  This claim also fails as a matter of law.

    D'Cunha does not plausibly allege that she was terminated "*because of*" her sex.  § 2000e-2(a)(1) (emphasis added).  The Complaint asserts, with no facts to support the charge, that "[u]pon information and belief, Northwell granted exemptions to several of its employees to accommodate their pregnancies."  Am. Compl. ¶ 45.  But a "plaintiff may plead facts upon information and belief only in limited circumstances."  *May Flower Int'l, Inc. v. Tristar Food Wholesale Co. Inc.*, No. 21CV02891RPKPK, 2022 WL 4539577, at *4–5 (E.D.N.Y. Sept. 28, 2022) (citation omitted).  Specifically, the alleged facts must be "peculiarly within the possession and control of the defendant" or the belief must be based on "factual information that makes the inference of culpability plausible."  *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018) (citation omitted).  And even then, "statements made upon information and belief must be supported by some factual allegations making them plausible."  *May Flower*, 2022 WL 4539577, at *4; *see also Schneiderman*, 882 F.3d at 384 ("A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory.").

    D'Cunha does not even attempt to argue that either of these conditions are satisfied.  Nor is her bare allegation that Northwell accommodated some pregnancies adequate to state a claim because she provides no "factual basis to support it."  *Salu v. Miranda*, 830 F. App'x 341, 345–46 (2d Cir. 2020); *see also May Flower*, 2022 WL 4539577, at *4–*5.  Moreover, even if the Court *were* to accept Plaintiff's contention as true, the fact that some women were granted

accommodations for their pregnancies *undermines*—not supports—an inference of sex-based discrimination.  *See Iqbal*, 556 U.S. at 678.

Fundamentally, D'Cunha was not vaccinated, which Northwell properly instructed was a condition of her job.  This is a requirement that the Second Circuit has found appropriate for healthcare workers.  *See We The Patriots*, 17 F.4th at 294 ("Vaccination is a condition of employment in the healthcare field.").  As with the religious discrimination claim, D'Cunha does not allege she was qualified for her position.  *See Vega*, 801 F.3d at 83.  The sex discrimination claim is therefore dismissed.

## II.     Plaintiff Fails to Plausibly Allege an ADA Claim

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To survive a motion to dismiss, D'Cunha must allege that (1) her "employer is subject to the ADA;" (2) she "is disabled within the meaning of the ADA or perceived to be so by [her] employer;" (3) she "was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation;" and (4) she "suffered an adverse employment action because of [her] disability."  *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008).

D'Cunha asserts that Northwell "discriminated against her on the basis of [her] perceived disability—that, despite providing a laboratory-confirmed antibody count, she was impaired in her immunity to the disease, and is a carrier or potential carrier of an infectious disease."  Am. Compl. ¶ 60.  This contention fails for several reasons.

First, D'Cunha failed to exhaust her administrative remedies with respect to this claim.  A plaintiff must file with the EEOC and receive a right to sue letter before filing an ADA claim in federal court.  *See* 42 U.S.C. § 2000e-5(e); 42 U.S.C. § 12117(a); *see also Williams v. New York*

*City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir.2006).  The charges filed by D'Cunha with the EEOC

only checked the boxes for discrimination based on religion and sex.  *See* Charges.  There was *no*

disability-based claim.  Although that fact is not dispositive because "it is the substance of the

charge and not its label that controls," *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 CIV. 6950

LBS JCF, 2012 WL 76915, at *3 (S.D.N.Y. Jan. 10, 2012) (citation omitted), nowhere does

D'Cunha allege a disability.  The Court is unconvinced that stating "I have [COVID-19] antibodies

in the highest range" gave the EEOC adequate notice of a purported disability discrimination

claim.  *See also Pinkard v. New York City Dep't of Educ.*, No. 11 CIV. 5540 FM, 2012 WL

1592520, at *8 (S.D.N.Y. May 2, 2012) ("Courts have consistently held that discrimination claims

based on age, sex, or disability are not reasonably related to claims based on race or color, and *vice

versa*.").

Moreover, D'Cunha alleges no facts supporting her conclusory assertion that Northwell

perceived her to be "a carrier . . . of an infectious disease."  Am. Compl. ¶ 60.  As for her assertions

that she was perceived as being "impaired in her immunity" and a "potential carrier of an infectious

disease," Am. Compl. ¶ 60, these claims fail because the ADA only protects individuals "regarded

as *having* . . . an impairment."  42 U.S.C. § 12102(1)(C).  That is to say, D'Cunha must allege

facts suggesting that she was regarded as *presently* having a disability.  Even if she *was* perceived

of being at risk of developing COVID-19 *in the future*, that would not plausibly state an ADA

claim.[5]

---

[5] Although the Second Circuit has not yet spoken on this question, every circuit court that has addressed the issue has concluded that the ADA does not prohibit discrimination based on *future* impairments.  *See, e.g., Darby v. Childvine, Inc.*, 964 F.3d 440, 446 (6th Cir. 2020) ("[A] genetic mutation that merely *predisposes* an individual to other conditions . . . is not itself a disability under the ADA." (emphasis added)); *Shell v. Burlington N. Santa Fe Ry. Co.*, 941 F.3d 331, 336 (7th Cir. 2019) ("[T]he [ADA's] text plainly encompasses only current impairments, not future ones."); *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1113 (8th Cir. 2016) ("[T]he ADA does not prohibit an employer from acting on some other basis, *i.e.*, on its assessment that although no physical impairment currently exists, there is an unacceptable risk of a future physical impairment."); *Equal Emp. Opportunity Comm'n v. BNSF Ry. Co.*, 902 F.3d 916, 923 (9th Cir. 2018) (The ADA "prohibits discrimination on the basis of an 'actual or perceived impairment' in

9

Finally, even assuming administrative remedies with regard to this claim *were* exhausted, the claim would nonetheless fail because, again, D'Cunha cannot allege she was qualified for her position. *See Brady*, 531 F.3d at 134; § 12112(a) (prohibiting discrimination "against a *qualified* individual on the basis of disability" (emphasis added)); *We The Patriots*, 17 F.4th at 294 ("Vaccination is a condition of employment in the healthcare field."). The ADA discrimination claim is therefore dismissed.

## III.   Futility of Further Amendment

D'Cunha has already amended her complaint once and, in opposing Defendant's motion, did not seek leave to amend again. Indeed, after Defendant filed a letter motion requesting leave to file the pending motion to dismiss, *see* Letter Motion [ECF No. 15], the Court issued an Order directing Plaintiff to "inform the Court via letter whether she intends to amend her complaint" and warning it would be her "last opportunity" to do so, *see* Scheduling Order [ECF No. 17]. D'Cunha declined the Court's invitation to amend to address Northwell's arguments in favor of dismissal. *See* Letter [ECF No. 18]. Accordingly, the dismissal is with prejudice. *See Felder v. United States Tennis Ass'n*, 27 F.4th 834, 848 (2d Cir. 2022) ("[W]e certainly see no error or abuse of discretion in the District Court's dismissal of Felder's complaint with prejudice, as Felder did not request leave to re-amend."); *Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison L.L.P.*, 351 F. App'x 472, 474 (2d Cir. 2009) ("Given that Trautenberg did not move for leave to replead in opposition to [the] motion to dismiss his original complaint with prejudice, the district court did not abuse its discretion by failing to grant him, sua sponte, leave to replead.").

---

the present tense." (citation omitted)); *Equal Emp. Opportunity Comm'n v. STME, LLC*, 938 F.3d 1305, 1315 (11th Cir. 2019) ("[W]e must conclude that the disability definition in the ADA does not cover this case where an employer perceives a person to be presently healthy with only a potential to become ill and disabled in the future.").

**CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss is GRANTED.  The Clerk of the

Court is respectfully requested to terminate docket entry 21 and to close this case.

**SO ORDERED.**

*Mary Kay Vyskocil*

Date:  **February 28, 2023**                **MARY KAY VYSKOCIL**
         **New York, NY**                         **United States District Judge**

JA-174

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
CANDICE D`CUNHA,

                          Plaintiff,

          -against-                                                    22 **CIVIL** 988 (MKV)

                                                                      **JUDGMENT**

NORTHWELL HEALTH SYSTEMS,

                          Defendant.
------------------------------------------------------------X

          It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Memorandum Opinion and Order dated February 28, 2023, Defendant's

motion to dismiss is GRANTED; accordingly, the case is closed.

**Dated:**  New York, New York

          March 1, 2023

                                                            **RUBY J. KRAJICK**

                                                    _____

                                                            **Clerk of Court**

                                          **BY:**      _K. Mango_

                                                    _____

                                                            **Deputy Clerk**



**United States District Court**
**Southern District of New York**

Ruby J. Krajick
*Clerk of Court*

Dear Litigant:

Enclosed is a copy of the judgment entered in your case. If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $505 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted*. If you are unable to pay the $505 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at **http://www.ca2.uscourts.gov/**.

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601-4150

Rev. 5/23/14

JA-176

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

_____
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (     )(     )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties: _____

_____
(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the      ☐ judgment      ☐ order      entered on: _____
                                                        (date that judgment or order was entered on docket)

that: _____

_____
(If the appeal is from an order, provide a brief description above of the decision in the order.)


_____          _____
Dated                                  Signature*

_____
Name (Last, First, MI)

_____
Address                    City            State              Zip Code

_____          _____
Telephone Number                       E-mail Address (if available)

_____

* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case.  Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.

Rev. 12/23/13

JA-177

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____          _____CV_____  (      )(      )
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-                                          **MOTION FOR EXTENSION
                                                   OF TIME TO FILE NOTICE
                                                   OF APPEAL**

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)


I move under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time

to file a notice of appeal in this action. I would like to appeal the judgment

entered in this action on _____ but did not file a notice of appeal within the required
                              date

time period because:

_____

_____

_____
(Explain here the excusable neglect or good cause that led to your failure to file a timely notice of appeal.)


_____          _____
Dated:                             Signature

_____
Name (Last, First, MI)

_____          _____
Address                  City      State           Zip Code

_____          _____
Telephone Number                   E-mail Address (if available)


Rev. 3/27/15

**JA-178**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

_____                    _____CV_____ (      )(      )
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-                                                     **MOTION FOR LEAVE TO
                                                             PROCEED IN FORMA
                                                             PAUPERIS ON APPEAL**
_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

I move under Federal Rule of Appellate Procedure 24(a)(1) for leave to proceed *in forma*

*pauperis* on appeal. This motion is supported by the attached affidavit.


_____        _____
Dated                                    Signature

_____
Name (Last, First, MI)

_____
Address                     City              State                 Zip Code

_____        _____
Telephone Number                         E-mail Address (if available)

Rev. 12/23/13

JA-179

## Application to Appeal In Forma Pauperis

_____ **v.** _____     Appeal No. _____

District Court or Agency No. _____

| Affidavit in Support of Motion | Instructions |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.) | Complete all questions in this application and then sign it.  Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number. |
| Signed: _____ | Date: _____ |

My issues on appeal are: (<u>required</u>):

1.  _For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise._

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | <u>Spouse</u> | You | <u>Spouse</u> |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property (such as rental income) | $ | $ | $ | $ |

- 1 -

JA-180

| | | | | |
|---|---|---|---|---|
| Interest and dividends | $ | $ | $ | $ |
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| Child support | $ | $ | $ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |
| **Total monthly income:** | $ 0 | $ 0 | $ 0 | $ 0 |

2.    *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

3.    *List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

**JA-181**

4.      *How much cash do you and your spouse have? $_____*

*Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

*If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts. If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.*

5.      *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| | | Make and year: |
| | | Model: |
| | | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| Make and year: | | |
| Model: | | |
| Registration #: | | |

- 3 -

JA-182

6.      *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |

7.      *State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
| | | |
| | | |
| | | |

8.      *Estimate the average monthly expenses of you and your family.  Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

| | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home) <br> Are real estate taxes included?        [  ] Yes [  ] No <br> Is property insurance included?        [  ] Yes [  ] No | $ | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ | $ |

- 4 -

JA-183

| | | |
|---|---|---|
| Transportation (not including motor vehicle payments) | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
|     Homeowner's or renter's: | $ | $ |
|     Life: | $ | $ |
|     Health: | $ | $ |
|     Motor vehicle: | $ | $ |
|     Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $ | $ |
| Installment payments | | |
|     Motor Vehicle: | $ | $ |
|     Credit card (name): | $ | $ |
|     Department store (name): | $ | $ |
|     Other: | $ | $ |
| Alimony, maintenance, and support paid to others | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ | $ |
| Other (specify): | $ | $ |
| **Total monthly expenses:** | $ 0 | $ 0 |

9.  *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

[  ] Yes        [  ] No        If yes, describe on an attached sheet.

10.  *Have you spent — or will you be spending —any money for expenses or attorney fees in connection with this lawsuit?* [  ] Yes [  ] No

*If yes, how much?* $ _____

JA-184

11. *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

12. *Identify the city and state of your legal residence.*

City _____   State _____

Your daytime phone number: _____

Your age: _____   Your years of schooling: _____

Last four digits of your social-security number: _____

**JA-185**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CANDICE D`CUNHA | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )   Civil Action No. 1:22-cv-988 |
| | ) |
| NORTHWELL HEALTH SYSTEMS | ) |
| | ) |
| **Defendant** | ) |

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Plaintiff hereby appeals to the United States Court of

Appeals for the Second Circuit from this Court's February 28, 2023 Memorandum Opinion and

Order (ECF No. 32) granting Defendant's Motions to Dismiss.

Dated March 30, 2023                                Respectfully Submitted,


E. Scott Lloyd
Lloyd Law Group, PLLC
15 Chester Street
Front Royal, VA 22630
(540)631-4081
scott@lloydlg.com
Counsel for the Plaintiff
*Admitted *pro hac vice*

1

Dated: March 30, 2022

Respectfully Submitted,

_____
Counsel
E. Scott Lloyd
Lloyd Law Group, PLLC
Virginia Bar # 76989
15 Chester Street
Front Royal, VA 22630
(540) 631-4081
scott@lloydlg.com
Counsel for the Plaintiff
*Admitted *pro hac vice*

Case 23-476, Document 34, 06/07/2023, 3526224, Page190 of 190

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I caused a copy of the foregoing to be served upon Defendant on March 30, 2023 via CM/ECF filing.

E.  SCOTT LLOYD